IN THE UNITED STATE DISTRICT COURT FOR THE
DISTRICT OF KANSAS

| | | |
|---|---|---|
| ANTONIA DOUGLASS, | ) | |
| Garden City, Kansas, | ) | |
| | ) | Case No. 2:20-cv-2076 |
| and | ) | |
| | ) | |
| ELIZABETH EVERETT, | ) | |
| Garden City, Kansas, | ) | |
| Plaintiffs | ) | |
| v. | ) | |
| | ) | |
| GARDEN CITY COMMUNITY | ) | |
| COLLEGE, | ) | |
| 801 Campus Drive | ) | **COMPLAINT FOR DECLARATORY** |
| Garden City, Kansas 67846 | ) | **RELIEF AND DAMAGES** |
| | ) | **UNDER TITLE IX,** |
| and | ) | **42 U.S.C. §§ 1983 AND 1985** |
| | ) | **DEMAND FOR JURY TRIAL** |
| HERBERT J. SWENDER, | ) | |
| former president of Garden City | ) | |
| Community College, | ) | |
| in his individual and former official | ) | |
| capacities, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| RODNEY DOZIER, | ) | |
| in his individual capacity and official | ) | |
| capacity as Chief of Police of | ) | |
| Garden City Community College | ) | |
| 801 Campus Drive | ) | |
| Garden City, Kansas 67846 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MERILYN DOUGLASS, | ) | |
| BLAKE WASINGER, | ) | |
| JEFF CRIST, | ) | |
| STEVE MARTINEZ, and | ) | |
| TERI WORF, Trustees of Garden City | ) | |
| Community College, in their | ) | |
| official capacities. | ) | |
| | ) | |
| and | ) | |

```
                                        )
BRICE KNAPP                             )
in his individual and former official   )
capacities as employee and cheer coach  )
of Garden City Community College        )
                                        )
and                                     )
                                        )
FREDDIE STRAWDER                        )
Garden City, Kansas                     )
in his individual and former official   )
capacities as both an employee of       )
Garden City Community College           )
and as an employee/police officer       )
with Garden City Police Department,     )
as a municipal entity under the auspices of )
the City of Garden City, Kansas,        )
                                        )
and                                     )
                                        )
GARDEN CITY, KANSAS, through its        )
POLICE DEPARTMENT                       )
                                        )
                        Defendants.     )
```

## COMPLAINT

Plaintiffs Antonia "Toni" Douglass ("Douglass") and Elizabeth Everett ("Everett"), by their counsel, and for their causes of action against Defendants state and allege:

### Preliminary Statement

1.      This is a Title IX retaliation, Title IX discrimination and civil rights action seeking declaratory relief and damages against employees and officials of Garden City Community College and Garden City Police Department for depriving Plaintiffs Douglass and Everett of established constitutional and statutory rights.

2.      Plaintiff Everett seeks full redress as provided by law against identified Defendants, state actors, under 28 USC §§ 2201 and 2202 for declaratory and other relief; under Title IX for damages and other relief for the retaliation and hostile environment based on her sex

violations; damages and other proper relief under 42 USC §§ 1983 and 1985 for the civil rights violations and civil rights conspiracy violations depriving Plaintiff of rights, privileges and immunities secured to her by the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution; and for deprivation of rights secured under the laws and Constitution of Kansas associated with her gender, her status as a student of Garden City Community College, her free speech, petition and associational rights, and her participation in the college's public offerings, benefits, and programs.

3.     Plaintiff Douglass seeks full redress as provided by law against identified Defendants, state actors, under 28 USC §§ 2201 and 2202 for declaratory and other relief; under Title IX for damages and other relief for the retaliation based on her protected activities in support of Everett and others similarly situated violations; damages and other proper relief under 42 USC §§ 1983 and 1985 for the civil rights violations and civil rights conspiracy violations depriving Plaintiff of rights, privileges and immunities secured to her by the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution; and for deprivation of rights secured under the laws and Constitution of Kansas associated with her gender, retaliation against her because she engaged in protected activities under Title IX; banning her from participation as a volunteer, supporter, and attendee at events of Garden City Community College, depriving her of her free speech, petition and associational rights, and otherwise wrongfully interfering in her participation in the college's public offerings, benefits, and programs.

**Jurisdiction and Venue**

4.     This Court has jurisdiction over this action by virtue of its authority to hear federal questions pursuant to 28 U.S.C. §§ 1331 and 1343 as to Plaintiffs' claims under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution and

under Title IX, and other claims that are so related as to form part of the same case or controversy pursuant to 28 U. S. C. § 1367(a).

5.       The Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C.§ 2201 and 2202.

6.       Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because all of the events giving rise to claims occurred in the District of Kansas.

**Parties**

7.       Plaintiffs Elizabeth Everett and Antonia Douglass are both citizens of the United States and residents of Garden City, Finney County, Kansas.  At all relevant times hereto Plaintiff Everett was a student at Defendant Garden City Community College.  At relevant times hereto Plaintiff Douglass was an active participant in a wide spectrum of programs and events offered to the public as a patron of GCCC, a season ticket holder for many athletic programs, a volunteer for GCCC Endowment, a booster for the athletic fundraising organization, the Broncbusters Athletic Association, a host mom for student athletes and a well-known supporter of the college and its offerings.

8.       Defendant Garden City Community College ("GCCC") is a public community college located in Garden City, Finney County, Kansas, established and existing under the laws of Kansas.  It is overseen by a publicly elected board of six trustees who are statutorily charged with the responsibility to operate the college.  To the extent it is relevant to a particular claim, Plaintiffs assert on information and belief that the institutional Defendants are subject to liability under the Section 1983 civil rights claims by virtue of the *Monell* Doctrine and under Title IX for discrimination and retaliation under that statute.

9.      The trustees are subject to the Kansas Open Meetings Act and board of trustees'

meetings as conducted during all relevant time periods are a public forum.  Plaintiffs seek a

declaration that their meetings and other campus sanctioned events at issue herein be declared as

such for purposes of First and Fourteenth Amendment free speech, assembly, petition, and

association rights.

10.      Defendant GCCC is a "person" within the meaning of 42 U.S.C. § 1983 and

pursuant to state law the college is not entitled to sovereign immunity under any claims alleged.

11.      Defendant GCPD is a "person" within the meaning of 42 U.S.C. § 1983 and

pursuant to state law the Garden City Police Department, a component, department or sub-entity

of Garden City, Kansas, a municipality and governmental entity or subdivision under the laws of

the State of Kansas, is not entitled to sovereign immunity under any claims alleged.

12.      Defendant Garden City, Kansas is a "person" within the meaning of 42 U.S.C. §

1983 and pursuant to state law is a municipality and governmental entity or subdivision under

the laws of the State of Kansas is not entitled to sovereign immunity under any claims alleged

herein.

13.      Defendant Freddie Strawder is believed to be a resident of Garden City, Finney

County, Kansas, and at all relevant time periods herein he was a detective with the Garden City

Police Department, Garden City, Kansas acting within the course and scope of his employment

as such.  At all relevant times, Defendant Strawder was acting under color of state law.  On

information and belief, he was also at all times relevant herein an adjunct instructor in the

criminal justice program of Garden City Community College.  He was acting under color of state

law as an adjunct instructor and within the course and scope of his employment as such.  He is

sued in his individual and upon information and belief he is no longer employed by either entity

and therefore is sued in his former official capacities with both entities. On information and belief, as a law enforcement officer under Kansas law Defendant Strawder had certain final decision-making authority. On information and belief, Defendant Strawder was privy to information associated with both Plaintiffs related to the facts and allegations of this complaint through admitted access to or discussions with the office of the president or otherwise through his employment with both GCCC and GCPD.

14.     Defendant Rodney Dozier is the campus chief of police and an employee of GCCC. He is believed to be a resident of Finney County, Garden City, Kansas. At all relevant times, Defendant Dozier was acting under color of state law. On information and belief, as a campus police chief under Kansas law, Defendant Dozier has certain final decision-making authority over GCCC campus-related law enforcement policies within its jurisdiction and certain final decision-making responsibility for ensuring GCCC compliance with all law enforcement legal requirements. On information and belief, he also answers to his direct supervisor, who is the president of the college, which at relevant times herein included co-Defendant Swender. Defendant Dozier is sued in his individual and official capacities.

15.     Defendant Herbert Swender at all relevant times herein was the president of Garden City Community College and an employee of GCCC. Since August 2018, he is no longer employed by the college and his current residence is unknown to Plaintiffs. At all relevant times, Defendant Swender was acting under color of state law. On information and belief, at all times relevant herein as president of the college Defendant Swender, whether by statutory or delegated means, exercised, seized and/or held final decision-making authority over all GCCC policies as well as responsibility for ensuring GCCC complies with all legal requirements.

16.     On information and belief, at all relevant times herein, in addition to their individual liabilities, Defendant Swender and Defendant Dozier held joint and several final decision-making authority for the college over the subject matter of issuing a No Trespass Notice to Plaintiff Douglass such that either one or both, whether found to be acting in concert with one another or separately, were and are assertedly responsible for the acts giving rise to Plaintiff Douglass's allegations of civil rights and Title IX violations at issue, along with their actions on behalf of the college under the holdings and progeny recognized as the *Monell* Doctrine giving rise to the college's liability.  Defendant Swender is sued in his individual and in his former official capacities.

17.     Defendants Blake Wasinger, Merilyn Douglass, Jeff Crist, Steve Martinez and Teri Worf are each believed to be residents of Finney County, Kansas and at all relevant time periods each one was a trustee of Garden City Community College.  At all relevant times, each trustee Defendant was acting under color of state law as an elected official of the college.  On information and belief, pursuant to state law trustees are empowered to set policy of the college as well as to delegate certain authorities to college administrators including Defendants Swender and Dozier.  Each trustee Defendant is sued in his/her official capacity, although subject to discovery each is placed on notice Plaintiff may seek amendment to assert individual liability claims.

18.     Defendant Brice Knapp was an employee of Garden City Community College and the cheer coach at all relevant times herein.  He is a resident of the State of Kansas, although his present address is unknown.  At all times relevant hereto he was a "person" and acting within the scope of his employment and/or agency with GCCC under color of state law.  He is sued in his individual and former official capacities.

**Facts**

**Background Allegations**

19.     Plaintiff Everett possessed a right under Title IX to be able to have access to educational programs and facilities without experiencing gender discrimination, harassment or retaliation.  Plaintiff Everett possesses the right to raise complaints of gender discrimination and to not be retaliated against for having exercised that right, because retaliation for having raised complaints of gender discrimination is itself a form and act of discrimination.

20.     Plaintiff Douglass possessed the right under Title IX to be able to have access to educational programs and facilities without experiencing gender discrimination, harassment or retaliation. Plaintiff Douglass possesses the right to raise complaints of gender discrimination and to not be retaliated against for having exercised that right, because retaliation for having raised complaints of gender discrimination is itself a form and act of discrimination.

21.     Plaintiff Everett possessed the right under Title IX to be free from retaliation.

22.     Plaintiff Douglass possessed the right under Title IX to be free from retaliation.

23.     Plaintiff Douglass possessed the right to Free Speech, Association and Petition under the First and Fourteenth Amendments.

24.     Plaintiff Everett possessed the right to Free Speech, Association and Petition under the First and Fourteenth Amendments.

25.     Plaintiff Everett possessed the right to equal protection under the Fourteenth Amendment.  Plaintiff is entitled to law enforcement protection uncorrupted by personal animus, which is clearly established law.

26.     Plaintiff Douglass possessed the right to equal protection under the Fourteenth Amendment.  Plaintiff is entitled to law enforcement protection uncorrupted by personal animus, which is clearly established law.

27.     Plaintiff Everett possessed rights under the Fourth and Fourteenth Amendments to be free of unreasonable seizure, not be subjected to detention following the wrongful institution of legal process, not be subjected to an illegal process fabricating evidence against her for malicious reasons, not be subjected to an arrest lacking probable cause, as well as the follow up issuance of an arrest warrant based on an affidavit that contained deliberately false statements and omissions, misleading the judge about the basis for the warrant, wrongfully procuring the post-detention arrest warrant.  She possessed the right to be free of unreasonable seizure for an arrest lacking probable cause because a law enforcement officer failed to advise the court of exculpatory evidence in an arrest warrant and/or unlawfully and maliciously orchestrated "evidence" fabrication.  *Wilkins v. DeReyes*, 528 F.3d 790 (10th Cir. 2008).

28.     Plaintiff Douglass possessed rights under the First, Fourth, Fifth, and Fourteenth Amendments for all actions taken against her associated with the April 25, 2018 unlawfully issued No Trespass Notice, including but not limited to the rights to be free of deprivation of access to public services, unlawful restrictions anomalous to an arrest and to an unreasonable seizure or restriction on her liberty interests to a public institution where the procedure itself was unlawful, as employed, (No Trespass Notice) because it lacked probable cause, was not determined by or issued by a detached judicial officer, was motivated by personal animus or malice, had no due process protections, was issued in retaliation for her exercise of First Amendment rights of speech and to deprive her of associational rights to others on campus and for purposes of gender based Title IX retaliation, for denial of equal protection including by

selective enforcement violations against her as a class of one as compared to others who have received similar No Trespass Notices, and under 42 U.S.C. § 1985(3) was based on a conspiratorial agreement reached by more than one person, motivated by a hateful discriminatory attitude toward a specific class of people, women who supported enforcement of Title IX rights, which includes Plaintiff, intending to deprive her of the constitutional rights, above, and the conspiracy caused such deprivation and caused her injury.

29.     Plaintiff Everett possessed rights under the Fifth Amendment to not be subjected to coercion of a "confession" by law enforcement officer[s] acting out of malice or at the behest or direction of a second employer or a private party with a personal animus against her, not the officer's law enforcement agency.

### The February 23, 2018 Unauthorized Hearing

30.     On or about February 23, 2018, Plaintiff Douglass was urgently summoned to Plaintiff Everett's aid by text messages asking Douglass to quickly come to the office of the Garden City Community College's then athletic director, John Green.

31.     Plaintiff Everett, a freshman member of the cheer squad, was in Green's office for a meeting called by the athletic director ("AD") with little prior information given to Everett. She had been kept in the dark about the AD's real intent to conduct an impromptu, witness-confronting, adversarial hearing regarding sexual harassment claims Everett had so far informally raised. Green or his staff had referred to the event as a meeting when Everett was summoned to his office on a Friday, after normal business hours.

32.     Upon information and belief, Green knew or should have known that college policy required any allegations of sexual harassment be referred to the Title IX

coordinator/investigator for handling, not investigated by the athletic department in the first instance.

33. Plaintiff Everett asserts the meeting, or rather pseudo-hearing, was a preemptive measure to tamp down Everett's informal reports of being sexually harassed in the Fall of 2017 through the Spring of 2018 by the cheer coach, Brice Knapp, and being blackmailed in February 2018 by a cheer peer, Henry Arenas.

34. By the time Everett texted Douglass for help, she was cornered, literally and figuratively. This petite, eighteen-year-old, young woman was being harangued, intimidated and bullied in the office of the college's athletic director. She was confronted by the AD, her cheer coach who had harassed her, and the male peer who tried to blackmail her. Perhaps, behind the scenes, Everett was already being undermined by others, who had been involved in setting the stage for this Friday night façade.

35. Plaintiffs assert, upon information and belief, the then college president, Defendant Swender, likely had, for reasons of his own, involved himself in this Title IX controversy, or did so immediately thereafter.

36. This February 23, 2018 impromptu hearing was a pivotal event and an abuse of power in the college's handling of Everett's Title IX issues. Defendants commenced active engagement in behaviors that evidence deliberate indifference for the rights of female students and their supporters at GCCC. This seminal event by Defendants or their agents acting at their behest is part of a series of penalizing acts directed at Plaintiffs because of their sex and/or their support for women, which improper behaviors are at the core of Plaintiffs' claims for Title IX retaliation.

37.     This February 23 "meeting" or "hearing" was out of the ordinary in a variety of ways:

A.      It was scheduled at an unconventional time.  It was scheduled by the athletic director after normal business hours, which seemed peculiar for his or other administrators' typical schedules, and it occurred after any female staff, usually in the outer office, would have left for the weekend.  It occurred after the college's Title IX coordinator would likely have also gone home.

B.      The AD intentionally used the element of surprise against Everett.

C.      Others showed up at the meeting called by the athletic director, when Everett did not expect others to be there.

D.      All the other participants seemed to have an air of self-assuredness as they came into the room, which indicated they likely knew Everett had been left in the dark about their attendance.

E.      The fact that all others involved in the meeting were male, while notable, is a lesser issue compared to this fact: the one male who had the proper oversight authority to address Everett's complaints and take action as the college's neutral arbiter of sexual harassment issues, the Title IX coordinator was not present.  [He was to become involved the next week in investigating and enforcing the limitations the college put in place after he assessed the situation and found Everett's complaints were credible.]  His absence is noteworthy.

F.      No one was directed to take notes of the meeting that Everett recalls, although AD Green may have.

G.    The AD seemed to expect that Everett would and must attend the meeting alone.

H.    Not having been told the real nature of the meeting, it was a surprise to discern from the others' behaviors that the AD had always intended to hold an adverse hearing, but not tell Everett.

I.    Everett was without benefit of any ally, advocate or representative. Fairness called for notice and opportunity to have a supportive person attend with Everett.

J.    The two male subjects of the sexual harassment/retaliation claims asserted by Everett were present and were given the floor, first, to air their concerns about and against Everett.

K.    Athletic director Green turned to them and it appeared to Everett that they were making counter-complaints against her, when the AD had not even heard what her complaints were.  He seemed to know, already.

L.    The cheer coach, Brice Knapp, who Everett had raised sexual harassment issues about, was present, seated nearby to Everett and was allowed to tell his story, trying to convince Everett she was in the wrong, and to convince the AD that nothing he had ever said or done with the cheer squad or toward Everett in particular was offensive, inappropriate or amounted to sexual harassment.  [It is beyond dispute, having been confirmed by college outside counsel, Randy Grisell, coach Knapp was the subject of several, prior sexual harassment complaints involving cheer women before the Everett matter came to light and AD Green, as Knapp's supervisor, had to know of these multiple complaints.]

M.      Also present was the cheer peer, Henry Arenas.  Everett had complained that in early February Arenas tried to blackmail her—have sex or oral sex with him or he would release publicly a compromising, faultfinding photo of her he'd taken at a party. [Arenas eventually admitted to the Title IX investigator and others on the cheer team that he had engaged in the blackmail threat as Everett had asserted in early February.]

N.      This peer was directed to sit in the seat next to her, intentionally positioning him in an intimidating location.

O.      This peer was given the floor to air his story, attempting to alter or recast incriminating facts about the blackmail, and Everett's objections were stifled by the athletic director.

P.      Everett was never given a meaningful opportunity to speak that night.

Q.      Others in attendance, which included the assistant athletic director, appeared to have an attitude of hubris and carried themselves as if they had been privy to the inside scoop of how this meeting was going to go.

R.      The agenda seemed pre-planned.  Both Knapp and Arenas were prepared to state their cases, grieving against Everett in an attempt to undermine her, seeking to get her to withdraw her statements about them, trying to assert or elicit information that might be useful to damage Everett, and establishing a gender-hostile atmosphere by a show of unified male domination led by the AD's forceful presence, such that should the details of the meeting ever become well-known on campus, the impression left would be one that no other female athlete would ever want to suffer the same fate.

38.     The reasonable and logical conclusion drawn from these facts is the AD's meeting was a pretext for summoning Everett to attend, by herself, an unsanctioned Title IX hearing and catch her off guard.

39.     The meeting was also likely to be intended by Defendants as a deterrent or warning to women in athletics or women in general on campus do not question male authority or raise claims of sexual harassment because they will not be well-received.

40.     The hearing violated Everett's rights as an improper exercise of state authority by AD Green, because the athletic director has no authority to adjudicate Title IX issues—that would be the Title IX investigator's realm.

41.      AD Green's arbitrary seizure of adjudicative authority on February 23, 2018 created a predicament for the college to defend its actions as meeting proper Title IX oversight standards.  The college faced an inherent conflict between honoring student rights and maintaining order over employees who exceeded their authority—Green's improper conduct deserved to be punished, but to recognize his blunder could expose the multiple prior complaints against Knapp that the college mishandled, which created the opportunity for coach Knapp, who remained in its employ, to then harass Plaintiff Everett.

42.     When Plaintiff Douglass arrived on campus at Everett's request and went to the athletic director's office, she was met by the assistant athletic director.  They knew one another and briefly spoke.  Then he proceeded to stall for time.  Douglass told him she was there because Everett sent her an urgent text message and asked for her to come to the meeting.  The assistant AD refused to budge from in front of the AD's door.

43.     This behavior led to the obvious conclusion of Douglass that there was something to hide and staff was actively participating in conduct to secrete and cover up how Everett was being treated in that "meeting."

44.     Based on Everett's concerning request, the young woman wanted help as quickly as possible, and Douglass felt she had to insist she be allowed in to see Everett. Douglass finally told the assistant AD to step aside or she would call law enforcement based on Everett's plea, because something was wrong.

45.     And it was. Everett was curled up in a chair in the corner, cowering with fear, surrounded by the men of the athletic department, as recounted above. Everett's body language was unmistakable—sitting with her legs and arms wrapped up altogether in a chair in a self-defensive position, this petite woman looked cornered and wide-eyed with fright.

46.     Everett was relieved to see Plaintiff Douglass and her husband. The three left shortly thereafter.

47.     Some explanations were exchanged that evening but nothing was sorted out because Plaintiff Douglass was not sure then exactly what had been going on; however, in the days, weeks and months to come, Plaintiffs Douglass and Everett, and others who supported women's rights at the college or joined the growing cacophony of critics of Defendant Swender and his allies, were forced to suffer bouts of serious and damaging retaliation at the hands of Defendants, which are linked to Everett's Title IX complaints and Douglass' public support for Title IX victims.

48.     Following the February 23, 2018 events, Plaintiffs' common concerns regarding bullying, intimidation, and mishandling of female athletes' complaints based on sex became

intertwined and led to retaliation and civil rights violations toward these Plaintiffs, one a student, and the other, a woman supporter of GCCC female athletes.

**A Culture of Sexual Harassment in Cheer Program Ignored by Leadership**

49.     After the unusual February 23, 2018 hearing ended, Everett was concerned that AD Green had more reasons than before to sweep her complaints and the cheer program's sexual harassment issues under the rug.

50.     Everett had not shared these events before with her mother, which is why she contacted Plaintiff Douglass, known among student athletes as a trustworthy and caring adult who had been a host mom for years to many students.  Plaintiff Douglass pointed Everett to her mother for a frank discussion and family support.

51.     The administration (Defendants) chose to keep covering up for their own ills of ignoring sexual harassment in the cheer program by blaming the victim (Plaintiff Everett) and anyone who supported her (Plaintiff Douglass).  But the trustees of the college, by Kansas law, are charged with overseeing the administration of GCCC and Plaintiffs hoped and believed that once the trustees knew about the administration's maladministration, they would take action to rectify the problems.  Plaintiffs were mistaken in that belief because come to find out at least one trustee had a specific, liability-related reason to hide the problems to protect himself.  Further discovery is necessary to confirm this assertion but on information and belief the claims are more than plausible, as explained below.

52.     Plaintiffs are aware of at least one trustee (Defendant Wasinger) who knew Everett well and for reasons of his own making chose to join in the improper behaviors and engage in the cover up, as well, backing the administration Defendants to mask his liability-triggering involvement.

53.     When Everett told her mother, Eleanor Everett, what was going on and what happened with AD Green and coach Knapp, Eleanor recalled an odd comment made by Dr. Blake Wasinger, a/k/a/ Defendant Trustee Wasinger, in the summer of 2017.  During her daughter's physical exam for cheer he said to Eleanor something to the effect of be careful about the cheer coach and your daughter's participation in cheer.

54.     Eleanor had taken that comment to heart, because before Elizabeth got too involved in cheer in the summer of 2017, Eleanor took the time to speak to coach Knapp about not exposing her daughter to unsavory experiences/behaviors through the cheer program, especially because of her age.  Knapp assured her he would watch out for her daughter.  Plaintiff Everett was 17 at the time and an early high school graduate.

55.     Sadly, Trustee Wasinger knew too much but did too little where Elizabeth Everett is concerned and he should be held personally accountable, if discovery bears out his individual responsibility.

56.     He obviously knew about coach Knapp's prior sexual harassment issues or he would not have made the oblique, but neither particularly clear, nor completely honest comment. It appears he must have intended to put Eleanor Everett on aware of something untoward about the coach's proclivities.

57.     In hindsight, this comment was more akin to a foretelling or prophecy undergirded with the accurate, factual context, because it came from a reliable source, a college trustee and Elizabeth Everett's doctor, who apparently knew enough about Knapp's sexual harassment claims history to advise Eleanor.

58.     Plaintiffs believed that after the AD Green incident on February 23, 2018, Dr. Wasinger would surely want to know about what happened to Elizabeth, because he was so

prescient the previous summer.  He would want to receive confirmation that what he foretold was a reality and happening on the campus, in order to do the right thing and fix the root causes of the problem, once he knew about it from Eleanor.  He would stand up, courageously, and protect his patient, Elizabeth, because he's a member of the healing arts for goodness sake and has taken an oath to do no harm.  And he would not be alone in this quest for Title IX justice.

59.     Plaintiffs believed that there was no doubt he would be immediately joined in this effort by the two nurturing women on the board of trustees, also members of the health care profession, two nurses, one of whom uses the moniker of a "doctor" in her professional and trusteeship capacities, who also care about doing no harm.  They were all well-respected medical professionals for goodness sake.  They care about the college and students and the Garden City educational community and its reputation in Southwest Kansas for goodness sake.  They would listen and take action.

60.     Plaintiffs believed that Dr. Wasinger would also tell all the other trustees about his having cautioned Eleanor Everett about coach Knapp, so they would all know that they, as the six elected fiduciaries overseeing the president, who oversaw all the other college employees, had to respond quickly and appropriately--because Dr. Wasinger knew coach Knapp's history was likely to repeat itself and sexual harassment claims by women in cheer were potential problems waiting to happen, and it did happen, to Elizabeth Everett, and so the trustees all needed to work together to find the root cause of this Title IX problem, to use their state granted authority to investigate why this continued to happen, unabated, and make permanent, systemic changes at the college, so other women students would not suffer from further harm or else they risked college institutional liability because one of the trustees knew there was a problem and if

he did nothing to convince the other trustees to do something then the potential risks were and are enormous.

61.     It stands to reason from the Everetts' perspective that Dr. Wasinger would use his powers of persuasion to be sure the trustees would allocate funds necessary, at the time, to get professional advice and nip this in the bud.

62.     And it stands to reason the three trustees mentioned above would be joined immediately by the law enforcement officer on the board of trustees, Board Chair and Sheriff's Deputy Steve Martinez, who has taken an oath to uphold the law for goodness sake.  And Title IX is a law.  And he would want to fix the underlying problems, too.

63.     And they would be joined immediately as well by the minister and hospital chaplain, Trustee and Minister Jeff Crist, who has accepted a calling by God to tend to the needs of all in harm's way for goodness sake.  Elizabeth Everett was put in harm's way.

64.     And last and certainly not least, retired banking executive and all around good guy, Trustee Leonard Hitz, NOT a defendant herein, was already asking questions about how to fix things because he lives across the street from the Everetts and he was on board with getting to the root problem from the moment he heard about what was going on.

65.     So logically at the time the Everetts were wondering what to do, who to turn to, and relying on the trustees, they reached a logical conclusion—there's no need to worry, the doctor, two nurses, a sheriff's deputy, a minister and the neighbor who's a retired banking executive—these 6 trustees would work together once Dr. Wasinger shared their plight with them because they were from caring, impeccable and responsible backgrounds who as fiduciaries would no doubt do the right thing for goodness sake.

66. No doubt Dr. Wasinger and the two nurse trustees would lead the board of trustees to take action and the whole board of trustees would tap into the multimillion dollar budget and retain whatever unconflicted and disinterested Kansas counsel that they needed to retain, separate from the administration, in order to advise them how best to address the multiple Title IX claims wrought by the cheer coach and/or by the president's faulty supervision, given that Defendant Swender was their "only employee", who supervises all other employees on campus.

67. Plaintiffs believed that Dr. Wasinger would listen and help because he offered his counsel before on the subject. Or so Eleanor Everett thought.

68. Placing trust in Dr. Wasinger's concern for Elizabeth's welfare, given that she was a patient, had babysat for his children, and they were family friends, or so she thought, Eleanor reached out to him, told him what happened, and asked him for advice about what to do next for Elizabeth. Or what could he do for women students at GCCC to prevent this from happening again. He was a powerful trustee and a caring man. Or so Eleanor Everett thought.

69. The response was initial concern, then deafening silence, and thereafter cutting all doctor/patient and social media ties.

70. Dr. Wasinger sought to distance himself, rather than effect change, as if the taint of his prior knowledge could be erased from the Everetts' memory banks. It can't be erased.

71. Furthermore, his lack of real concern is an omission by a trustee. When called upon to assist in correcting a Title IX problem, the lack of response by an elected trustee is an overt act. Denial of responsibility is ineffective to cure or respond to a particular harm the state actor contributed to causing, when an official has prior knowledge of the danger and gives an ineffective warning.

72. Plaintiffs assert the college acted with deliberate indifference based on Dr. Wasinger's prior knowledge and warning, inadequate that it was, to the claimant.

73. Plaintiffs assert his non-responsiveness evidences more than deliberate indifference of an elected official charged with college oversight. Evidence will show, for example by review of his voting record and other statements/actions relevant to the Plaintiffs' claims, that in the nearly two years since the problems of Title IX harassment and retaliation were raised with him, Dr. Wasinger has taken more overt actions to ignore, downplay, intimidate, retaliate and otherwise deter Plaintiffs and others from positively dealing with Title IX problems or he has denied there is or was ever a problem.

74. Dr. Wasinger and four other trustees' approval (excepting trustee Hitz) in January 2019 of the report of Greg Goheen, the supposedly independent investigator hired to report on a May 8, 2018 Faculty Senate Report to the Board, evidences the college's ongoing institutional deliberate indifference toward Plaintiffs, increasing the harm already done, and against Title IX permanent policy reformation, as explained herein.

75. This same board vote also separately exemplifies another instance of ongoing Title IX based retaliatory action against Plaintiffs in January 2019 by the publication and release of Goheen's findings the Board knew or should have known were:

    A.    misstatements of facts, as reported (per se)

    B.    misstatements of facts by omission (per quod) of material necessary to make the Report accurate and not misleading or defamatory

    C.    fraudulent findings/conclusions that became adopted Board actions/policies caused by intentional omission of Dr. Wasinger's prior knowledge of Knapp's sexual harassment claims history coupled with Dr. Wasinger's state created

danger, failure to adequately warn, breach of fiduciary duties, failure to supervise, suppression of material evidence trustees needed to know to properly act on Title IX concerns or adoption of known, inadequate remedies to Title IX gender based policies associated with Plaintiff Everett through Dr. Wasinger's indifference or improper behaviors.

76.     Upon information and belief, the trustees' acceptance and adoption of that part of the Goheen Report referring to Elizabeth Everett's claims as their own, presumably accurate factual findings of the board sans any reference to Dr. Wasinger's prior knowledge of Knapp's proclivities and his warning to Eleanor Everett evidences the inherent problem of a deliberate indifference caused by a board-wide mistake compounded by a single board member's misleading statement or actionable omission

77.     Additionally, objective evidence of trustee's deliberate indifference to Title IX claims is not limited solely to the circumstance of Dr. Wasinger's interactions with the Everetts. The Defendant trustees in the Spring of 2018 made at least one board-wide objective, censorious gaffe with this event captured on video and posted online.

**Video April 10, 2018 Meeting-Trustees' Indifference to Student and Title IX Supporters**

78.     On April 10, 2018, based on a majority board decision, at least five members of the board, all named Defendants, decided the board's policy would be to refuse the request of a female cheer student to reopen the public comments portion of their meeting to hear from her.

79.     Upon information and belief, the student had been in her night class when the board's public comment sign-up sheet was made available, so she was not able to follow the board's protocol.  She approached the board and proceeded to ask for an exception to their

routine protocol because she had information germane to the topic of Title IX complaints of sexual harassment by coach Knapp.

80.     The video is worth a thousand words, which is offered for the purpose of objective assessment of the board's tolerance or intolerance, deliberate indifference, their attitude toward controversy raised by female students with Title IX complaints at an official meeting, as well as their overall attitude toward female students who respectfully asked for their time and attention on an important trustee oversight issue.

81.     Some trustees and/or administration nay sayers have questioned whether Plaintiffs faked letters or claims presented to the board that night or expressed doubt that real students were harmed or felt violated by coach Knapp, which made this student's personal statement all the more significant in this context.  See, https://www.youtube.com/watch?v=u_3ZORme3Ys (last accessed 2-18-2020) at 10:55 into the video.

82.     Plaintiff Douglass, Plaintiff Everett's mother, Eleanor Everett, and community member, Aaron Kucharik speak at the beginning of the video.  This video of public comments captures the trustees' reactions in the moment and evinces the tone and receptiveness of trustees for the Title IX supporters' advocacy.

83.     Trustees and president Swender are presumed to know the College's history of having been cited in 2007 by federal authorities for Title IX inadequacies involving a female athlete under similar circumstances, which occurred under a prior president's tenure.  Two of the five named Trustees, Douglass and Worf, were college trustees at the time of the Agreement; however, the Agreement's existence was not well known in 2018, including among some faculty and staff employed in or around 2007.

84.     Plaintiff Douglass reported to trustees that among other things the facts were Plaintiff Everett was being discriminated against because of her sex and added that Everett was not the only woman athlete in the cheer program to have attended Garden City Community College and to have been subjected to unwelcome, improper sex discrimination.  She presented letters from seven women or their parents addressing sex discrimination involving the cheer coach.  She asked the trustees to rectify the sex discrimination problems at GCCC.

85.     Following these statements by Douglass and Eleanor Everett, both Plaintiffs were retaliated against for the outspoken, lawful conduct in daring to speak truth to power.  Aaron Kucharik was also retaliated against.

### Coach Knapp Leaves with Questions in his Wake

86.     Between February 23 and April 10, 2018, there were a series of interactions, meetings, and other communications involving Plaintiffs Douglass and Everett, AD Green, coach Knapp, Defendant Swender and other administrators regarding the mishandling of complaints involving coach Knapp, which bear mention for purposes of context, are material and relevant, but whose details are omitted for brevity of a Complaint.

87.     Plaintiffs aver that as a result of the Everett Title IX complaint, coach Knapp and the college eventually severed the employment relationship, although upon information and belief questions linger regarding whether Knapp was surreptitiously kept in the fold and on the payroll but hidden from public view.  Upon information and belief, Knapp retained state authority and influence over college sanctioned actions after his purported final day of employment on March 29, 2018 by virtue of an extended payout or other agreement.

88.     Upon information and belief, Knapp was seen on campus in the summer of 2018 in the vicinity of the athletic department when the college advised Plaintiffs and the public

Knapp was history not to be dwelled upon, he was to have no contact with cheer members or to be involved in college activities.

89. Upon information and belief, Knapp was known to have actual video editing skills on the athletic department's equipment, which equipment has been suspected to be a means or mechanism upon which someone may have created an anonymous video alleging trustee Hitz sexually harassed female students on stage at the May 2018 graduation when he congratulated and hugged some students he knew well.

90. Plaintiffs aver that retaliation against any supporters of Plaintiffs' claims could be probative of the theory that a § 1985 conspiracy was engaged in by certain Defendants, rippling outward into the community as a warning to the public to deter criticisms of Defendants.

91. By the April 10, 2018, board of trustees' meeting, public knowledge of the sexual harassment problems in the cheer program was widespread throughout the Garden City community.

92. The deliberate indifference of top administrators became apparent in the meetings referenced above and in factual situations addressed herein in other contexts. See, No Trespass Retaliation of Plaintiff Douglass, below, as one example.

**NJCAA Sanction Ancillary Retaliation**

93. Even before the Everett hearing in February, Plaintiff Douglass had been concerned about how female students in other athletic programs were being mistreated as pawns for the AD's exploitation and/or manipulated financially through scholarship irregularities, specifically a woman volleyball player from Hawaii, who Douglass had gotten to know as her host mom.

94.     That student athlete's claims involve Plaintiff Douglass but not Plaintiff Everett per se.

95.     Upon information and belief, either one or both Defendant Swender and AD Green, in the summer of 2017, exhibited enough concern or personal animus toward Plaintiff Douglass that the student was commanded by college administrators NOT to ever mention to Plaintiff Douglass the nature, location and circumstances of the student's residence arrangements at AD Green's home in the June/July 2017 timeframe or else her standing as an athletic scholarship holder would essentially evaporate and she would become persona non grata at GCCC.

96.     The student athlete understood the command to be a threat and a form of intimidation clearly intended to drive an associational wedge between Plaintiff Douglass and the student, contrary to both of their First Amendment rights based on questionable motives to cover up NJCAA sanctionable conduct both Defendant Swender and AD Green knew about, sanctioned or jointly or severally conjured up as a way to have their cake and eat it too at the expense of this student's and Plaintiff Douglass's association and personal relationship.

97.     This situation is probative in this case for Plaintiff Douglass's claims because it evidences the extreme and outrageous lengths and deeply rooted conspiratorial nature of Defendant Swender's actions or AD Green's actions as those individuals will be shown to have gone to in their joint, actionable civil rights violating endeavors.

**Defendant Swender and his Supporters Develop and Express Animus toward Plaintiffs**

98.     Defendants conceived and carried out extreme strategies because of their expressed and unabashedly held animus they developed for Plaintiff Douglass and Plaintiff Everett.

99.     As questions regarding Title IX violations grew, and the newspaper was publicizing stories about the cheer scandal so did the express animus of certain Defendants.

100.    It was Defendant Swender's standard operating procedure that critics of Defendant Swender were not to be permitted or tolerated on campus, as evidenced by the Faculty Senate Report of May 8, 2018.

101.    Plaintiffs Douglass and Everett were dangerous to Swender's career.

102.    Plaintiff Douglass was asking too many questions and finding too many negative answers.

103.    Plaintiff Everett's claims were both credible and admitted to by the male cheer student.

104.    Because Defendant Swender is the "only employee of the board of trustees" he was falling under scrutiny.

105.    Women in general on GCCC's campus were less well-respected than men and devalued by Swender.

**The April 10, 2018 Trustees' Meeting**

106.    Upon information and belief, Defendants hold Douglass primarily responsible for publicly outing and airing the college's dirty laundry, and they hold personal animus toward her and toward Everett, because these two women came together from different perspectives, but became a force for change, permanent change, that certain Defendants wanted to resist so much that they were willing to conspire together and go to great lengths to destroy both Plaintiffs.

107.    Plaintiff Douglass's background and connections to GCCC were long established and she has been a well-known and student-beloved GCCC community supporter of athletes, which led Everett to her.

108.    By April 2018, Douglass had already come under suspicion of the college administration because she had been asking questions since 2017 about issues she saw affecting other women athletes and had begun attempts to quietly and privately address systemic issues she had become aware of going on at GCCC.

109.    Douglass, in an incremental fashion in 2018 was hoping to ameliorate issues, not trigger punitive measures, by going to the elected trustees overseeing the college and asking for opportunities to address with certain trustees her concerns, because she expected the best, not the worst, in others.

110.    Plaintiff Douglass's quiet efforts on behalf of female athletes were responded to by being merely strung along by trustee Merilyn Douglass, then clearly rebuffed with stony silence.  Trustee Douglass would only meet if president Swender was present even after knowing the point of the discussion was to focus on concerns or complaints about Swender, whose reputation for retribution was also well-known to Plaintiff and therefore the risk of harm to the victims was untenable.

111.    In late 2017 and thereafter Plaintiff attempted on several occasions, both via text and orally, to quietly address the Title IX concerns others had shared with her regarding the administration's past and ongoing treatment of women students.  She encouraged students, parents and others to report their Title IX concerns to the college through appropriate channels including through speaking to administrators and trustees, as well.  She offered to deliver their messages to the trustees to substantiate the depth and breadth of the problems, which she did do on April 10, 2018.

112.    Over the course of time, some individuals reported back to Plaintiff Douglass with each indicating they felt their concerns fell on deaf ears, so much so that Plaintiff has come

to believe, based on these experiences, the trustees and/or its now former president and his administration informally adopted a policy or practice of telling people they would take action but instead of doing so the college intentionally scuttled any complaints.

113. Plaintiff Douglass has been a Garden City Community College constituent and donor/supporter for more than 25 years, who, until April 10, 2018, had never addressed publicly the board of trustees at their monthly meeting. Plaintiff spoke up that evening because her private communications, regarding addressing Title IX problems at the college, had been rebuffed.

114. Plaintiff Douglass brought to the trustees seven letters from former students or their parents expressing their concerns and asked for the trustees' collective action to investigate the college's institutional structure that aided the festering of serious, unaddressed Title IX issues, past and present.

115. What happened next and in the months to follow regarding the college president's eventual ouster and his retaliation against Plaintiff and others rivals the storyline of any best-selling intrigue novel, was declared the number one story of 2018 by the local newspaper, The Garden City Telegram, and gives credence to the saying that fact is stranger than fiction. Sadly, this case is real life, not fiction, and the civil rights of its protagonists have been damaged and tattered by the actions of a tyrannical college president, fueled by maladroit college trustees and aided by callous allies.

116. Plaintiff Douglass and others, including several who spoke that evening, became the subjects of intense, unlawful reprisals because they dared to question the unrelenting harm and retaliation being done for years to women students contrary to Title IX through the misuse of

authority by a state bureaucrat who held sway largely because of his self-promoted connections to the rich and powerful individuals in Kansas and Garden City.

117.    Plaintiff's criticisms, daring to publicly question the president's repressive control of material and relevant information to evade board review and filter from board detection the president's inappropriate actions including open tolerance of underlings' wrongful behaviors affecting women students, triggered a series of actionable events conceived by the president and carried out, wittingly or unwittingly, by Defendants with the knowledge and/or intent to damage the Plaintiff and anyone else who spoke or allied with her standpoint.

**The April 25, 2018 No Trespass Notice Issued to Plaintiff Douglass**

118.    On April 25, 2018, without prior warning or even the courtesy of a phone call, the college had served on Plaintiff an unwarranted and baseless No Trespass Notice.

119.    The No Trespass Notice was done for effect, to intimidate and harass her, to surprise her, and to deter further comments by her and others who had spoken up at the April 10 trustees' meeting in support of female students who were being sexually harassed in violation of Title IX.  She expressed her opinion to Defendant Dozier that Defendant Swender instigated the Notice, because it was just like him to do something like this.  She was referring to Defendant Swender's well-known reputation for vindictiveness coupled with actual knowledge she possessed, from Defendant Swender's lips to her ears, when he bragged about himself and how he enjoyed exercising his authority to hurt people he disliked.

120.    Defendant Swender had several years earlier, out of the blue, gleefully whispered in a conspiratorial way to her and her husband how he had used what he came to know about Leonard Hitz to cause him problems with unemployment.  Plaintiff Douglass had good reason to attribute the source of the No Trespass Notice to Defendant Swender.

121.    The timing was just a week before college graduation, knowing Plaintiff Douglass would be impacted by such an obtuse and not easily challengeable process.  There is no administrative recourse in the college's policies and procedures and that was the point.  Without recourse, the president of the college could see to it that her physical ties to students and the larger college community were severed, at least for the foreseeable future.  Her due process constitutional rights were violated, as well.

122.    In retaliation for Plaintiff's public statement, upon information and belief, Swender, Trustees or individuals acting at their behest because of their state authority, used their positions in government to set in motion a series of events, described in detail below, leading directly to the night of April 25, 2018, when Defendants employed an "as applied" unconstitutional device to retaliate with the full weight of a government edict to attempt to intimidate and squelch Plaintiff's exercise of freedom to movement, association, speech and to petition government issuing a No Trespass Notice to banish her from college property and events.

123.    Defendants' adoption as a College policy the use of a No Trespass Notice against Plaintiff was for the purpose of chilling her constitutional rights to free speech, petition, and association.

124.    And then came the *Lozman* decision and whether or not the college or its counsel knew about it going through the Court's docket, the decision itself and the arguments of counsel before the Court are insightful and instructive for this case.

125.    The behaviors of Defendants at issue in this case are chillingly analogous to the councilmembers' retaliatory conduct of triggering the arrest of Mr. Lozman for speaking up at a council meeting on a subject matter the council considered off-limits, as denounced by the

Supreme Court in the case of *Lozman v. City of Riviera Beach, Florida*, 585 U.S. ____, 138 S.Ct. 1945 (2018), the resemblance of which bears mention herein.  The Supreme Court condemns such retaliatory behavior because of its insidiousness and finds:

> An official retaliatory policy is a particularly troubling and potent form of retaliation, for a policy can be long term and pervasive, unlike an ad hoc, on-the-spot decision by an individual officer.  An official policy also can be difficult to dislodge.  A citizen who suffers retaliation by an individual officer can seek to have the officer disciplined or removed from service, but there may be little practical recourse when the government itself orchestrates the retaliation.  For these reasons, when retaliation against protected speech is elevated to the level of official policy, there is a compelling need for adequate avenues of redress.

126.    Within five weeks of the June 18th decision in *Lozman* and after three months of bitter public rebukes by many members of the community and the college at large in support of Plaintiff and against then-president, Defendant Swender, whose ultimate decision-making authority (including regarding college policy on the No Trespass Notice) was adamantly and obstinately ratified by five of the six elected trustees, suddenly the college lifted the Notice, without explanation or apology, on July 27, 2018.

127.    However that was not the end of the story, but sadly closer to the beginning, and Plaintiff brings this complaint because despite the college having relented, ever so slightly, by lifting the ban, the trustees to this day refuse to address and revise the policies and practices violative of Title IX, among other since-discovered issues, which was the initial reason for Plaintiff's public complaints to the board.  This complaint as well as the likely complaints of others has become the only mechanism available to Plaintiff and affected students/faculty/staff, who have tried to amicably find, without court involvement, the obvious common ground among the parties and sit down together to resolve these lingering issues, but such requests have been barred by obstructionist viewpoints of college officials.

128.    In light of this factual background, the actionable conduct at the heart of this complaint is the exploitation of governmental authority by Defendants offensively weaponizing an ordinance authorizing issuance of No-Trespass Notices by property owners, in this instance for the purpose of chilling Plaintiff's constitutional rights.  The April 25, 2018 Notice Defendants issued against Plaintiff is a form of citizen's arrest because to disobey its terms exposes the recipient to immediate arrest by law enforcement.

129.    Plaintiff Douglass turns to this court for redress.  Similar to Mr. Lozman, Plaintiff's constitutional rights deprivations have been caused by both individual and institutional retaliation.  In this case, concerted acts of Defendants were designed to punish her for speaking and for petitioning for students' Title IX rights, to set her apart from the associations she had known and loved hosting student athletes, and to make her pay, socially, emotionally and financially, for having exercised her First and Fourteenth Amendment Rights, rather than Defendants taking responsibility and fixing the college's ills.  For the sake of brevity this Complaint sets forth some, sufficient, but certainly not all, material facts giving rise to her civil rights claims.

130.    Plaintiff Douglass took an active role in GCCC activities, both on and off campus, including hosting student athletes, attending games, cooking and serving pre-game dinners, attending student banquets, graduation ceremonies, concerts, plays, fundraisers and they enjoyed relationships with administrators, trustees, faculty, students and other community members interested in GCCC's offerings and benefits.

131.    Like others in the community, Plaintiff Douglass stayed abreast of college business through various means including attending functions, receiving college announcements, speaking with administrators, students, faculty, staff, coaches and endowment members.

132.    Student athletes came to know Plaintiff Douglass as "Miss Toni" because as a host mom she helped non-local athletes acclimate to campus life in Garden City by connecting with them, inviting them to her family's home for dinner, listening to their concerns and doing those things a parent figure can do for young men and women away from home for the first time and in an education environment that can sometimes be daunting.

133.    Many college athletes knew they could turn to the Douglasses to share serious issues with knowing that Miss Toni had rules of decorum and otherwise, which she expected you to follow, but that she was also non-judgmental and could be relied upon for sound advice and counsel, if needed.  Miss Toni can be a force to be reckoned with because she is an extrovert, self-assured, outspoken and an organizer.  She gets things done.

134.    In general, Plaintiff and her family were part of what might be described as the GCCC core group of college supporters and they were both ubiquitous attendees at college events, especially athletic events.  They knew and socialized with various community members on the Broncbuster Athletic Association (the "BAA", which is the fundraising organization for college scholarships to support out of state GCCC athletes that Mark Douglass led as its president for nearly a dozen years).

135.    Their relationships included some on the board of trustees and many members of the college's upper administration, including being on a first name basis with then president Defendant Swender.  All in all, with natural exceptions, through the Spring of 2017, Plaintiff Douglass and her husband enjoyed and were welcomed by the college writ large for their loyal support, financially and time commitment-wise, and well-known in the community for their genuine interest in the college's wellbeing.

136.     In March 2017, Mark Douglass resigned as BAA president over differences with the Athletic Director, John Green, including among other, lesser concerns, primarily his handling of the books/investments and using a signature stamp of Mark Douglass' signature, intended for emergency only use, routinely and without Mr. Douglass' knowledge or permission.

137.     Thereafter, the Douglasses had less respect for and connection with the president and his leadership of the college but they continued their connections with student athletes, which was important to them because they enjoyed these relationships and were not going to let differences with John Green or Herb Swender over college administration affect the students.

138.     By late 2017 and early 2018, however, Plaintiff Douglass became aware of student-centered issues involving sexual harassment, past and present, regarding inappropriate behavior of the male cheer coach, Brice Knapp.  As the facts unfolded instances of questionable behavior dating back to 2015 were brought to Plaintiff's attention, including the coach having suggested, encouraged and then taken a picture of 5 women cheer squad members who posed for him with bare bottoms, "mooning", against his hotel window during an out of town cheer competition.

139.     Plaintiff Douglass asserts violations to her rights in the form of retaliation hinged upon deliberate indifference and overt unconstitutional behaviors fully ripened after a series of events beginning in late February 2018 and thereafter.  She met with indifference and obstinance privately, by administrators and certain trustees, in late 2017 and early 2018, but then Douglass felt the leadership left her and Plaintiff Everett with no choice but to go public.  Douglass and Plaintiff Everett's mother, Eleanor, spoke in support of Elizabeth and other young women publicly at a GCCC board of trustees' meeting on April 10, 2018.  That meeting became the catalyst for new acts of unlawful retaliation to follow.

140.     Douglass reported to the entire board of trustees that among other things the facts were Plaintiff Everett was being discriminated against because of her sex and added that Everett was not the only woman athlete to have attended Garden City Community College and to have been subjected to unwelcome, improper sex discrimination in athletics.  She presented letters from seven women or their parents addressing sex discrimination involving the cheer coach.

141.     Following these statements by Douglass and Eleanor Everett, both Plaintiffs were retaliated against for the outspoken, lawful conduct in daring to speak truth to power.  Because she asked the trustees to rectify the sex discrimination problems at GCCC, and also confronted the issues head-on with college administrators she believed and understood to be responsible for the deliberate indifference, thus exercising her constitutional rights to freedom of petition, association and speech on matters of urgent and public concern, Douglass became the subject of an unlawful series of civil rights violations and Title IX retaliation, which tie back to the now former president and/or certain trustees.

142.     At a letter of intent signing in the Hall of Fame Room on campus, Plaintiff Douglass exercised her free speech and association rights, and with barely an utterance from her lips on the subject of Title IX to Leslie Wenzel, a GCCC employee and a social media friend, Plaintiff Douglass was taken aback when Wenzel rudely and abruptly whirled around, turning her back on Plaintiff Douglass.  The exchange lasted mere seconds.  Regardless, Douglass was engaged in Title IX protected activity and then stopped.  Wenzel, on the other hand, wanted to send the message to Douglass that she supported those who supported the philosophy of: Resist All Supporters of Title IX Rights and your resistance will be recognized by the administration and you will be in the administration's good graces.  Anti-Title IX behaviors were to be rewarded and Supportive Title IX behaviors were to be punished.

143.    Ironically, this blatantly Anti-Title IX Rights attitude is and becomes evidence of the college's Title IX animosity and evidence of the college encouraging Title IX retaliation when the college warmly embraced her individually-held-opinion as the college's own opinion, that it's okay to retaliate against Title IX supporter Douglass for her speech related to Title IX.

144.    The Wenzel exchange itself became a retaliation event when campus police chief, Rodney Dozier, framed it as such by using it as a reason and justification to slap a No Trespass Notice on Plaintiff Douglass.  When the college grafted this otherwise personal conversation into an administratively authorized No Trespass Notice to cite to as justification for it and the only topic in the brief exchange is Title IX rights, for them or against them, the college embraced the Anti-Title IX attitude and then deprived Douglass of her constitutional rights on April 25, 2018 when the college issued a No Trespass Notice supposedly based in part on this unremarkable encounter.

145.    The college, as an institution, does not have the right to resist all supporters of Title IX rights which conduct had surfaced a week or so earlier when Douglass spoke at the April 10, 2018 board meeting in support of the cheer women's Title IX cause.

146.    Plaintiffs' assertions and facts stated herein are, inherently, only a highly condensed glimpse of the more fulsome evidence of retaliation and civil rights violations known to Plaintiffs and/or believed to exist in support of their claims.  Even though this Complaint is a summary, Plaintiffs contend the improper behaviors of Defendants are conscience-shocking, sadly true, and evidence-based validation for the theory that the cover-up is always worse than the initial wrong associated with it.  The trustees have gone to great lengths to try to distance themselves from their fiduciary duties but they can't do so successfully because they were on

notice that Defendant Swender was violating Plaintiff's rights and yet they stood with Swender, not with the people subject to Swender's authoritarian rule they were elected to protect.

147. Plaintiffs seek punitive damages to the extent they are awardable as an earsplitting warning to deter others from engaging in similar aberrant behaviors and risk bringing GCCC or any other Kansas educational institution into analogous, unnecessary disrepute by out of control, state-sanctioned folly and irrationality, carried out by unconstrained, powerful and manipulative college leadership.

### Plaintiff Everett's Retaliation by Unlawful Arrest

148. The unlawful conduct rose to a crescendo with the intervention of another Defendant, the Garden City Police Department's Freddie Strawder, who at all times relevant hereto is believed to have also worked for GCCC as an adjunct criminal justice instructor.

149. In May 2018, upon information and belief, Defendant Swender or someone acting at his behest, summoned Defendant Strawder for his assistance in retaliating against Plaintiff Everett directly and Plaintiff Douglass indirectly.

150. On or about May 9 or 10, 2018, Strawder, acting in dual capacities for two separate municipalities pursuant to Section 1983 and for GCCC pursuant to Title IX, set a stage for the circumstantial groundwork to coax another cheer student into a conspiracy to retaliate against Everett.

151. Strawder, a detective and not merely a patrol officer, admits in his official police report that at the beginning of this misadventure the GCPD lacked probable cause to arrest Everett for a comment she made to another cheer participant who openly disliked Everett. He invited the peer to come to his office the next day—no urgency to quell supposedly boiling civil unrest between two young women.

152.     Lacking probable cause, it becomes evident from the circumstances described in this police report and knowing that he also worked for Defendant Swender that Strawder's intent was not to do the right thing and defuse a possible confrontation between two women, but rather his intent was to engage in unlawful police conduct, which he presumed would never see the light of day, to create probable cause by inciting Everett, baiting her, via texts he proposed to exchange between the peer and Everett—while he dictated or directed what to say, how to say it and how to keep pushing the envelope between the two women until he coaxed Everett to allegedly make a criminal threat against the peer.

153.     Then the GCPD pounced and placed Everett under arrest on May 10, 2018 for making a "criminal threat; cause terror, evacuation or disruption".

154.     The Strawder report is beyond cavil; it is outrageous.  It quotes the text exchange, which began only after he clearly indicates any conduct of Everett up to that point was NOT grounds for probable cause to assert a criminal threat had been made.

155.     The peer was likely directed by someone at the college to call Strawder, specifically, because the report does not mention the young woman having made contact with Strawder through dispatch at 911.  The timing contemporaneous with an uptick in criticism of Defendant Swender the evening of May 8, 2018, cheer members appearing before the board of trustees on May 8 to speak in support of coach Knapp, and then the 24 hour lag time between the initial phone call complaining about Plaintiff Everett making a threat, appears to be more than just a coincidence.  This series of events started May 9 but at Strawder's direction another day elapsed before he interviewed the peer.

156.     It was the evening of May 8, 2018 at the board of trustees' meeting where a faculty senate report was delivered to the trustees detailing over 28 pages of complaints about

trustee inadequate oversight over Defendant Swender and exposing publicly a plethora of bullying and intimidating incidents by the president over the past eight or so years at GCCC.

157. The GCPD officer who followed Everett and then saw that she was arrested on campus was curiously not a dispatch patrol officer, but another detective.

158. Upon information and belief, this incident was masterminded by Defendant Swender and carried out by loyalists to his cause and reign.

159. The police report itself makes clear that Strawder dictated the text baiting, resulting in Everett's arrest, strip search and overnight jail stay.

160. Not so coincidentally, during that overnight stay, unknown individuals with access to the jail paraded Everett's cheer peer through the jail and she was shocked to hear him loudly taunting her from somewhere outside her cell, while she had been totally disrobed and left with only a blanket in the cell. She was subjected to punitive treatment with malicious barbs by jail or law enforcement officers who brought this young man to the jail to taunt her.

161. These are the people left in responsible charge of several state/municipal authorities in Garden City and based on their aberrant behaviors detailed herein Plaintiffs seek enforcement of their civil rights through the federal courts because Defendants and others likely involved have and will continue to have no fear of any outside curtailment of their behaviors, because they have been allowed to run roughshod over the milieu created by state sanctioned authority in the hands of bad actors wielding unbridled power. Plaintiffs implore this court to find these individuals and entities responsible for civil rights violations and hold them accountable by awarding damages commensurate with the offenses in order to remedy past harm and to deter future misconduct.

## COUNT I: TITLE IX RETALIATION
### Plaintiff Everett v. Defendant Garden City Community College

162.     Plaintiff incorporates by reference the facts and allegations set forth in all preceding paragraphs as if fully set forth here.

163.     The Supreme Court recognized a cause of action for Title IX retaliation in *Jackson v. Birmingham Bd. of Ed.*, 544 US 167 (2005).

164.     In the Tenth Circuit, the courts apply the Title VII framework to Title IX retaliation claims. *Gossett v. Okla. ex rel. Bd. Of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001).

165.     The college is a recipient of federal funds.

166.     Plaintiff engaged in protected activity when she reported the harassment of coach Knapp and Henry Arenas, as well as through the reports of harassment made on her behalf by her mother, Eleanor Everett to trustees Wasinger and Hitz, the report of a community member, Jeffrey Weeast to president Swender and to trustee Wasinger on her behalf regarding the harassment she was subjected to and the presentations of support for her and others similarly situated to the board of trustees on April 10, 2018, made by Plaintiff Douglass, Eleanor Everett, and Aaron Kucharik.

167.     Plaintiff Everett suffered a materially adverse action when she:

A.     Was denied access to educational opportunities in the form of participation in extracurricular activities.

B.     Was urged to take different classes because she was being intimidated by others in the classes she enrolled in.

C.     Was subjected to shunning by her peers who were encouraged to do so by coach Knapp and others.

D. Was subjected to intimidation and interrogation by AD Green and others.

E. Missed school due to anxiety, depression and stress caused by the college's and Defendants' conduct.

F. Was subjected to a conspiracy by college officials including GCCC and GCPD dual employee Freddie Strawder and believed to have been authorized by president Swender or other unknown individuals to engage in a course of conduct leading to an unlawful arrest of Everett through incitement and unlawful police conduct by baiting her through text messages dictated by Strawder into allegedly making a criminal threat against a peer.

G. Was forced to expend thousands of dollars in attorneys' fees and bond to defend the criminal action.

H. Was forced to undergo the unlawful arrest, detention, strip search, and humiliation associated therewith because of the college's and Defendants' retaliation.

I. Was held up to public contempt and ridicule by Defendants for having reported Title IX harassment.

J. Was denied future participation in extracurricular activities because of ongoing intimidation carried over to the new coach, which was fostered by Defendants' hostile attitudes.

K. Will be subjected to future harms based on the notoriety of the unlawful arrest.

L. Suffered from extreme emotional distress that it affected her grades, causing her to withdraw from classes and fail others resulting in delays toward graduation and additional semesters of classes to reach graduation.

M.     Was maliciously taunted by Henry Arenas who was paraded through the jail during her overnight detention and yelled intimidatingly at her, believed to have been arranged by Defendant Strawder or other unknown individuals at the urging of president Swender, coach Knapp or others.

168.     There is a causal connection between the protected activity and the materially adverse actions, as evinced by the following facts:

A.     The same college administrators and coach Knapp who received the protected reports engaged in activity aimed at frustrating the investigation into those reports, permitted coach Knapp to continue making sexual comments about female students including Plaintiff, sought to intimidate Plaintiff with AD Green's pseudo-hearing, encouraged, authorized, organized and/or endorsed the unlawful arrest and detention, and permitted coach Knapp to exclude her from participation in extracurricular activities.

B.     The retaliatory acts came immediately after the protected activities.

C.     The retaliatory acts occurred as part of a clear chain of cause and effect stemming from the protected activity.

D.     The retaliatory acts were in some cases designed to thwart the efficacy of Plaintiff's protected activities and deter her from engaging in protected activities thereafter.

E.     The same college administrators who had actual knowledge of Plaintiff's protected activities deliberately permitted coach Knapp to continue creating a hostile educational environment.

F.     The college administration utilized its law enforcement educational program instructor to carry out the GCPD retaliation indicating a clear chain of cause and effect stemming from the protected activity to the unlawful arrest, detention and intimidation by another state actor institution, which multiplied exponentially the effect of the initial college intimidation.  The college had substantial control over Strawder as a criminal justice instructor of the college including disciplinary control, which Plaintiff believes has never been exercised despite knowledge of the wrongful conduct through the auspices of the college's attorney, Randy Grisell.

G.     Furthermore, when Strawder engaged in the retaliatory conduct it involved both entities he worked for, GCCC and GCPD, and therefore under these circumstances in this particular context, where the retaliatory conduct originated with the college connection, has substantial control over the state actor, it is within the college's purview to have exerted control to stop the retaliation and harassment.  The college's failure to control actually instead served to ignite the retaliation.  Therefore, Plaintiff alleges the link between the cause and effect are direct and clear to serve as the basis for liability against the college.

H.     The college trustees' flagrant disregard for protecting female cheer students' and especially Plaintiff Everett's educational opportunities to participate in extracurricular activities without being subjected to gender harassment that was publicly exhibited on April 10, 2018 at their board meeting multiplied exponentially the likelihood Everett would and thereafter did suffer additional instances of retaliation.  The trustees' conduct evinces a direct causal link between the college leaderships' intolerance for Title

IX enforcement and actual acts of hostility toward women including retaliation as to be extreme and outrageous behavior.

169.　The college's affirmative actions and inactions made Plaintiff Everett more susceptible to sexual harassment and retaliation after Plaintiff's reports.

170.　The college's conduct was in no way reasonably designed to help Plaintiff Everett or stop the hostile educational environment but rather created the incendiary spark to encourage more retaliation, which their conduct actually did do and widened its reach into the GCPD.

171.　Defendants' conduct was wanton and in reckless disregard for the rights and safety of Plaintiff Everett.

172.　Defendant college exhibited deliberate indifference to Plaintiff Everett's rights and wellbeing when it excluded her from cheer participation after having reported the harassment to college officials, by failing to conduct a timely, proper and reasonable Title IX investigation, by the unauthorized and improper AD Green pseudo-hearing, by the college's inadequate investigation into coach Knapp, by the college's cover up of prior complaints involving coach Knapp, by the inadequate investigation by Bev Temaat of Dodge City Community College,  by the subsequent intimidation and continued retaliation against Plaintiff by the college, coach Knapp, president Swender, trustees Wasinger, Martinez, Douglass, Worf, and Crist and other unknown allies, and other conduct as alleged herein.

173.　As a direct result of Defendants' conduct, Plaintiff Everett suffered lost educational opportunities, criminal attorney's fees, the cost of a bond, emotional distress, anxiety and stress, lost earnings capacity and loss of economic opportunities, reputational damage, additional tuition fees and student fees along with other increased educational costs, medical bills, and additional costs and damages, including attorneys fees.

174.     WHEREFORE, Plaintiff prays for an award of actual damages against Defendants in an amount in excess of $75,000, under Title IX, fully compensating Plaintiff for the damages suffered as a direct and proximate result of Defendants' unjustified actions, an award of interest and costs of suit, including reasonable attorney fees, punitive damages as justified, and such other and further relief as the Court finds just and proper.

## COUNT II: TITLE IX RETALIATION
### Plaintiff Douglass v. Defendant Garden City Community College

175.     Plaintiff incorporates by reference the facts and allegations set forth in all preceding paragraphs as if fully set forth here.

176.     Plaintiff Douglass engaged in a number of protected activities under Title IX including but not limited to the following:

A.     When Plaintiff Douglass came to the aid of Plaintiff Everett on February 23, 2018, who was being interrogated without due process in a pseudo-hearing regarding sexual harassment complaints with AD John Green, coach Brice Knapp and cheer peer Henry Arenas, among others in attendance and lodged complaints about Everett's treatment.

B.     When Plaintiff Douglass objected to what she identified and reported as serious gender related harassing conduct directly addressing her complaint to AD Green at the time, then later reported to and lodged her objections with president Swender, associated with the February 23, 2018 event.

C.     When she objected to coach Knapp traveling with the cheer team to nationals in March 2018 because of his repeated instances of sexual harassment of women especially when they were out of town at similar events and lodged her concerns with AD Green and president Swender.

D.      When she registered her repeated objections to the treatment of women athletes because of the abject failures of college administration to have previously put a stop to coach Knapp's repetitive, unwanted sexual advances and comments made to cheer women, noting the failures resulted in Everett becoming susceptible to Knapp's harassing behaviors up through and including March 2018.

E.      When Plaintiff Douglass called on the president of the college at various times, and the AD at various times, as well as the trustees of the college on April 10, 2018 and at various times thereafter, to take action and quit looking the other way and failing to do everything reasonably possible to stop sexually harassing conduct, acknowledge the victims of the past problems, make amends, and publicly resolve to take and enforce permanent measures to prevent future harassment and retaliation for those engaging in protected activity, instead of threatening and intimidating both Plaintiffs and others who have supported their efforts.

F.      When at a GCCC Endowment Association event on or about April 13, 2018 she objected to and called out the behavior of a community volunteer and ally of president Swender's, Kim Ruele, for having the temerity and insensitivity toward victims of sexual harassment to call the boss of another cheer supporter who spoke in favor of women and better Title IX enforcement at the college, Aaron Kucharik, and try to get Kucharik fired for his public support statements at the April 10, 2018 board meeting.

G.      When she engaged in Title IX protected activity at a letter of intent signing in the Hall of Fame Room on campus which precipitated the Wenzel exchange.

H.      When Plaintiff Douglass called for president Swender's and AD John Green's terminations and for trustees' recalls by way of filing recall petitions in the

summer of 2018 with the county clerk, because they had not publicly resolved to take sexual harassment of cheer women seriously and instead had doubled down on intimidation, threats and harassment, including the college's participation in the May 2018 Strawder unlawful arrest and detention of Plaintiff Everett.

I. When Plaintiff Douglass participated in the college's investigation of the claims made in the Faculty Senate Report by agreeing to be interviewed and provide information about claims she had relevant and first-hand knowledge about, but that protected activity was turned into an opportunity to further retaliate against cheer women and both Plaintiffs in January 2019 by adopting knowingly inaccurate, misleading and defamatory statements contained therein.

J. When Plaintiff Douglass at the January 2019 board meeting raised the issue of trustee Martinez lying in his testimony related to Plaintiff Douglass as evinced in the report of Greg Goheen, the board's investigator, and she objected to the backhanded way the report treated the cheer scandal and Plaintiff Douglass, as yet another Title IX retaliatory act by the board she was engaging in protected activity. The portions of the report associated with Title IX cheer matters mischaracterized and misrepresented the events it was purportedly accurately reporting, which Plaintiff Douglass also called the board and Goheen out on -- because to minimize, deny, or denigrate the cheer women and their claims of sexual harassment is another form of unwarranted and uncalled for retaliation, which has the deterrent effects of the institution itself marginalizing the victims and discouraging future reports, while bolstering the perpetrators in direct contravention of Title IX's precepts.

K. Plaintiff Douglass was engaging in protected activities by exercising her free speech rights during the public comment portion of the board meeting, but the college in February 2019 retaliated against Title IX supporters by voting to terminate the public comment section of board meetings to shut down free speech about Title IX issues.

L. When Plaintiff Douglass reported the harassment of Elizabeth Everett and the prior harassment of numerous other female cheer participants to the Board of Trustees on April 10, 2018.

M. When Plaintiff Douglass reported to trustee Douglass in late 2017 and early 2018 her concerns regarding treatment of women athletes involving sexual harassment and the college's responses thereto, but trustee Douglass refused to meet with her without president Swender, who was the focus of the Title IX concerns.

177. Plaintiff Douglass suffered a materially adverse action, examples of which include when she:

A. Was served with an unwarranted and baseless No Trespass Notice.

B. Was subjected to a conspiracy by college officials including GCCC and GCPD.

178. There is a causal connection between the protected activity and the materially adverse actions, as evinced by the following facts:

A. The retaliatory acts came immediately after the protected activities.

B. The retaliatory acts occurred as part of a clear chain of cause and effect stemming from the protected activity.

C.      The retaliatory acts were in some cases designed to thwart the efficacy of Plaintiff's protected activities and deter her from engaging in protected activities thereafter.

D.      The college trustees' flagrant disregard for protecting female students and athletes subjected to gender harassment and retaliation.  The trustees' conduct evinces a direct causal link between the college leaderships' intolerance for Title IX enforcement and actual acts of hostility toward women including retaliation as to be extreme and outrageous behavior.

179.    Defendants' conduct was wanton and in reckless disregard for the rights and safety of Plaintiff.

180.    Defendant college exhibited deliberate indifference to Plaintiff Douglass' rights and wellbeing as alleged above.

181.    As a direct result of Defendants' conduct, Plaintiff Douglass suffered emotional distress, anxiety and stress, reputational damage, denial of and violation of constitutional rights under the First, Fourth, Fifth and Fourteenth Amendments, and additional costs and damages, including attorneys' fees.

182.    WHEREFORE, Plaintiff prays for an award of actual damages against Defendants in an amount in excess of $75,000, under Title IX, fully compensating Plaintiff for the damages suffered as a direct and proximate result of Defendants' unjustified actions, an award of interest and costs of suit, including reasonable attorney fees, punitive damages as justified, and such other and further relief as the Court finds just and proper.

**COUNT III: *SIMPSON AND DAVIS* TITLE IX HOSTILE EDUCATIONAL
ENVIRONMENT**
**Plaintiff Everett v. Defendant GCCC**

183.     Plaintiff incorporates by reference the allegations set forth in all preceding

paragraphs as if fully set forth here.

184.     Title IX, 20 U.S.C. § 1681(a) states:

No person in the United States shall, on the basis of sex, be excluded from
participation in, be denied the benefit of, or be subjected to discrimination under
any educational program or activity receiving Federal financial assistance.

185.     An educational institution that receives federal funds violates Title IX and is

subject to a private action for damages where the entity is "deliberately indifferent" to known

acts of discrimination against students. *Gebser v. Lago Vista Independent School District*, 524

U.S. 274 (1988).

186.     The protections of Title IX extend to situations where the entity is deliberately

indifferent to the sexual harassment of a student by another student. *Davis v. Monroe County

Board of Education*, 526 U.S. 629 (1999).

187.     In *Simpson v. University of Colorado, Boulder*, 500 F.3d 1170 (10th Cir. 2007),

the Tenth Circuit stated that an entity could be held liable under Title IX if it is a federal funding

recipient and possesses an "official policy" of "deliberate indifference to providing adequate

training or guidance that is obviously necessary for implementation of a specific program or

policy of the recipient" or if an entity "sanctioned, supported, even funded a program ... that,

without proper control" would result in sexual harassment.

188.     Defendant GCCC is a recipient of federal funds.

189.     Defendant GCCC possessed information that Plaintiff Everett had been the victim of coach-on-student sexual harassment by coach Knapp as well as student-on-student sexual harassment by a male cheer peer.

190.     The Defendant GCCC through its policy of deliberate indifference to the Plaintiff's report of this sexual harassment, as evidenced by the February 23, 2018 unsanctioned and unauthorized hearing conducted by AD Green detailed herein and incorporated by reference, evinces wanton, reckless and actionable conduct by Defendants.

191.     Defendant GCCC possessed an official policy of condoning sexual harassment nd discrimination , as evinced by the conduct of policy-making officials of permitting coach Knapp to make sexual comments about female cheer students on campus or at campus events and retaining him in the college's employment even after several prior sexual harassment complaints by female cheer students dating back to 2015, and irresponsibly responding to complaints about this conduct by dismissing it with a shrug of the shoulders and chalking it up to this behavior is nothing more than what you will experience the rest of your life, boys will be boys, and similar types of lackluster, indifferent responses acquiescing and approving the coach and the student sexual harassment behaviors.

192.     In a related policy, Defendant GCCC officially displayed deliberate indifference to training athletic department staff, coach Knapp, AD Green and fellow college employees in their duty to do everything in their power to stop sexual harassment from occurring and to avoid retaliating against a student who reports harassment.

193.     GCCC is responsible for enforcing these policies and ensuring that its employees are adequately trained to follow these policies.

194.     GCCC employees were operating within the scope of their employment at all times relevant with regard to the events described herein.

195.     Deliberately indifferent behaviors are described in detail above and incorporated herein.

196.     Escalating behaviors occurred and upon information and belief were supported by Defendants when by May 2018, cheer peers came to a board of trustees meeting to speak publicly in favor of their coach and against Plaintiff Everett in a public show of bullying and intimidating her, but strangely it appeared they were accompanied in that effort by another community supporter, a private person, who was by then known to the Plaintiffs as a naysayer toward both Plaintiffs.  She was operating at the behest of state actors and by virtue of that delegated permission or authority was for all intents and purposes a state actor at all times relevant hereto.

197.     These two policies made Plaintiff Everett more vulnerable to the sexual harassment and retaliation by coach Knapp that did in fact occur.

198.     The college employees and board members with authority to protect Plaintiff Everett had actual knowledge of these policies and their inherent inadequacies thus making Plaintiff Everett more susceptible to harassment.

199.     These same employees and board members also had actual knowledge that coach Knapp had sexually harassed female cheer students previously, as described in preceding paragraphs.

200.     Defendant Wasinger had actual knowledge that coach Knapp posed a serious, specific threat to Plaintiff Everett evinced by his warning months earlier to Plaintiff's mother to be wary of coach Knapp.

201.     Defendant's conduct was wanton and in reckless disregard for the rights and safety of Plaintiff Everett.

202.     Defendant's conduct exhibited deliberate indifference to Plaintiff Everett's rights and wellbeing.

203.     As a direct result of Defendant's conduct, Plaintiff Everett suffered lost educational opportunities, medically significant emotional distress, pain and suffering, lost earning capacity and medical bills.

204.     WHEREFORE, Plaintiff prays for an award of actual damages against Defendants in an amount in excess of $75,000, under Title IX, fully compensating Plaintiff for the damages suffered as a direct and proximate result of Defendants' unjustified actions, an award of interest and costs of suit, including reasonable attorney fees, punitive damages as justified, and such other and further relief as the Court finds just and proper.

## COUNT IV: *ESCUE* TITLE IX HOSTILE EDUCATIONAL ENVIRONMENT
### Plaintiff Everett v. Defendant GCCC

205.     Plaintiff incorporates by reference the facts and allegations set forth in all preceding paragraphs as if fully set forth here.

206.     In *Escue v. N. Okla. Coll.*, 450 F.3d 1146 (10th Cir. 2006), the Tenth Circuit articulated three elements for a private cause of action under Title IX: first, the college remained deliberately indifferent to acts of harassment of which it has actual knowledge; second, the harassment was reported to an appropriate person with the authority to take corrective action; and third, the harassment deprived the victim of educational benefits or opportunities.

207.     The college is a recipient of federal funding.

208. The college remained deliberately indifferent to the sexually charged hostile educational environment Coach Knapp and the male cheer peer continued to create even after it had actual knowledge that they had sexually harassed Plaintiff.

209. Plaintiff reported the conduct of Coach Knapp and the male cheer peer multiple times to the college officials who had authority to address the complaints and means to take corrective action.

210. Coach Knapp and the male cheer peer's harassment of Plaintiff deprived her of educational opportunities, in that the actual, ongoing sexual commentary created a pervasive hostile educational environment for Plaintiff, who was not able to focus on normal educational opportunities while college employees beleaguered her and continued to enable a sexually hostile educational environment.

211. Defendant denied Plaintiff opportunities to participate fully in the college's education and athletic programs.

212. The college's deliberate indifference is evinced by:

A. The deliberate decision to continue to employ, endorse and promote Coach Knapp, and at no time take action to limit his interactions with female students, despite actual knowledge of a credible report of an inappropriate sexual harassment.

B. The deliberate decision to interrogate the Plaintiff in an attempt to pressure her into denying or withdrawing her reports of harassment.

C. The affirmative decision to do nothing at all regarding Plaintiffs' reports of sexual harassment and retaliatory harassment.

D. The affirmative decision to allow its coach to exclude Plaintiff from athletic and educational activities.

E.     The affirmative attempts to frustrate Plaintiff's attempt to provide complete and accurate information to the third-party investigator into the reported harassment and the exclusion of Plaintiff's mother from the interview process even though Plaintiff wanted her as a witness to the interview.

F.     The failure to provide Plaintiff with documentation of findings and a report as college policy assured would be provided.

G.     Encouraging other cheer participants to engage in intimidation of Plaintiff even after coach Knapp was no longer employed and seeking to gather negative information about Plaintiff in April 2018 through contacts made with human resources' Emily Clouse.

213.     The Defendant's affirmative actions and inactions made Plaintiff more susceptible to sexual harassment and retaliation both before and after her reports.

214.     The college's conduct was in no way reasonably designed to help Plaintiff or stop the hostile educational environment.

215.     Defendant's conduct was wanton and in reckless disregard for the rights and safety of Plaintiff.

216.     Defendant's conduct exhibited deliberate indifference to Plaintiff's rights and wellbeing.

217.     As a direct result of Defendant's conduct, Plaintiff suffered lost educational opportunities, emotional distress, pain and suffering, lost earning capacity and medical bills.

218.     WHEREFORE, Plaintiff prays for an award of actual damages against Defendants in an amount in excess of $75,000, under Title IX, fully compensating Plaintiff for the damages suffered as a direct and proximate result of Defendants' unjustified actions, an award of interest

and costs of suit, including reasonable attorney fees, punitive damages as justified, and such other and further relief as the Court finds just and proper.

**COUNT V: DEPRIVATION OF RIGHTS UNDER THE
UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983
FIRST AND FOURTEENTH AMENDMENT VIOLATIONS**
**Plaintiff Douglass v. GCCC, Herbert Swender, Rodney Dozier, Each Named Trustee**

219.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth here.

220.    Plaintiff Douglass alleges that at all times relevant hereto, Defendants Garden City Community College, Herbert Swender, Rodney Dozier, Jeff Crist, Merilyn Douglass, Steve Martinez and Teri Worf, were acting under color of state law and their actions were made possible by virtue of state law.

221.    Plaintiff Douglass alleges each Defendant deprived her and caused her to suffer the loss of federal constitutional rights guaranteed to her by the First and Fourteenth Amendments when each Defendant committed the following acts and violations, including acting in accordance with Defendant GCCC's custom, policy and/or practice in violating Plaintiff's constitutional rights as set forth below:

A.    They participated in the wrongful issuing, ratifying, authorizing, modifying, refusing to lift, and/or enforcing of a No Trespass Notice banning Plaintiff from any GCCC events on or off campus effective on April 25, 2018 with no fixed time limitation and that in performing the acts alleged, the Defendants acted without lawful justification, intentionally, maliciously, and/or with a deliberate indifference to or a reckless disregard for the natural and probable consequences of their acts, caused injury and damage in violation of Plaintiff's constitutional rights as guaranteed under 42 U.S.C.

§ 1983 and the United States Constitution, including its First and Fourteenth Amendments.

B.     Their acts banning her from campus sought to punish her for exercising her First and Fourteenth Amendment rights at GCCC events or on GCCC's campus by chilling her free speech rights amounting to an unlawful prior restraint and denying her right to association.

C.     The trustee defendants failed to intercede on behalf of Plaintiff when their fiduciary duties obliged them to do so, knowing their employees had acted unlawfully in issuing the No Trespass Notice, to protect Plaintiff from unjustified and unconstitutional infringement of Plaintiff's First and Fourteenth Amendment association, petition and free speech rights in violation of 42 U.S.C. § 1983 for having spoken to the displeasure of Defendants (an unlawful content based retaliation).

D.     The trustee defendants denied her right to freely associate with whomever she desired at campus functions and locations (an associational deprivation) in retaliation for her having spoken to the displeasure of Defendants.

E.     In addition, their wrongful acts included an unlawful petition right deprivation by Defendant GCCC when she petitioned them to "cease and desist" the college's improper and unconstitutional use of the No Trespass Notice against her.  They denied her petition and then continued to retaliate against her by enforcing the unlawful ban.

F.     They denied Plaintiff her First and Fourteenth Amendment petition rights seeking relief from Defendant GCCC when she petitioned them 1. to fix board custom, policies, and/or practices associated with the issuance of No Trespass Notices, like hers,

59

that lacked probable cause; 2. to fix board custom, policies and/or practices associated with retaliation based on the content of one's speech; 3. to fix board custom, policies and/or practices making permanent reforms to assure the college alleviates gender based discriminatory practices, as written and as applied; and 4. to fix board customs, policies and/or practices to assure no future administration takes any retaliation against individuals who speak in favor of Title IX enforcement.

G.     They denied Plaintiff's First and Fourteenth Amendment rights by issuing and enforcing the No Trespass Notice because it interfered with her associational rights by, among and between herself and all others including without limitation students, faculty, staff, and all other campus attendees at any campus related events including without limitation at graduation, board meetings, athletic events, athletic banquets, meetings, educational and cultural opportunities, social gatherings, endowment events, when compared to all other citizens who are allowed to enjoy GCCC without the necessity to have to petition for guarantee of such rights.

H.     They denied Plaintiff's First and Fourteenth Amendment rights by using an <u>unlawful as applied</u> No Trespass Notice custom, policy, practice and/or ordinance to suppress  Plaintiff's lawful exercise of First and Fourteenth Amendment association, petition and free speech rights all done in retaliation for and based upon the content of her speech, which they did not like.

I.     They denied Plaintiff's First and Fourteenth Amendment rights using an unlawful as applied No Trespass Notice to accomplish a different unlawful purpose: punishment, retaliatory abuse, malicious retribution, misuse of otherwise lawful means of

process, and/or arbitrary abuse of state authority for malicious, wrongful, personal, or ignoble aims.

222.     As to each lettered assertion above, these bad acts by the Defendants were done without lawful justification, intentionally, maliciously, and/or with a deliberate indifference to or a reckless disregard for the natural and probable consequences of their acts.

223.     And the Defendants did cause injury and damage to Plaintiff in violation of Plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its First and Fourteenth Amendments.

224.     As a result of the foregoing, Plaintiff was deprived of her liberty, associational, petition, and free speech rights as well as the right to be free from retaliation for exercising her constitutional rights as specified, she suffered specific and serious physical restraint and injury, psychological injury and emotional distress, great humiliation, and was otherwise damaged and injured.

225.     WHEREFORE, Plaintiff prays for an award of actual damages against Defendants in an amount in excess of $75,000, under the Constitution and 42 U.S.C. § 1983, fully compensating Plaintiff for the damages suffered as a direct and proximate result of Defendants' unjustified actions, an award of interest and costs of suit, including reasonable attorney fees pursuant to 42 U.S.C. § 1988, punitive damages as justified, and such other and further relief as the Court finds just and proper.

### COUNT VI: DEPRIVATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983 FEDERAL DUE PROCESS CLAUSE FOURTEENTH AMENDMENT VIOLATIONS
**Plaintiff Douglass v. GCCC, Swender, Dozier, Each Named Trustee Defendant**

226.     Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth here.

227.    Plaintiff Douglass alleges that at all times relevant hereto, Defendants Garden City Community College, Herbert Swender, Rodney Dozier, Jeff Crist, Merilyn Douglass, Steve Martinez and Teri Worf, were acting under color of state law and their actions were made possible by virtue of state law.

228.    Plaintiff Douglass alleges each Defendant deprived her and caused her to suffer the loss of federal constitutional rights guaranteed to her by the Due Process Clause of the Fourteenth Amendments when each Defendant committed the following acts and violations, including acting in accordance with Defendant GCCC's custom, policy and/or practice in violating Plaintiff's constitutional rights as set forth below:

A.    They participated in the wrongful issuing, ratifying, authorizing, modifying, refusing to lift, and/or enforcing of a No Trespass Notice banning Plaintiff from any GCCC events on or off campus effective on April 25, 2018 with no fixed time limitation and in doing so the Defendants acted without lawful justification, intentionally, maliciously, and/or with a deliberate indifference to or a reckless disregard for the natural and probable consequences of their acts, caused injury and damage in violation of Plaintiff's Due Process constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its Due Process Clause of the Fourteenth Amendment.

B.    They denied Plaintiff's Due Process Clause rights by failing to give her an identifiable procedure within the provisions of the Notice to allow or detail a defined way or mechanism to challenge the nature, adequacy, justification, procedural and/or unconstitutional provisions of the No Trespass Notice.

C.　They denied Plaintiff's Due Process Clause rights by simultaneously denying Plaintiff the right to equal protection under the law as a class of one who was issued a No Trespass Notice lacking any adequate Due Process Clause means to challenge the Notice as compared to all other individuals who have been issued a No Trespass Notice by Defendants but given adequate Due Process Clause means contained in the language of the Notice to challenge the Notice by some process or procedure.

229.　As to each lettered assertion above, these bad acts by the Defendants were done without lawful justification, intentionally, maliciously, and/or with a deliberate indifference to or a reckless disregard for the natural and probable consequences of their acts, caused injury and damage in violation of Plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its Fourteenth Amendment.

230.　As a result of the foregoing, Plaintiff was deprived of her due process rights as well as the right to equal protection of the law as specified, she suffered specific and serious injury, psychological injury and emotional distress, great humiliation, and was otherwise damaged and injured.

231.　WHEREFORE, Plaintiff prays for an award of actual damages against Defendants in an amount in excess of $75,000, under the Constitution and 42 U.S.C. § 1983, fully compensating Plaintiff for the damages suffered as a direct and proximate result of Defendants' unjustified actions, an award of interest and costs of suit, including reasonable attorney fees pursuant to 42 U.S.C. § 1988, punitive damages as justified, and such other and further relief as the Court finds just and proper.

## COUNT VII: CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS
## UNDER 42 U.S.C. § 1985(3)
### Plaintiffs Douglass and Everett v. All Defendants

232.   Plaintiffs incorporate by reference the facts and allegations set forth in all preceding paragraphs as if fully set forth here.

233.   Plaintiff Douglass and Plaintiff Everett at all times relevant hereto sought to and did exercise their free speech, association and petition rights under the First and Fourteenth Amendments.

234.   Because they are women and they spoke up at GCCC for women's rights, at all relevant times hereto, each became well known for supporting, speaking on behalf of and caring about the respectful treatment of women on the college's campus, its programs and in their community.

235.   All Defendants and perhaps unknown others associated with Defendants knew or thought Plaintiffs Douglass and Everett are each a member of a class of one or more women who are outspoken about GCCC and about the college's leadership, employees, agents or allies treatment of women on its campus, in its programs or associated with its events.

236.   All Defendants and perhaps unknown others associated with Defendants knew or thought Plaintiffs Douglass and Everett support women on the GCCC campus, in its programs and in their community as a constituent member of a class of one or more persons based on gender and they knew this because of their outspoken statements in support of their gender.

237.   All Defendants and perhaps unknown others associated with Defendants may also have identified them as members of a more narrowly tailored class of one or more persons who publicly objected to the college's inadequate enforcement of women's rights, in general, and Title IX gender rights, specifically, and/or as a person who objected to retaliation by the college

for anyone having exercised her/his First and Fourteenth Amendment rights to support, in words or deeds, women's rights on the GCCC campus and/or as a person whose class for purposes of this Count is known for expressing speech supportive of women coupled with content of such speech being critical at times of the college, its administrators, staff, faculty and/or specifically Defendant Swender and/or the named trustee Defendants with respect to women's rights.

238.    Plaintiffs Douglass and Everett were and are identified by all Defendants and perhaps unknown others associated with Defendants, as a class of one or more persons who publicly support and advocate for better enforcement of Title IX rights at GCCC, for better treatment of women and their rights at GCCC, and speak critically at times of the college, its administrators, staff, faculty and/or specifically Defendant Swender and/or the named trustee Defendants on this subject.

239.    All Defendants and perhaps unknown others associated with Defendant, and the college speaking through its agents, have overtly expressed their animus against Plaintiff at public meetings, in private conversations, through written instruments, texts, emails, and through visible and obvious body language Defendants exhibit at times when they interact with Plaintiffs. The evidence Plaintiffs will elicit will show this assertion is true, or more likely true than not, by whatever applicable evidentiary standard may apply for each relevant person although not all examples are capable of being detailed here.

240.    Defendant Swender, in public meetings and after public meetings, expressly held and holds Plaintiff Douglass and her kind as a class in contempt, he has a personal animus, extreme dislike, and hateful discriminatory attitude against her and her kind as a class or classes as identified herein.  He voiced distain of Plaintiff for who she is, what values she expresses, the company she keeps, her outspoken nature in support of women and regarding the treatment of

women at GCCC and he is and was motivated in whole or in part by this extreme dislike or malicious discriminatory attitude against her or her kind as a class when he acted as alleged in this Count and elsewhere in this Complaint. He deplores criticism of himself, especially criticism of how he disrespectfully treats women when he does and Plaintiff Douglass has become and is a credit to her gender, a self-assured, one-woman class known for discrimination locating heat seeking missile and wrecking ball size abilities as a class and on behalf of her kind as far as he's concerned when it comes to criticizing his handling of GCCC's women's rights issues, the NJCAA women's volleyball sanctioning incident, the Elizabeth Everett series of incidents, Title IX rights violations involving the cheer scandal, writ large, and for a wealth of other reasons based on her gender or her outspokenness on these issues that even Plaintiff may not know but Defendant does and he really dislikes her class. He also does not like Plaintiff Everett.

241.    He openly and without question has expressed his personal animus against Plaintiff Douglass based on Plaintiff's status as a public supporter for better enforcement of Title IX rights at GCCC and based on Plaintiff's critical speech regarding his administration on this subject.

242.    Defendant Dozier in a public board of trustees meeting in January 2019 said he takes it personally that Plaintiff Douglass has involved him in the public criticisms of the inadequate handling of or enforcement of Title IX rights violations at the college because of his having issued the No Trespass Notice banning Plaintiff Douglass from GCCC activities.

243.    Upon information and belief, Defendant Swender is more likely than not the one person or among a very elite few individuals associated with GCCC to care enough, be hubris-filled enough, savvy enough, informed enough, maliciously motivated enough, with clout

enough, state granted authority enough, with access to power, money and/or ability to get legal counsel convinced to go along enough, the high level superior over campus police enough, and possessing these qualities unto himself, that Plaintiff believes he is the originator, or more likely than not, the final decision maker responsible for, even if he denies this final fact, the ignitor of the fire under the college campus police chief's chair to come up with the letter containing the No Trespass Notice issued by Rodney Dozier on April 25, 2018 to Plaintiff Douglass banning her from any GCCC contact or campus access. These same characteristics apply with equal weight to his ability and interest in seeing to it that Plaintiff Everett was neutralized or her reputation was harmed by a false arrest for criminal threat. He is the most likely candidate based on the number of factors that would need to fall into place to motivate someone to do such a drastic, civil rights depriving thing based on such flimsy excuses or maybe when it comes to the No Trespass Notice incident it really is Rodney Dozier, who is more mild mannered, kinder, and even-tempered, generally speaking, because after all, he has publicly admitted he takes it personally that he's been singled out for criticism about the No Trespass Notice and his investigation that led to it.

244. Either way, at least two people know, probably more, and given time the members of a federal jury will decide which one it is because two people had the motivation, expressed motivation, required by the applicable statute, 42 U.S.C. § 1985(3), and there is extremely little doubt that a conspiracy did exist involving two or more people and the conspiracy was carried out by agreement between Defendant Swender and Defendant Dozier in the case of Plaintiff Douglass or between Defendant Swender and Defendant Strawder in the case of Plaintiff Everett, or perhaps including others.

245. And the aim of the conspiracy agreement, motivated by the requisite ill will, was an intent to deprive Plaintiff Douglass and/or Plaintiff Everett of her civil rights.

246. The actionable offense, the aim of the conspiracy, against Plaintiff Douglass was to ban her from involvement with anyone on the campus or at campus events through the use of a No Trespass Notice, which if done unlawfully runs the risk of violating her civil rights in several respects because inherent with such a ban is a violation of Plaintiff's rights to freedom of association and freedom of liberty or movement on or about a state facility, the campus or events of GCCC.

247. The mechanism that was misused, as applied, was Garden City's No Trespass Ordinance and the fact the college is a state sponsored and supported entity makes this curtailment the misuse of state authority by state actors.

248. The actionable offense, the aim of the conspiracy, against Plaintiff Everett was to create a situation where she would could be caught or tempted to commit a criminal threat against someone who also had a personal animus against Plaintiff Everett, in this instance a female cheer peer used by Freddie Strawder as a convenient pawn, but provide cover for the unlawful civil rights violations Defendant Strawder knew he would likely have to commit or through the acts of the cheer peer would commit, a Fourth Amendment false arrest or malicious prosecution violation, if he was ever caught. Violations of Plaintiff Everett's First Amendment and Fourteenth Amendment free speech and association rights would also be an aim of the conspiracy, to deter her from speaking against Defendants about Title IX or other women's rights issues on the GCCC campus.

249. The mechanism that was misused, as applied, was improper use of law enforcement resources, personnel, police equipment and taking time away from the proper

enforcement of the law and correct fulfillment of police duties. The fact that either or both GCCC and GCPD, state entities, were involved makes the curtailment of Plaintiff Everett's rights the misuse of state authority by state actors. Public funds were misdirected as well presuming Defendant Strawder was on the clock when he carried out his part of the conspiracy agreement.

250.     Plaintiff Douglass alleges that upon information and belief, there are other possible hate mongers of her class, she has received threats by someone or more during the course of this saga, associated with GCCC that even if one of those conspirators necessary to support this Count might be discovered through the discovery process, she avers she has made a sufficient showing to support opening up discovery to inquire further into this subject. Besides Defendant Dozier at least one other person, Randy Grisell, was involved in the No Trespass Notice process before it was sent and another then employee, Emily Clouse, is mentioned in records of the college and by admission of Rodney Dozier in January 2019 to have been involved in the investigation. No aspersions are being cast herein, but Defendant Dozier may or may not have standing authority to have retained his services at the college's cost and legal invoices of a state college should be open records under KORA as a possible means to locate relevant information as to who else might have been involved.

251.     Plaintiff Everett alleges that she has also received threats and that other persons make hold her in contempt or severe dislike because of her membership in the same class mentioned above.

252.     Plaintiff Douglass asserts the aim of the conspiracy was accomplished when she was banned from the campus from April 25, 2018 until July 27, 2018 and she alleges the conspiracy caused her injuries and the deprivation of her civil rights to freedom of association,

liberty, freedom of ingress and egress upon public property like any other citizen, deprivation of freedom to speak at campus events, attend graduation, attend the annual athletic banquet she had historically attended, to meet with campus friends, faculty, staff, students and attend any and all kinds of events. She had season tickets to sporting events she could not attend. She would have attended parties for students she knew. She was unable to provide transportation to at least one student, if not more, who sought her assistance. The deprivation was a chilling prior restraint on her speech. It was intended to harm her reputation, hurt her emotionally, control her physically, hurt her economically with unusable tickets.

253. Furthermore, the No Trespass Notice had no expiration date, it had no provision for challenging it, thus lacking in due process, which is a separate violation of her civil rights under the Due Process Clause of the Fourteenth Amendment.

254. Plaintiff is aware that other campus issued No Trespass Notices, for example to students, normally contain provisions for challenging or appealing the ban, thus Plaintiff Douglass was denied equal protection of the law constitutional violations, as well.

255. Plaintiff Douglass has the right to associate with whomever she desires under the First and Fourteenth Amendment and this right was violated, and she was deprived of her free associational right because the conspiracy was accomplished.

256. In addition, Plaintiff Douglass alleges that the named defendant trustees herein may have been involved in assuring the No Trespass Notice was not dissolved. They would have had the authority to order its lifting because by state law they are statutorily delegated all rights necessary to oversee the college.

257. Plaintiff Douglass alleges these five trustees exhibited and expressed animosity toward her before the Notice was issued, as evidenced by the April 10, 2018 video of the

meeting referenced above. They may have participated in the issuance, but additional discovery is needed to make this determination.

258. One trustee, Steve Martinez, evinced a personal animus against Plaintiff Douglass at some time during the past two years as publicly available information indicates he went so far as to lie about rumors involving Plaintiff that it raises a colorable issue whether he may have been enticed to partake of the conspiracy.

259. In the publicly available Goheen Report, pages 29 and 36, Defendant Swender is alleged to have floated or planted with Trustee Martinez a nasty falsehood, a purposeful lie intending to harm Plaintiff Douglass, which Martinez repeated to a faculty member and likely others, which he publicly confirmed was the case during the January 2019 board meeting. Video evidence of Martinez' admission memorializes these facts.

260. Contrary to the Goheen Report, during the public comment portion of the January 2019 board of trustees meeting Mr. Martinez admitted, when confronted with his own lie denying he heard Defendant Swender make the nasty comment, that, in fact, Defendant Swender said it to him. He admitted a cover up and his part in it.

261. Mr. Martinez then apologized to Plaintiff Douglass, but the Martinez' admission has significance to this Count because it goes to raise an inference of his possible support for the aim of the conspiracy offense, despite Mr. Martinez' apology for his part in the nasty rumor.

262. Trustee Douglass has exhibited behaviors indicating she bears ill will toward Plaintiff Douglass. She has been heard to sigh loudly, whisper under her breath, make statements critical of Plaintiff Douglass, dismiss comments of Plaintiff Douglass with huffs and the like, and after the June 2019 board meeting focused on the budget of the college criticized Plaintiff Douglass for not moving on, threatening to call security because of Plaintiff Douglass's

questions (prompted at Defendant's request and with her permission directed to college staff) because of criticisms Plaintiff Douglass has made and did make related to trustee inadequacies in Title IX oversight costing the college nearly $500,000 in unnecessary payments to the former president associated with the cheer scandal and the like. This is not an exhaustive list of the animus evidencing behaviors and comments of trustee Douglass.

263. Trustees Crist, Worf and Wasinger have publicly decried Plaintiff's criticisms of the college's inadequate Title IX enforcement responses and Plaintiff Douglass has been the recipient of behaviors similar to those of Trustee Douglass detailed above from each of them at different times. Therefore, upon information and belief, Plaintiff asserts these trustees may have been part of or contributed to the conspiracy averred in this Count. Additional discovery is needed to augment this element; however, the evidence known to Plaintiff to date leads to her assertion that it is more likely true than not that each one harbors a personal animus against her on the basis of her class.

264. Plaintiff Douglass was deprived of her due process rights as well as the right to equal protection of the law as specified, suffered specific and serious injury, psychological injury and emotional distress, great humiliation, and was otherwise damaged and injured.

265. Plaintiff Everett asserts the aim of the conspiracy was accomplished when she was falsely arrested on May 10, 2018 and she alleges the conspiracy caused her injuries and the deprivation of her civil rights to liberty, freedom of travel while she was detained, violation of her bodily integrity when she was strip searched based upon a false use of process, she also was deterred and deprived of her free speech rights through a chilling prior restraint. She fears retaliation even now. It was intended to harm her reputation, hurt her emotionally, control her

physically, hurt her economically and cause her to expend sums on court costs, bond and criminal attorney's fees.

266.    Plaintiff Everett was deprived of her Fourth Amendment rights as well as the right to equal protection of the law as specified, suffered specific and serious injury, bodily injury, psychological injury and emotional distress, great humiliation, and was otherwise damaged and injured.

267.    WHEREFORE, Plaintiffs each pray for an award of their own actual damages against Defendants in an amount in excess of $75,000, under the Constitution and 42 U.S.C. § 1985, fully compensating each Plaintiff for the damages each suffered as a direct and proximate result of Defendants' unjustified actions, for Plaintiff Everett an award of her criminal attorney's fees, costs, interest, bond and other relief associated with the underlying criminal matter, an award of their interest and costs of suit, including reasonable attorney fees pursuant to 42 U.S.C. § 1988, punitive damages as justified for each Plaintiff, and such other and further relief as to each Plaintiff the Court finds just and proper.

### COUNT VIII: EQUAL PROTECTION VIOLATION 42 U.S.C. § 1983
**Plaintiff Everett v. Brice Knapp, in individual and official capacities**

268.    Plaintiff incorporates by reference the facts and allegations set forth in all preceding paragraphs as if fully set forth here.

269.    Coach Knapp singled out Plaintiff Everett as a "class of one" for sexual harassment and invasion of privacy on the basis of her gender.

270.    Coach Knapp did not treat similarly situation male students in the same fashion as he treated Plaintiff Everett.

271.    Coach Knapp, will sexually harassing Plaintiff Everett and asking other male students about her personal sex life, continued his practice of making sexual comments about

female students at school in front of other students and college employees, including in the presence of Plaintiff Everett. His inappropriate comments about Plaintiff and other women cheer students were repetitive, prying, and offensive.

272. There was no rational basis for coach Knapp to single out Plaintiff Everett, or any other female students, for sexual harassment and privacy invasions.

273. Coach Knapp was acting under color of law, in his capacity as a college coach and employee, during college programs and during college operating hours.

274. Defendant's conduct was wanton and in reckless disregard for the rights and safety of Plaintiff Everett.

275. Defendant's conduct exhibited deliberate indifference to Plaintiff Everett's rights and wellbeing.

276. There is no qualified immunity available to Defendants as Plaintiff's privacy rights in this context were long ago clearly established by the Tenth Circuit precedent, including *Lankford v. City of Hobart*, 27 F.3d 477 (10th Cir. 1994).

277. As a direct result of Defendant's conduct, Plaintiff Everett suffered lost educational opportunities, medically significant emotional distress, pain and suffering, lost earning capacity and medical bills.

278. WHEREFORE, Plaintiff prays for an award of actual damages against Defendants in an amount in excess of $75,000, under the Constitution and 42 U.S.C. § 1983, fully compensating Plaintiff for the damages suffered as a direct and proximate result of Defendants' unjustified actions, an award of interest and costs of suit, including reasonable attorney fees pursuant to 42 U.S.C. § 1988, punitive damages as justified, and such other and further relief as the Court finds just and proper.

**COUNT IX: VIOLATION OF 42 U.S.C. § 1983**
**FALSE ARREST UNDER FOURTH AND FOURTEENTH AMENDMENTS**
**Plaintiff Everett v. Freddie Strawder, in individual and official capacities,**
**Garden City, Kansas/GCPD**

279.     Plaintiff incorporates by reference the facts and allegations set forth in all

preceding paragraphs as if fully set forth here.

280.     Plaintiff Everett alleges Defendant Strawder and Defendant Garden City, Kansas

and Garden City Police Department (hereinafter together "GCPD") caused or failed to prevent

her from being unlawfully arrested, harassed, suffer and invasion of her bodily integrity with an

unlawful strip search, instituted illegal process, detained and imprisoned her without any

probable cause, warrant or other legal process directing or authorizing the Plaintiff's arrest or

legal detention on or about May 10, 2018.

281.     That at all times relevant hereto Defendant Strawder was acting under color of

state law as an employee of GCPD or in combination with his other employer GCCC when he

wrongfully encouraged the fabrication of a series of text messages intending to incite Plaintiff

into making a criminal threat.

282.     Defendant Strawder knew as a police detective the consequences of his initiation

and participation in this fabrication of circumstances amounted to a civil rights violation,

intending to cause Plaintiff to be falsely arrested, and yet he purposely acted anyway.

283.     Strawder also knew the submission of an Affidavit to the Finney County Court to

support an arrest warrant, which contained inaccurate, misleading or fabricated evidence was

illegal, wrongful and violative of a criminal defendant's Fourth Amendment rights (as well as

Fifth Amendment rights against self-incrimination when he coaxed text messages against

Plaintiff's interest through his subterfuge) because such coercion and fabrication of evidence has

long been established as a constitutional violation of a criminal defendant's rights in the Tenth Circuit.

284.     Strawder's participation in Plaintiff's false arrest without a warrant, followed by an unlawful detention, violated her civil rights where both the arrest and the detention lacked probable cause to stop, hold and detain her.

285.     The Fourth Amendment right to be free of unlawful search and seizure by a state actor using fabricated evidence and/or coercive type interrogations of material witnesses as pled herein is a well-established constitutional right.

286.     Plaintiff Everett was arrested without a warrant and based on fabricated evidence to support probable cause.

287.     Having been arrested without a warrant on or about May 10, 2018, Everett's arrest was wrongful in violation of the Fourth Amendment's requirement of a judicial determination of probable cause as a prerequisite to support an extended restraint of liberty following arrest.

288.      Plaintiff Everett challenges as wholly insufficient the probable cause legal determination made by or during the Finney County District Court's consideration of the issuance of post-arrest, Arrest Warrant, including the fact the Affidavit contained fabricated evidence and excluded exculpatory evidence from judicial consideration after she was already arrested and booked into the Jail.

289.     Defendant Strawder's actions were the basis for the arrest warrant and as detailed herein they were knowingly improper.

290.     Defendant Strawder proximately caused Plaintiff Everett's warrantless arrest conducted by another officer.  Strawder acted maliciously and was personally motivated by ill will.

291.     He should not be entitled to qualified immunity for his individual, wrongful acts based on his knowing violation of Everett's constitutional right to be free of unlawful legal process.

292.     Defendants falsely arrested Plaintiff and should be subject to § 1983 liability because Strawder's actions proximately caused Plaintiff's arrest.

293.     The underlying action terminated in favor of Everett when the special prosecutor notified defense counsel months later that no action would be taken to prosecute Everett after the false arrest.  The facts supporting this favorable termination will show that after reviewing the police report and noting it includes an admission by Strawder that he lacked probable cause for a criminal threat arrest before the text messaging began it is clear Strawder's admitted participation in dictating the text messages thereafter incited the alleged criminal threat arrest and it is clear from the police report itself that termination of the criminal proceedings in favor of Everett became a foregone conclusion because of Strawder's improper conduct.

294.     No probable cause existed to support the original arrest, continued confinement or prosecution.

295.     Strawder acted with malice.

296.     Plaintiff asserts it was unreasonable, reckless and intentionally unlawful under Kansas law for detective Strawder to rest his determination of probable cause upon the contrived text messages he participated in creating.  Absent the text messages, there was no evidence

against Everett thus making the Affidavit an inherently unreliable bases for an arrest and detention.

297.    Plaintiff Everett sustained damages to be proven at trial because of Strawder's misconduct.

298.    Defendant GCPD failed to properly train, supervise, or discipline its police officers, including Defendant Strawder, concerning the correct and best practices in evaluating probable cause to detain a person under an arrest warrant, especially where a criminal threat charge is involved, thereby permitting Defendant Strawder to be in a position to violate Plaintiff's constitutional rights.

299.    Defendant GCPD being aware that such lack of training, supervision, and discipline leads to improper conduct by its employee police officers, acted with deliberate indifference in failing to establish a program of effective training, supervision and discipline. Defendant GCPD is aware of the persistent and substantial risk of improper detentions of persons based on insufficient or incorrect warrant information, and effective training, supervision, and discipline would have lessened the likelihood of such occurrences.  There are recurrent circumstances which involve such potential danger to the constitutional rights of citizens and which are officially tolerated by Defendant GCPD.  Such policies, practices, customs or usages were a direct and proximate cause of the conduct alleged herein and otherwise a direct and proximate cause of the harm to Plaintiff, in violation of rights guaranteed by 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments.

300.    As a direct result of the foregoing, Plaintiff was deprived of her liberty, subjected to an unlawful strip search, suffered specific and serious physical injury, psychological and emotional distress, great humiliation, and was otherwise damaged and injured.

301.     WHEREFORE, Plaintiff prays for an award of actual damages against Defendants in an amount in excess of $75,000, under the Constitution and 42 U.S.C. § 1983, fully compensating Plaintiff for the damages suffered as a direct and proximate result of Defendants' unjustified actions, an award of her criminal attorney's fees, costs, bond and other relief associated with the underlying criminal matter, an award of interest and costs of suit, including reasonable attorney fees pursuant to 42 U.S.C. § 1988, punitive damages as justified, and such other and further relief as the Court finds just and proper.

## COUNT X: VIOLATION OF 42 U.S.C. § 1983 - MALICIOUS PROSECUTION UNDER FOURTH AND FOURTEENTH AMENDMENTS
### Plaintiff Everett v. Freddie Strawder, in individual and official capacities, Garden City, Kansas/GCPD

302.     Plaintiff incorporates reference the facts and allegations set forth in all preceding paragraphs as if fully set forth here.

303.     Defendant Strawder's actions against Plaintiff Everett amounted to a separate and wrongful Fourth Amendment violations of her rights—malicious prosecution under 42 U.S.C. § 1983.

304.     Strawder's actions proximately caused Plaintiff's detention following arrest based on an illegal process.

305.     The underlying action terminated in favor of Everett.

306.     No probable cause existed to support the institution of legal process including the original arrest, continued confinement or prosecution.

307.     Strawder acted with malice.

308.     Plaintiff Everett sustained damages to be proven at trial because of Strawder's misconduct instituting an illegal process resulting in her arrest and detention without probable cause.

309.     Plaintiff asserts he acted recklessly, unreasonably and intentionally.

310.     Defendant GCPD failed to properly train, supervise, or discipline its police officers, including Defendant Strawder, concerning the correct and best practices in evaluating probable cause to detain a person under an arrest warrant, especially where a criminal threat charge is involved, thereby permitting Defendant Strawder to be in a position to violate Plaintiff's constitutional rights.

311.     Defendant GCPD being aware that such lack of training, supervision, and discipline leads to improper conduct by its employee police officers, acted with deliberate indifference in failing to establish a program of effective training, supervision and discipline. Defendant GCPD is aware of the persistent and substantial risk of malicious prosecution due to illegal institution of legal process based on insufficient or incorrect warrant information, and effective training, supervision, and discipline would have lessened the likelihood of such occurrences.  There are recurrent circumstances which involve such potential danger to the constitutional rights of citizens and which are officially tolerated by Defendant GCPD.  Such policies, practices, customs or usages were a direct and proximate cause of the conduct alleged herein and otherwise a direct and proximate cause of the harm to Plaintiff, in violation of rights guaranteed by 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments.

312.     As a direct result of the foregoing, Plaintiff was deprived of her liberty, subjected to an unlawful strip search, suffered specific and serious physical injury, psychological and emotional distress, great humiliation, and was otherwise damaged and injured.

313.     WHEREFORE, Plaintiff prays for an award of actual damages against Defendants in an amount in excess of $75,000, under the Constitution and 42 U.S.C. § 1983, fully compensating Plaintiff for the damages suffered as a direct and proximate result of Defendants'

unjustified actions, an award of her criminal attorney's fees, costs, bond and other relief associated with the underlying criminal matter, an award of interest and costs of suit, including reasonable attorney fees pursuant to 42 U.S.C. § 1988, punitive damages as justified, and such other and further relief as the Court finds just and proper.

**COUNT XI: VIOLATION OF 42 U.S.C. § 1983 - *LOZMAN* CLAIM UNDER FIRST, FOURTH, FIFTH AND FOURTEENTH AMENDMENTS**
**Plaintiff Douglass v. GCCC, Herbert Swender and Rodney Dozier in individual and official capacities**

314. Plaintiff incorporates by reference the facts and allegations set forth in all preceding paragraphs as if fully set forth here.

315. Plaintiff Douglass alleges Defendant GCCC violated her civil rights under 42 U.S.C. § 1983 and the First, Fourth, Fifth and Fourteenth Amendments, including under the *Lozman* theory, as applied to the use of a No Trespass Notice that was issued on April 25, 2018 without probable cause and issued because state actors harbor personal animus against her.

316. At all relevant times hereto, all GCCC related Defendants misused their state authority to carry out unlawful purposes associated with the Notice.

317. They acted knowingly, intentionally, recklessly, and/or maliciously.

318. The No Trespass Notice was misused in retaliation for Plaintiff Douglass's having exercised her free speech rights to criticize GCCC Defendants and based on the content of her speech they sought to punish her, deter her from future speech (chilling speech claim), use the Notice as an unlawful prior restraint (prior restraint claim), and to deprive her of free association with campus related persons and activities (association claim).

319. In retaliation for her public statements on and after April 10, 2018, upon information and belief, Defendant Swender, Defendant Dozier, Defendant Trustees and/or unknown individuals acting at their behest, acting under color of state law and as state actors

used their positions in government to set in motion the series of events leading directly to the night of April 25, 2018, when Defendants employed an "as applied" unconstitutional device to retaliate with the full weight of a government edict to chill Plaintiff's civil rights to freedom of ingress and egress on public property, association, speech, and petitioning government by utilizing the No Trespass Notice to banish her from college property and events.

320. The Defendants exploited their governmental authority by offensively weaponizing, like a cudgel, the Garden City Municipal Ordinance Sec. 6.7. Criminal Trespass, a part of the Uniform Public Offense Code, which many Kansas municipalities adopt and modify.

321. The Ordinance reads in relevant part:

(a) Criminal trespass is entering or remaining upon or in any: (1) Land, non-navigable body of water, structure, vehicle, aircraft or watercraft by a person who knows such person is not authorized or privileged to do so, and (A) Such person enters or remains therein in defiance of an order not to enter or to leave such premises or property personally communicated to such person by the owner thereof or other authorized person…"

322. Criminal trespass is a Class B violation under Garden City Municipal Ordinance, Uniform Public Offense Code.

323. The Notice served on Plaintiff Douglass by Defendant Dozier, GCCC Chief of Police, by hand delivery accompanied by a Garden City Police Officer on the night of April 25, 2018 was and is an unlawful Notice and it is a prior restraint of free speech and association rights, as applied, having been framed in the guise of a <u>conduct regulation.</u>  The Notice is a speech regulation and has no rational basis, as applied, and no probable cause for its issuance when Defendants' purpose was actually based on Plaintiff's lawful exercise of her free speech rights, not as it purports to be based on her alleged "conduct" or alleged "confrontations" of GCCC employees or attendees at GCCC events.

324.     It was issued in retaliation for her speech, not conduct, at Defendant Swender's insistence and carried out by his Chief of Campus Police who knew Defendant Swender's improper, malicious motive was a misuse of law enforcement authority for an improper personal reason or aim that would wrongfully deprive Plaintiff of her civil rights. And yet he carried out an unlawful order anyway, when he should have exercised independent judgment, knowing the Notice had no probable cause to be issued, and refused his superior's illegal and improper order.

325.     The fact it was based on Plaintiff's speech, not conduct, was confirmed by counsel for the college, Randy Grisell, within less than 24 hours of its issuance. Upon information and belief, reliance on this fact is reasonable because both Defendant Dozier and Mr. Grisell have said he was involved in either drafting or reviewing the Notice and therefore spoke for the Defendant when this speech-based rationale was confirmed.

326.     The Notice itself said: "This notice is being given to you as a result of conduct by you, on the GCCC campus, or at GCCC sponsored events, that has caused GCCC employees or others on campus or attending events to feel intimidated, harassed or unnecessarily uncomfortable."

327.     The Notice is also deficient in several other unconstitutional ways. Plaintiff Douglass was entitled to due process in the issuance of a Notice by a state actor, which Defendant Dozier, as a trained law enforcement officer, knew or should have known, even if the Ordinance's language fails to state such requirement. Because it was not an order issued by a court having competent jurisdiction there was nowhere for Plaintiff to challenge the Notice, except back to the college's administration.

328.     The lack of a jurisdictional forum altogether is a due process violation when a state actor purports to restrain Plaintiff's Fourth Amendment search and seizure rights, curtail her

liberty and retaliate against her First Amendment speech and association rights along with

Fourteenth Amendment application. If an administrative body has jurisdiction then the Notice

should have contained provisions referring to that jurisdiction as the forum to turn to in order to

challenge the Notice. Lacking that, it violates her due process rights.

329. Plaintiff asserts further than she was entitled to notice of the specific charges

against her in detail, the names of witnesses and grounds for the ban. She was also entitled to a

hearing process, an actual hearing, entitled to present a defense, have witnesses summoned, to

cross examine witnesses, have an attorney present at the hearing, have findings presented to her,

have that hearing before a neutral officer, and if not conducted before the final decision-maker

then she is entitled to a written report of findings. It is not permissible to merely provide notice

of suspension of her civil rights and liberty interests and state in a notice that an appeal can be

requested. Even that barest minimum was missing from the Notice.

330. The Ordinance actually has a provision related to its applicability when a

restraining order has been issued by a court of competent jurisdiction, which Plaintiff asserts

should have been the procedure followed, if any was ever appropriate, when a law enforcement

officer attempts to use the Ordinance to ban anyone from state property under his jurisdiction.

331. Plaintiff asserts Defendant Dozier chose to use the wrong provision, subsection

(A), which is likely intended for or applicable to private landownership situations, when the only

provision a law enforcement officer, who constitutionally needs probable cause to take lawful

state action that amounts to issuance of an arrest warrant type process, would be (C). He and

arguably his counsel, Randy Grisell, should have known law enforcement officers, who are state

actors, are bound to respect citizen's constitutional rights under the Fourth and Fourteenth

Amendments and only institute a legal process when it comports with constitutional safeguards, including probable cause requirements, because to act otherwise risks a civil rights violation.

332.     In addition, the due process rules may be flawed by a separate violation, the denial of equal protection, which Plaintiff asserts is the case here.  The college issues No Trespass Notices routinely to students and others on campus through its administrative officers, such as the residence hall director, and upon information and belief, Plaintiff is aware that those Notices typically do contain references to the college's due process mechanisms to challenge those Notices.  This Notice was different and Plaintiff alleges the difference is based on an equal protection denial of her rights as a class of one.

333.     As asserted herein, Plaintiff has engaged in protected activity and Defendants have denied her equal protection of the law by selective enforcement violations against her as a class of one as compared to others who have received similar No Trespass Notices.

334.     All Defendants and perhaps unknown others associated with Defendants knew or thought Plaintiff Douglass is a member of a class of one or more women who are outspoken about GCCC and about the college's leadership, employees, agents or ally's treatment of women on its campus, in its programs or associated with its events.

335.     All Defendants and perhaps unknown others associated with Defendants knew or thought Plaintiff Douglass supports women on the GCCC campus, in its programs and in their community as a constituent member of a class of one or more persons based on gender and they knew this because of her outspoken statements in support of her gender.

336.     All Defendants and perhaps unknown others associated with Defendants may also have identified her as a member of a more narrowly tailored class of one or more persons who publicly objected to the college's inadequate enforcement of women's rights, in general, and

Title IX gender rights, specifically, and/or as a person who objected to retaliation by the college for anyone having exercised her/his First and Fourteenth Amendment rights to support, in words or deeds, women's rights on the GCCC campus and/or as a person whose class for purposes of this Count is known for expressing speech supportive of women coupled with content of such speech being critical at times of the college, its administrators, staff, faculty and/or specifically Defendant Swender and/or the named trustee Defendants with respect to women's rights.

337.    Plaintiff Douglass is identified by all Defendants and perhaps unknown others associated with Defendants, as a class of one or more persons who publicly support and advocate for better enforcement of Title IX rights at GCCC, for better treatment of women and their rights at GCCC, and speak critically at times of the college, its administrators, staff, faculty and/or specifically Defendant Swender and/or the named trustee Defendants on this subject.

338.    With respect to each class identified in the paragraphs above, Plaintiff asserts Defendants have discriminated against her because of her class membership, the effect of which is to burden a protected class by engaging in or encouraged sex discrimination.  The actions place a special burden on women and their supporters within the community by the maintenance of rules and practices that disfavor women and Plaintiff in particular.

339.    Defendants have held out to the public their disdain for Plaintiff because she is an outspoken supporter of women's rights and the use of the Notice to keep her off campus and away from college events was an attempt to encourage, aid and facilitate the continued discrimination against and segregation of women during the educational process, treating her as a class member differently from others not in this class.  She was singled out for selective enforcement of the college's rules regarding issuance of No Trespass Notices and burdened thereby.

340.    Upon information and belief, Defendant Dozier and others at the college, for example Emily Clouse, went looking for people to write letters or send emails taking positions against Plaintiff Douglass and looking for potential bad acts others may point to in order to support the issuance of the Notice.  This search for evidence to support the Notice is believed to have taken place after it was issued, not so much before, to bolster the body of evidence, knowing that the Notice lacked probable cause to be issued in the first instance, but this same search for evidence also supports Plaintiff's assertion that it was done to send a discriminatory message that women who are outspoken for women's rights are as a class to be held up for ridicule, punishment and castigated.

341.    The Defendants acts caused deprivation of her rights and caused her injury.

342.    Defendants adopted through its final administration decision maker, Swender, or through its final decision maker for its law enforcement entity, Dozier, a College policy authorizing the use of No Trespass Notices for the purpose of chilling constitutional rights to free speech, petition, and association, which became college policy and violates Plaintiff's rights under the *Monell Doctrine* applied through 42 U.S.C. § 1983.

343.    The behaviors of Defendants at issue in this case are so closely analogous to the councilmembers' retaliatory conduct causing the arrest of Mr. Lozman for speaking up at a council meeting on a subject matter the council considered off-limits, which the Supreme Court denounced on June 18 2018 in the *Lozman* case, it is more likely true than not, that the college's lifting of the Notice against Plaintiff Douglass on July 27, 2018, was done for fear of liability based on the Court's conclusion that "when retaliation against protected speech is elevated to the level of official policy, there is a compelling need for adequate avenues of redress".  Plaintiff Douglass seeks redress for the college's use of the Notice for retaliation and against Defendants

Dozier and Swender individually for their continued imposition of the Notice against her after June 18 until July 27 when they were put on notice that qualified immunity should not apply to such a clearly established right.

344.    In this case, concerted acts of Defendants were designed to punish her for speaking and for petitioning for students' Title IX rights, to set her apart from the associations she had known and loved hosting student athletes, and to make her pay, socially, emotionally and financially, for having exercised her First and Fourteenth Amendment Rights.

345.    Plaintiff seeks punitive damages to the extent they are awardable against only those Defendants the law properly permits granting such awards as an earsplitting warning to deter others from engaging in similar institutionally-adopted aberrant behaviors and risk bringing GCCC or any other Kansas educational institution into analogous, unnecessary disrepute by out of control, state-sanctioned folly and irrationality, carried out by unconstrained, powerful and manipulative college leadership.

346.    As a result of the foregoing, Plaintiff was deprived of her liberty, suffered specific and serious physical injury, psychological injury and emotional distress, great humiliation, reputational damage, and was otherwise damaged and injured.

347.    WHEREFORE, Plaintiff prays for an award of actual damages against Defendants in an amount in excess of $75,000, under the Constitution and 42 U.S.C. § 1983, fully compensating Plaintiff for the damages suffered as a direct and proximate result of Defendants' unjustified actions; an award of interest and costs of suit, including reasonable attorney fees pursuant to 42 U.S.C. § 1988; punitive damages as justified, and such other and further relief as the Court finds just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

## DESIGNATION OF PLACE OF TRIAL

Plaintiffs designate the place of trial in Kansas City, Kansas.

Respectfully submitted,

/s/ Jean Lamfers
Jean Lamfers, KS #12707
Lamfers & Associates, L.C.
7003 Martindale
Shawnee, KS 66218
Tel.: (913) 962-8200
jl@lamferslaw.com

and

Sarah A. Brown, KS #12130
Brown & Curry, LLC
1600 Genessee Street, Suite 956
Kansas City, MO 64102
Tel.: (816) 756-5458
Fax: (816) 666-9596
sarah@brownandcurry.com

ATTORNEYS FOR PLAINTIFFS