## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **ANTONIA DOUGLASS and** | ) | |
| **ELIZABETH EVERETT** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.  2:20-cv-2076-KHV-GEB** |
| | ) | |
| **GARDEN CITY COMMUNITY** | ) | |
| **COLLEGE, et al.** | ) | |
| **Defendants.** | ) | |

## PRETRIAL ORDER

On September 6, 2022, U.S. Magistrate Judge Gwynne E. Birzer conducted a pretrial conference in this case by videoconference. A second pretrial conference was conducted on September 21, 2022. At both conferences, the parties appeared through the counsel as follows. Plaintiffs Antonia Douglass and Elizabeth Everett appeared through counsel Jean Lamfers and Sarah A. Brown. Defendants Garden City Community College ("GCCC"), Herbert Swender, Rodney Dozier, Merilyn Douglass, Blake Wasinger, Jeff Crist, Steven Martinez, Teri Worf and Brice Knapp appeared through counsel Jeremy K. Schrag. Defendant Swender additionally appeared though personal counsel Ronald P. Pope.  Defendants Freddie Strawder and City of Garden City, Kansas appeared through counsel Samuel A. Green.

This pretrial order supersedes all pleadings and controls the subsequent course of this case.  It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice.  Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(b).

1.    **PRELIMINARY MATTERS.**

    **a.**    **Subject-Matter Jurisdiction.**  Subject-matter jurisdiction is invoked under 28 U.S.C. § 1331 and is not disputed.

    **b.**    **Personal Jurisdiction.**  The court's personal jurisdiction over the parties is not disputed.

    **c.**    **Venue.**  Venue in this court is not disputed.

    **d.**    **Governing Law.**  Subject to the court's determination of the law that applies to the case, the parties believe and agree that the substantive issues in this case are governed by the following laws:

        Title IX of the Education Amendments of 1972; The United States Constitution and 42 U.S.C. § 1983 (First, Fourth, Fifth and Fourteenth Amendments); 42 U.S.C. § 1983; 42 U.S.C. § 1985.

2.    **STIPULATIONS.**

    **a.**    The following facts are stipulated:

        **i.**    Antonia (Toni) Douglass lives in Garden City and is a Garden City community member.

        **ii.**    Douglass is not a GCCC student or employee.

        **iii.**    Elizabeth Everett is a former Garden City Community College (GCCC) student.

        **iv.**    Elizabeth Everett was a member of GCCC's cheerleading squad.

        **v.**    GCCC is an educational institution and a community college in Kansas.

        **vi.**    GCCC a public entity as defined by the Kansas Open Records Act.

  **vii.**  GCCC is a "person" within the meaning of 42 U.S.C. § 1983 and pursuant to state law the college is not entitled to sovereign immunity.

  **viii.**  GCCC is a recipient of federal funds.

  **ix.**  GCCC is a member of the KJCCC.

  **x.**  Herbert Swender is the former President of GCCC and was president until August 2018.

  **xi.**  Rodney Dozier is the Chief of Police for the GCCC Police Department.

  **xii.**  Blake Wasinger, Jeff Crist, Steven Martinez and Teri Worf were Trustees of GCCC and Merilyn Douglass was and is a Trustee of GCCC.

  **xiii.**  Brice Knapp is the former Cheer Coach employed by GCCC from April 2014 until the end of March 2018.

  **xiv.**  Freddie Strawder was employed by the City of Garden City as a detective with the Garden City Police Department in 2018.

  **xv.**  Brice Knapp resigned on March 29, 2018.

  **xvi.**  Herbert Swender resigned in August 2018.

  **xvii.**  AD John Green resigned in October 2018.

**b.**  The parties have stipulated to the admissibility of the following exhibits for purposes of summary judgment and trial:

  **i.**  Video of GCCC Board of Trustee Meeting, June 9, 2020 (A00040);

  **ii.**  Video of GCCC Board of Trustees Meeting, June 25, 2020 (A00041);

  **iii.**  No Trespass Notice (A00001)

  **iv.**  Declaration and Documents Produced by Fort Scott Community College Pursuant to Business Records Subpoena (Tiumalu) (A01245-A01258)

  **v.**  Declaration and Records Produced by NJCAA Pursuant to Business Records Subpoena (Tiumalu) (A01259-A01264)

vi.      Documents Produced by the NJCAA Pursuant to Business Records Subpoena (Tiumalu) (A01265-A01269)

vii.     Files Produced by Tammy Hutcheson Pursuant to Subpoena including:

         a. Tiumalu Texts
         b. Audio Recording March 22 2018; 11.37.03 a.m. liz office mtg
         c. Audio Recording March 22 2018; 14.39.39 p.m. liz office 2
         d. Audio Recording March 29 2018; 08.14.49 a.m. ryan and emily
         e. Audio Recording March 29 2018; 16.51.05 p.m. walked in on Emily DCCC
         f. Audio Recording March 29 2018; 17.27.35 p.m. dccc in hall
         g. Audio Recording May 3 2018; 10.58.01 a.m. strawder
         h. Audio Recording July 31 2018; 19.36.30 body language recording
         i. Audio Recording; Social Media
         j. Audio Recording; Feb 2018 (Swender at employee meeting re body language)

viii.     GCCC Board of Trustees Meeting minutes April 10, 2018

ix.      GCCC Board of Trustees Meeting minutes May 8, 2018

x.       Goheen Report dated December 11, 2018

xi.      Student Athlete Handbook 2017-2018 (ESI-007656-7679)

c.       It is stipulated by the parties that, for purposes of any summary judgment motions and trial, all exhibits marked and/or used during depositions taken in this matter and all documents produced during discovery in this matter up through September 13, 2022, to include documents produced in response to any authorization or release of records or subpoenas issued to third parties, meet the standards for foundation and authenticity and that copies may be used in lieu of originals. The parties reserve their rights to object to the admissibility in summary

judgment motions or at trial on any other grounds, including without limitation, relevance, hearsay, materiality, prejudice, confusion, duplication, waste of time, improper character evidence, privilege, improper lay opinion, lack of personal knowledge, and/or competency.

3.    **FACTUAL CONTENTIONS.**

    a.    **Plaintiffs' Factual Contentions.**

        i.    **Plaintiffs' Common Factual Contentions**

Antonia Douglass is a resident of Garden City, Kansas. For more than 25 years, she has been an active participant in GCCC programs and events, and has served as a host mom for GCCC student athletes, a volunteer for the GCCC Endowment Association and a booster for the Broncbusters Athletic Association, a college-sanctioned fundraising organization.

In the 2017-2018 school year, Elizabeth Everett was a student at GCCC and a petite, freshman member of the cheer squad. In the summer of 2017, she had her physical exam with Wasinger to be cleared to participate on the college cheer team. When her mother, Eleanor Everett, went to pick up the paperwork, Wasinger warned her to be careful about the cheer coach, Knapp, and her daughter's participation in cheer.

        *Prior complaints about Knapp*

Coach Knapp had been the subject of several prior sexual harassment complaints involving female students for behaviors dating back to the summer of 2014. GCCC administrators conducted investigations into sexual harassment complaints against Knapp in 2015 and again in 2017. In 2015, Sophia Hernandez had reported Knapp making

sexually inappropriate remarks to her daughter. In 2017, Hernandez reported Knapp had photographed cheer students' bare butts at a hotel where they were staying for a competition. GCCC's top administrators, including Swender, Human Resources administrators, Chief Financial Officer, Title IX administrators and investigators, and Athletic Director John Green had actual knowledge of these complaints. No effective remedial action was instituted which led to continued sexual harassment of female students, including Plaintiff Everett.

Starting in 2017, individuals began to share concerns with Douglass about GCCC's past and ongoing treatment of female students, and in particular cheer coach Brice Knapp's inappropriate behavior toward female cheer squad members.

In early 2018, Douglass privately reached out to GCCC administrators, Trustees and encouraged students, parents and others to report their Title IX concerns to GCCC through the appropriate channels. She offered to deliver their messages to the GCCC Board of Trustees ("the Board") in an attempt to substantiate the depth and breadth of the problems. When GCCC administrators and the Trustees failed to take action, Douglass came to believe that their concerns were falling on deaf ears and that GCCC was intentionally scuttling the sexual harassment and discrimination complaints.

Everett made an informal report to her coach, Knapp, in February of 2018 that a fellow cheer squad member Henry Arenas blackmailed her and demanded that she perform sexual acts with him or he would publicly release a compromising party picture of her. After meeting with Knapp, Everett then reported the incident to AD Green.

### *The February 23 meeting*

On or about Friday, February 23, 2018, after normal business hours, AD Green called Everett into his office for an impromptu meeting. Everett showed up alone. When Everett entered the office, AD Green, the assistant AD, Coach Knapp and Arenas antagonistically confronted her, cornering her, and tried to convince her that her informal reports were wrong because none of their actions were offensive, inappropriate or amounted to sexual harassment. Everett quickly realized that the meeting was not appropriate and came to understand it was an unsanctioned Title IX hearing and a preemptive measure to tamp down her informal reports. Everett believed that AD Green, Coach Knapp and Arenas intended the meeting to be a deterrent or warning to women in athletics or women in general on campus to not question male authority or raise claims of sexual harassment because they will not be well-received. GCCC's Title IX coordinator was not present during the meeting.

Feeling intimidated, Everett texted Douglass, a host mom for GCCC student athletes, for help. Everett asked Douglass to quickly come to the office of GCCC AD Green.

When Douglass received the urgent text from Everett, she and her husband went to AD Green's office on campus. The assistant AD met her outside of AD Green's door. Douglass explained that Everett had sent her an urgent text message and asked her to come to the meeting. The assistant AD stalled for time and blocked the entrance. Douglass grew increasingly concerned, believing that the assistant was actively covering up how Everett was being treated in the meeting. She finally told the assistant AD to step aside or she

would call law enforcement based on Everett's plea, because something was wrong. When Douglass entered the office, she found Everett curled up in a chair in the corner, cowering in fear and surrounded by AD Green, Coach Knapp and Arenas.  Everett was relieved to see Douglass and left with her shortly thereafter.

### The Title IX investigation

Ryan Ruda, Vice President for Instruction and Student Services, as well as the GCCC Title IX Coordinator and Investigator, began an investigation into Everett's complaints on February 27, 2018. Ruda reported the summary of his interviews and findings to Swender and others on March 12, 2018.  AD Green had previously reported his version of the February 23 meeting to Ruda.

### Plaintiffs' efforts to address on-going sexual harassment

After the February 23, 2018 incident, Douglass encouraged Everett to tell Everett's mother about the cheer squad's sexual harassment issues. Douglass also decided that because GCCC leadership had ignored her past concerns, she had no choice but to inform the Board of Trustees about the pervasive sexual harassment in the Cheer program in support of the Title IX victims.

When Everett told her mother about the February 23 incident and other issues of sexual harassment, her mother recalled that in the summer of 2017, Blake Wasinger—a member of the GCCC Board of Trustees ("the Board") and a doctor who performed physicals for GCCC student athletes—told her to "be careful about the cheer coach and [her] daughter's participation in cheer."  Trustee Wasinger's comment especially concerned Everett's mother because at the time, Everett was 17.  Everett's mother had approached

Coach Knapp about the odd comment, but he assured her that he would watch out for her daughter. Everett's mother now believed that Trustee Wasinger's comment was about Coach Knapp himself, and his prior sexual harassment issues.

On March 23, 2018, Everett reported that from the fall of 2017 through the spring of 2018, Coach Knapp had sexually harassed her. Tammy Hutcheson, a GCCC faculty member, assisted Everett with making her complaints of sexual harassment and retaliation. Hutcheson met with Ryan Ruda, Emily Clouse, as well as the outside investigator Bev Temaat concerning the sexual harassment Everett had experienced.

Others had also reported sexual harassment in the cheer program to GCCC administrators. Aaron Kucharik, a community member and member of the GCCC Endowment Society, received an anonymous packet containing letters and photos concerning Coach Knapp's sexually inappropriate conduct at the funeral home in Garden City where he worked. Kucharik delivered this "dead drop" packet to GCCC's administration, including Ryan Ruda, Melanie Hands, and Emily Clouse, with the intent that the college administration would address the situation with Knapp that had been festering for years. Renee Harbin, another GCCC faculty member, wrote a letter on March 26, 2018 to the GCCC Human Resource office which communicated incidents of sexual harassment by Knapp of female cheer students who were afraid to come forward themselves for fear of retaliation and backlash. By the end of March 2018, Douglass and Kucharik had also taken information regarding the cheer coach's sexually improper conduct to the Garden City Police Department, making them aware of issues going on at

the campus involving coach Knapp. None of these reports were adequately dealt with by GCCC.

### *The April 10, 2018 Board meeting*

On April 10, 2018, at a Board meeting, Douglass spoke during the public comment portion. Douglass stated that GCCC employees were subjecting Everett and other female athletes in the cheer program to unwelcome, improper sex discrimination. As evidence, she presented letters from seven women or their parents addressing sex discrimination involving Coach Knapp.  She asked the Trustees to rectify the sex discrimination problems at GCCC, but they appeared hostile and indifferent.

Everett's mother also spoke during the public comment portion, opposing sexual harassment against her daughter and others at the meeting. In addition, community member Kucharik spoke at the meeting in support of the victims of sexual harassment.

Plaintiffs and their supporters hoped that Board members would take action and address the multiple Title IX claims brought against Coach Knapp and systemic issues lingering at the college. But the Board was unreceptive and indifferent. The Board also refused to reopen the public comment portion of the meeting for a female cheer student who wanted to comment on the cheer squad sexual harassment situation. The local newspaper then publicized stories about the cheer scandal. After making their public statements, Douglass, Kucharik and Everett suffered retaliation by Defendants for having spoken to the Board and publicizing the sexual harassment issues at the college.

10

### The May 8, 2018 Board meeting

On May 8, 2018, the GCCC faculty submitted a Faculty Senate Report to the trustees with detailed complaints about inadequate oversight of Swender. The Senate Report mentioned the No Trespass Notice served on Douglass, the sexual harassment and misconduct by Knapp, and related Title IX concerns, among other issues. In response, the Board hired in June an allegedly independent investigator, Greg Goheen, to look into the matters raised in the report excepting Title IX. Goheen was not unbiased or neutral. The independent investigator did not interview Tiumalu and other key witnesses mentioned in the report.

The May 8, 2018 meeting was attended by numerous individuals, including a number of students on the cheer squad who supported Knapp. Everett, Douglass and their families and friends needed to be escorted for their safety by GCCC police through the hostile crowd at the conclusion of the meeting.

On May 10, GCCC received a request under the Kansas Open Records Act ("KORA"), K.S.A. § 45-215 et seq., asking for the email records of more than 20 people, including Plaintiff, who had Title IX issues at GCCC. This "fake" KORA request is believed to have been submitted by Swender as a fishing expedition concerning individuals who might be termed critics of the president, including Plaintiffs.

### The January 2019 Board meeting

In January of 2019, the Board accepted the investigator's report and voted to approve the report even though it contained misstatements of fact and fraudulent findings. The Board then released it to the public. The actions of the Board were not isolated acts of

misconduct but instead resulted directly from Defendants' official customs, policies, patterns or practices allowing Swender and his administration to take actions essentially unsupervised by the Trustees.

### *The June 2020 Board meetings*

At two Board meetings in June of 2020, Trustees Blake Wasinger and Merilyn Douglass condemned and expressed annoyance at lawsuits like Plaintiffs' because they increased GCCC's insurance rates and wrongfully harmed the college financially. They also blamed and inferred that people involved in civil rights lawsuits like plaintiffs or who supported such claims were bad people in the Garden City community, were damaging the College, the students and destroying faculty and staff jobs because those were the consequences of the insurance rate hikes wrought upon the College due directly to the civil rights claims. The ostracizing comments by Wasinger and M. Douglass were directed toward Plaintiffs and witnesses who supported their complaints. By sharing these comments with a wide audience, Wasinger and M. Douglass injured Plaintiffs' reputations, intimidated them from testifying, and intimidated witnesses from associating with or testifying for them.

Defendants Wasinger and Douglass, overlooking their own oversight failures in the first instance, made statements blaming a discrete, protected class of individuals entitled to due process, first amendment protection from retaliation, and equal protection of their civil rights, as the cause of the insurance rate increase were intimidating. They linked the initiation of civil rights litigation to the college's economic and student harms, which also breached the Trustees' written agreement of non-retaliation associated with the Goheen

investigation. The Defendants' actions and statements were intended to and did intimidate and threaten Plaintiffs, and deter their witnesses from testifying against the college about the Title IX allegations.

### ii.   Plaintiff Antonia Douglass' Factual Contentions

After the April 10, 2018 Board meeting, GCCC and the Board started to retaliate against Douglass for supporting Title IX victims. One day while on campus, Douglass was participating in a letter of intent signing and speaking about the Title IX allegations when GCCC employee Leslie Wenzel cut her off and rudely and abruptly whirled around, turning her back on her. Then, on April 25, 2018, without prior warning, the GCCC Campus Chief of Police Rodney Dozier and a Garden City Police Department ("GCPD") uniformed officer served Douglass with a No Trespass Notice ("Notice") banning her from campus with no opportunity or avenue to appeal. As the basis for the Notice, Dozier cited the exchange with Wenzel. Dozier and HR director Emily Clouse solicited individuals Douglass did not know or have contact with to provide complaints against her. These individuals had close ties to Knapp and GCCC administration. Douglass believes that GCCC issued the Notice to intimidate and harass her, and to deter further comments by her and others who had spoken up at the Board meeting in support of female students who were being sexually harassed and retaliated against in violation of Title IX. The administration was attempting to silence her and anyone else from exercising their first amendment rights to speak and associate with others. She believes that Swender was instrumental in initiating the Notice and in keeping it in place for months thereafter.

Douglass asked the college administration and the Trustees to revoke the Notice, especially because its timing prevented her from attending GCCC's graduation ceremony and other important end-of-year GCCC events. The administration and Trustees instead failed to intercede and they enforced the Notice. Then, on July 27, 2018, without explanation or apology, GCCC lifted the Notice. Douglass fears the likelihood of reissuance because GCCC did not de-weaponize its potential use, adopt policies restricting its use or condemn its past misuse.

In the summer of 2019, after a Board meeting, the Trustees insisted that Douglass should just move on regardless of their failure to adopt permanent changes. After Douglass publicly opposed sexual harassment in support of the Title IX victims, she suffered socially, emotionally and financially and was set apart from the relationships and associations that she had known and loved hosting student athletes. Because Douglass supported and associated with Title IX victims, Defendants retaliated against her by publicly shaming her at Board meetings and issuing the Notice without probable cause that banned her from campus and GCCC events,

Defendants failed to fix Board custom, polices and/or practices associated with retaliatory behavior based on the content of speech and gender-based discrimination. The Trustees silenced her at Board meetings by eliminating the public comments at Board meetings in February 2019, publicly shamed her and blamed her for GCCC's financial woes at the Board meetings in June 2020, and interfered with her ability to host student athletes and used their public offices to intimidate witnesses from associating with or testifying for her.  These retaliatory actions were based on GCCC's Title IX policy or custom to scuttle

any Title IX complaints, silence and intimidate critics and inadequately enforce Title IX. These behaviors continued long after Brice Knapp left the college and are unabated.

In the spring of 2018, when Douglass started to publicly support Title IX victims and bring attention to Title IX allegations, Swender, Dozier and other employees at GCCC had a meeting of the minds to orchestrate the issuance of the Notice on April 25, 2018. When defendants wrongfully issued the Notice, they prevented her from reporting Title IX violations on campus, supporting Title IX victims on campus and hosting GCCC student athletes. Defendants had provided an appeal procedure or mechanism to other individuals who received a Notice but refused to provide one to her. The Notice caused a chilling prior restraint on her speech, harmed her reputation and hurt her emotionally, physically and economically. GCCC employees and Trustees endorsed their behavior by refusing to revoke the Notice and instead enforcing it and publicly shaming her at Board meetings which violated her First Amendment rights of speech, association and petition by intimidating and silencing her for reporting Title IX concerns and for her participation in a recall petition campaign of five of the six Trustees, excepting Trustee Leonard Hitz. These conspiratorial actions were based on GCCC Title IX policy, custom or practice to act in concert to intentionally quiet any Title IX complaints, silence and intimidate critics and inadequately enforce Title IX. This policy was enabled by and carried out by final, official decision makers, namely Swender, Dozier, and the defendant Board members.

### iii.    Plaintiff Elizabeth Everett's Factual Contentions

Everett started to experience backlash for coming forward with the Title IX allegations. On or about May 9 or 10, 2018, Everett made a comment to another cheer

squad member who openly disliked her and whose mother was one of the individuals solicited by Knapp, Clouse and/or Dozier for negative comments associated with Douglass to keep the no trespass in place. Someone then called the Garden City Police Department ("GCPD") and reported that in a text exchange. Detective Freddie Strawder, a GCPD employee and a GCCC adjunct criminal justice instructor, learned of Everett's comment and invited the peer to come to his office the next day. In his office, Strawder determined the text did not constitute probable cause for any action against Everett. He then proceeded to dictate or direct the peer about what to text Everett, how to say it and how to keep pushing the envelope to coax Everett into allegedly making a criminal threat against the peer. Strawder admitted in his official police report that the GCPD lacked probable cause to arrest Everett for her initial text and he failed to include in the Affidavit for an Arrest Warrant the material fact of his direct participation in the ensuing text messages exchanged. Swender's administration directed the call to Strawder to report the text.

On May 10, 2018, the GCPD arrested Everett based on the text exchange for making a criminal threat and causing terror, evacuation or disruption. Everett was strip-searched and placed in a jail cell naked, with only a blanket, overnight. During that night, officers coincidentally arrested the student who had harassed and blackmailed her, Henry Arenas, and escorted him through the jail where he taunted Everett from outside her cell. Everett was arrested without probable cause and Strawder submitted a post-arrest affidavit to support her arrest warrant that contained inaccurate, misleading or fabricated evidence.

GCCC employees and board members had actual knowledge that Coach Knapp had sexually harassed female cheer students previously. Wasinger, Swender and GCCC

administrators had actual knowledge that Knapp posed a serious, specific threat to female students, including Everett.

Everett engaged in protected activity when she reported the harassment of coach Knapp and Henry Arenas, as well as through the reports of harassment made on her behalf by her mother, Eleanor Everett to trustees Wasinger and Hitz, the report of a community member, Jeffrey Weeast to president Swender and to trustee Wasinger on her behalf regarding the harassment she was subjected to, and the presentations of support for her and others similarly situated to the board of trustees on April 10, 2018, made by Plaintiff Douglass, Eleanor Everett, and Aaron Kucharik.

After she reported the sexual harassment, Everett was subjected to intimidation and interrogation by AD Green and others when she was denied access to educational opportunities in the form of participation in extracurricular activities, when she was urged to take different classes because she was being intimidated by others in the classes she enrolled in, when she was subjected to shunning by her peers who were encouraged to do so by Knapp and his supporters, when she missed school due to anxiety, depression and stress caused by the Defendants' conduct, when she was threatened with having her scholarship taken away by Knapp after she complained about the blackmail, when she was excluded from the athletic banquet, when she was subjected to a conspiracy by college officials including GCCC employees and GCPD dual employee Strawder to engage in a course of conduct leading to her unlawful arrest through incitement and by baiting her through text messages dictated by Strawder into allegedly making a criminal threat against a peer, when she was forced to expend thousands of dollars in attorneys' fees and bond to

defend the criminal action, when she was forced to undergo the unlawful arrest, detention, strip search, and humiliation associated with it, when she experienced public contempt and ridicule by Defendants for having reported Title IX harassment, when she was denied future participation in extracurricular activities because of ongoing intimidation carried over to the new coach, when she suffered from such extreme psychological distress that it affected her grades, causing her to withdraw from classes and fail others resulting in delays toward graduation and additional semesters of classes, when she was maliciously taunted by Henry Arenas who was paraded through the jail during her overnight detention and yelled intimidatingly at her.

GCCC exhibited deliberate indifference to Everett's rights and wellbeing by continuing to employ, endorse and promote Knapp, and at no time take action to limit his interactions with female students, despite actual knowledge of a credible report of inappropriate sexual harassment. The complaints of other students were also deliberately ignored despite Swender being advised by Temaat of the need to take immediate action to hire outside, experienced investigators in March or April 2018 to conduct a full-fledged Title IX investigation of at least four areas of concern she reported to him and college counsel Randy Grisell. GCCC remained deliberately indifferent even after it had actual knowledge that Everett had been sexually harassed. GCCC's deliberate indifference is also evinced by its deliberate decision to interrogate the Plaintiff in an attempt to pressure her into denying or withdrawing her reports of harassment, its affirmative decision to do nothing at all regarding Plaintiffs' reports of sexual harassment and retaliatory harassment, its affirmative decision to allow its coach to exclude Plaintiff from athletic and educational

activities, its affirmative attempts to frustrate Plaintiff's attempt to provide complete and accurate information to the third-party investigator into the reported harassment and the exclusion of Plaintiff's mother from the interview process even though Plaintiff wanted her as a witness to the interview, its failure to provide Plaintiff with documentation of findings and a report as college policy assured would be provided, its encouragement of other cheer students to engage in intimidation of Plaintiff even after coach Knapp was no longer employed. The failure to train was evidenced by HR's Clouse inadequate investigatory skills she displayed to Temaat, which Temaat told Swender was a concern and issue that his staff was not doing the right things. The failure to train was also evidenced by the abusive interview tactics employed by Knapp and Green contrary to Title IX policies and practices.  GCCC's affirmative actions and inactions made Plaintiff more susceptible to sexual harassment and retaliation both before and after her reports, and its conduct was in no way reasonably designed to help Everett or stop the hostile educational environment. Defendant's conduct created an incendiary spark to encourage more retaliation, which it did by widening its reach into the GCPD.

GCCC exhibited deliberate indifference and reckless disregard for Everett's rights and safety when it failed to conduct a timely, proper and reasonable Title IX investigation, when it permitted Knapp to conduct an unauthorized Title IX investigation, to do so in a FERPA privacy violating manner and Title IX retaliatory manner allowing other students to be present during an initial interview, and in doing so to violate Elizabeth Everett's rights.  GCCC also violated her Title IX rights when it condoned the February 23, 2018 unsanctioned and unauthorized hearing conducted by AD Green, when it covered up prior

complaints involving coach Knapp dating back to behaviors starting in 2014, when it withheld a recording of Knapp's unauthorized investigative interview, when it completely failed to investigate Everett's Title IX retaliation complaint, when it retained Bev Temaat of Dodge City Community College who was represented to Everett and the public as the college's independently retained Title IX investigator, but who denied she was ever retained by GCCC to do anything but a preliminary factfinding mission, when it failed to require a report of Temaat under the circumstances, when GCCC itself performed an inadequate investigation that among other things failed to include any reference to a recording of an initial interview with Everett in its official records, when Temaat did report to Swender that she had significant concerns with the college's training for any investigation, personnel related or otherwise associated with Everett, by allowing Knapp to intimidate and threaten Everett's scholarship status during his inadequate interview attended by three other students, and by its subsequent intimidation and continued retaliation against Plaintiff.

GCCC possesses both an informal and an official policy of deliberate indifference under the guise of the Carver model of governance by its failure to provide adequate training or guidance to state actors exercising oversight authority who failed to have adequate skills and experience to conduct investigations, as confirmed by Temaat's report directly to Swender, including that its informal policy allowed a human resources director untrained in Title IX to attempt to conduct Title IX interviews of individuals and the college president called on an outside investigator to purportedly overcome those training failings but never fully retained that investigator and failed to immediately retain qualified other

investigators to properly investigate Ms. Everett's claims. The college acknowledged a need for expertise, then failed to properly acquire such expertise or train its own staff to carry out the requisite investigation of Everett's matter. When the outside investigator noted at least four different Title IX potential violations, including systemic oversight issues, GCCC and its president were deliberately indifferent to the needs of its entire college community to fix its identified shortcomings. When GCCC recognized it is obviously necessary for implementation of its Title IX program or policy which without proper control, results in sexual harassment and retaliation they failed to take action to ameliorate the inadequacies. GCCC possessed an official policy of condoning sexual harassment and discrimination, as evidenced by the conduct of policy-making officials of permitting coach Knapp to conduct an investigation in his own program, to make sexual comments about female cheer students on campus or at campus events and retaining him in the college's employment even after prior sexual harassment complaints by female cheer students dating back to 2015, and inadequately responding to complaints about this conduct and thus acquiescing and approving the coach's and male student's sexually harassing behaviors. GCCC was deliberately indifferent to the sexually charged hostile educational environment coach Knapp and the male cheer peer continued to create. GCCC also had an official policy of deliberate indifference to training athletic department staff, coach Knapp, AD Green and fellow college employees in their duty to do everything in their power to stop sexual harassment from occurring and to avoid retaliating against any person who reports harassment. These inadequate policies caused or contributed to cause the hostile educational environment Everett was subjected to including being interviewed,

21

investigated and threatened with loss of her scholarship during the interview by Knapp whose behaviors contributed to or created the hostile environment in the first instance.

GCCC is responsible for enforcing its policies and ensuring that its employees are adequately trained to follow the policies. The deliberate indifference and lack of enforcement of the policies contained in the Student Athlete Handbook of 2017-18, in the college's inadequate but published grievance procedures, and its adoption by the trustees of the Carver model of governance that abdicates trustees' control to the one employee it purportedly oversees, the president, made Plaintiff Everett more vulnerable to the sexual harassment and retaliation by male students and coach Knapp. The policies require the trustees to take a hands-off approach to oversight to such a degree that the trustees are not adequately trained and equipped with the skills to conduct proper oversight and the use of the Carver model at GCCC set in stone the systemic oversight inadequacies that permitted Swender and his administration to informally adopt policies that violate Title IX and Everett's First Amendment and Fourth Amendment civil rights.

GCCC's employees, including Swender, the Trustees, Dozier, Knapp, and other administrators, violated plaintiff's constitutional rights when they conspired against her to deter her from reporting, prosecuting, and testifying about Title IX issues by orchestrating a scheme that involved peer cheer students being inappropriately involved in an interview process and pressuring her to make possible admissions against her interests, to undermine her claims, to aid and abet her arrest that lacked probable cause and later publicly blaming her for GCCC's financial woes caused by leaderships' overt and covert cover up behaviors. These actions were based on GCCC's Title IX policy or custom to act in concert to silence

and intimidate complainants and critics, cover up systemic abuse, protect abusers like Knapp and inadequately enforce Title IX.  The false arrest and comments caused Everett psychological injury, reputational harm, bodily harm and economic harm because among other harms Everett had to pay for court costs, bond and criminal attorney's fees and she faces permanent damage to employment prospects based on the notoriety GCCC's conspiratorial acts triggered.

> ### b.    Defendants' Factual Contentions.

Plaintiffs are friends and jointly bring this lawsuit against GCCC and its Board of Trustees members  because of their subjective belief that they were wronged by GCCC and are entitled to monetary compensation.  Plaintiff Everett also asserts claims against the City of Garden City and Freddie Strawder.

> #### i.    *Plaintiff Antonia (Toni) Douglass*

Plaintiff Antonia (Toni) Douglass ("Douglass") is a Garden City resident and self-proclaimed supporter of Garden City Community College ("GCCC") events.  She is not a GCCC student or employee. Her complaints stem from a short series of events beginning in February 2018 and concluding in July 2018.

Douglass claims that on February 23, 2018, she briefly attended a Title IX meeting with Plaintiff Elizabeth Everett and GCCC's athletic director regarding sexual harassment allegations about the GCCC cheerleading program. A few weeks later, on April 10, 2018, Douglass attended a GCCC Board of Trustee's meeting in which she accused the Board of Trustees of failing to respond to sexual harassment complaints. On April 25, 2018, after

Douglass threatened several GCCC employees and students, Defendant Rodney Dozier–a GCCC police officer–issued her a No Trespass Notice. The No Trespass Order restricted Douglass from entering the GCCC campus or attending GCCC sponsored events. She claims that GCCC issued the No Trespass Notice in retaliation for her comments at the April 10, 2018, board meeting. This is unfounded.  Douglass threatened GCCC employees and students while attending GCCC sponsored events. Her behavior and statements continued to escalate. Her threatening behavior lead to the issuance of the No Trespass Notice. The No Trespass Notice was rescinded three months later on July 27, 2018. Douglass claims the No Trespass Notice violated her Title IX and constitutional rights.

### ii.   *Plaintiff Elizabeth Everett*

Plaintiff Elizabeth Everett ("Everett') is a former student who attended GCCC from 2017 to 2018 and was a member of the cheerleading squad. She alleges that she was sexually harassed and blackmailed by another cheer student and that after she reported this to GCCC, she faced retaliation.

In February 2018, Everett brought Title IX complaints against a fellow student for sexual blackmail. GCCC investigated the allegations and removed the accused student from the cheer squad. Everett then alleged that her cheer coach retaliated against her for filing a Title IX complaint. GCCC again investigated Everett's complaint and GCCC's cheer coach's employment ended one week later.  GCCC acted promptly to all of Everett's complaints.

Everett was arrested on May 10, 2018 for criminal threat.  She threatened a fellow student, Sabrina Gunnip, by calling her; sending text messages; and posting threats of

24

violence on Facebook. The threats were made on May 9, 2018 and May 10, 2018.  Freddie Strawder, a detective with the Garden City Police Department ("GCPD") investigated the threat after he received a call from the victim, Gunnip, on May 9, 2018.  Gunnip was crying and indicated she felt threatened by Everett. Strawder continued the investigation on May 10, 2018. While Strawder was meeting with Gunnip on May 10, 2018, Everett continued sending threatening text messages to Gunnip.  Everett was arrested by GCPD on May 10, 2018 for criminal threat, a felony.

Everett threatened Gunnip because she supported cheerleading coach Knapp. Everett claims that GCCC and the Board of Trustees conspired together to "create a situation where [Everett] would be caught or tempted to commit a criminal threat against someone," which ultimately led to her arrest by Detective Freddie Strawder with the GCPD. Everett claims that Defendants conspired to entice Everett to commit a criminal threat in front of Detective Strawder because Everett and co-Plaintiff Antonio Douglass are women.  None of these allegations are true.

Further, Everett claims that in June 2020, the GCCC Trustee's improperly threatened her to prevent her from truthfully testifying in this lawsuit.  At the June 8, 2020, Board of Trustee's meeting, Defendant Blake Wasinger stated that the lawsuits brought against GCCC are no longer about "awareness and change" but are about "money." Wasinger's statement is not threatening or intimating. His statement is accurate.

4.    **LEGAL CLAIMS AND DEFENSES.**

a.    **Plaintiffs' Claims.**[1]

Plaintiffs assert that they are entitled to recover upon the following theories:

i.    **Plaintiff Antonia Douglass' Claims and Theories:**[2]

A. **Title IX Retaliation (Count II)** by GCCC in violation of 20 U.S.C. § 1681 et seq.  Defendant GCCC retaliated against Plaintiff Douglass after she raised complaints, beginning in December 2017 and continuing thereafter, of sexual harassment and discrimination on behalf of students at GCCC in violation of their rights under Title IX by causing her to be subjected to a No Trespass Order, to be ostracized and intimidated. Plaintiff's complaints also caused the GCCC Defendants to harass and embarrass her through its conduct in adopting the Goheen report, closing public comments in February 2019 and for a number of months thereafter, and during the June 2020 Board meetings blaming civil rights complainants as the bad actors.

B. **First Amendment Retaliation (Count V)** under the United States Constitution, U.S. Const. amends. I, XIV, and 42 U.S.C. § 1983 by Defendants Swender, Dozier, Knapp and Trustees M. Douglass, Wasinger, Crist, Martinez, and Worf in their individual capacities,[3] and GCCC under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). GCCC and the individual defendants violated Plaintiff's First Amendment rights of speech, association and petition and retaliated against her for exercising her First Amendment rights in a series of animus-based retaliatory acts which they carried out because they blamed her for opposing and disclosing sexual harassment and discrimination of students beginning in January 2018, which became public knowledge through the open Board of Trustees meetings beginning on April 10, 2018, and in the news media thereafter. Defendants retaliated against

---

[1]  Plaintiffs organized their respective claims by party, instead of in the order of the Counts stated in the Second Amended Complaint (SAC). However, each claim as stated below references the specific Count in the SAC.

[2]   Count X of the Second Amended Complaint asserted Section 1983 – *Lozman* claim under the First, Fourth, Fifth and Fourteenth Amendments.  In the Court's Memorandum and Order (Doc. 90) on the GCCC Defendants' Motion to Dismiss, the court ruled that *Lozman* and its progeny do not state a separate cause of action and that any analysis related to the *Lozman* count is "subsumed in the First Amendment retaliation analysis." Doc. 90 at 7, fn. 1.

[3]  The Court dismissed plaintiff's official capacity claims against Swender, Dozier, Knapp, Douglass, Wasinger, Crist, Martinez and Worf.  Doc. 90 at 16.

plaintiff because of the exercise of her First Amendment speech, association and petition rights (1) through their conduct which was designed to deter and punish her for speaking to the media, (2) through their conduct to discourage her speech as a prior restraint, by the No Trespass Order which prevented her from associating with students and college staff and by interfering with plaintiff's friendships; (3) through their conspiratorial meeting of the minds conduct beginning in January 2018  to hold her up to ridicule and blame her for GCCC's financial harm when Trustees Wasinger and Douglass spoke about lawsuits like plaintiff's in at least two Board meetings in June of 2020; (4) through their conduct by failing to protect plaintiff from infringement of her constitutional rights to associate, petition and exercise free speech, including the No Trespass Notice banning her from campus and preventing her association with individuals on campus, refusing to rescind the Notice for three months, curtailing public comments by defining categories that could not be mentioned believed to have begun in February 2018, shutting down the public comment session at the February 2019 Board of Trustees meeting which continued for several months thereafter, directing her to "move on" following the July 2019 Budget meeting; (5)  through their conduct when defendants voted to accept the independent investigator's report; and (6) through their conspiratorial acts to continue ostracization and intimidation as identified above.  This has been a continuing course of treatment based on animus against Plaintiff for her advocacy of civil rights of female students and those who stood up for them as documented through the evidence and testimony of witnesses in this case.

Under the Section 1983 *Monell* claim, GCCC's retaliatory actions were based on its Title IX policy or custom to silence critics, engage in conspiratorial acts to appear to retain, going so far as to have their general legal counsel, Randy Grisell, identify the individual in writing, an outside investigator then fail to do so, and not investigate or to inadequately investigate Title IX activity. In response to Plaintiff's effective utilization of the Public Forum of the trustee's open comment section of its meetings beginning in April 2018 through January 2019, they then voted to close the forum in February 2019 and for a number of months thereafter based on their animus toward Plaintiff. This conduct violated Plaintiff's constitutional rights under the First Amendment and well as to equal protection and due process. Retaliation for exercising constitutionally

protected rights under the First Amendment to the Constitution violates Section 1983.

C. **Violation of Due Process (Count VI)** under the United States Constitution, U.S. Const. amend. XIV and 42 U.S.C. § 1983 by Defendants Swender, Dozier and Trustees M. Douglass, Wasinger, Crist, Martinez, and Worf in their individual capacities, and GCCC under *Monell*. GCCC and the individual Defendants violated the due process clause by (1) wrongfully using state authority in issuing and enforcing the Notice that banned her from GCCC events effective April 25, 2018, because she used her First Amendment Rights to speak critically of defendants at public meetings beginning on April 10, 2018, reported Title IX allegations and supported Title IX victims beginning in January 2018, on February 23, 2018, and at board meetings in April 2018, May 2018, June 2018, July 2018, August 2018, January 2019, the July 2019 budget hearing, and perhaps other meetings reflected in the Board Minutes and (2) failing to give her an identifiable procedure or mechanism within the Notice provisions that would allow her to challenge its nature, adequacy, justification, procedural and/or unconstitutional provisions unlike the No Trespass notices issued to students that had procedures set forth in them. The policies have never been changed that permitted the Notice to issue against a community member with no procedural processes for contesting it and thus prospectively she remains under threat of further unequal treatment and unlawful actions, as evidenced by comments made to her following the 2019 budget hearing where she was threatened and intimidated by board members with calling the police, inferring they would issue another Notice, simply because she asked questions regarding spending funds and then was told to "move on" from her civil rights advocacy.

D. **Conspiracy to interfere with civil rights (Count XII)** under 42 U.S.C. § 1983 by Defendants Swender, Dozier, Knapp, Crist, M. Douglass, Martinez, Wasinger, and Worf in their individual and official capacities, and GCCC under *Monell*, and the following non-parties who also participated in the conspiracy, Debra Atkinson, Melisa Bours, Emily Clouse, Greg Goheen, John Green, Randy Grisell, Sabrina Gunnip, Leonard Hitz, Colin Lamb, Kim Reule, Ryan Ruda, Holly Springer, and Leslie Wenzel, as documented through the evidence and testimony of witnesses in this case. Defendants conspired to deter Plaintiff from speaking and exercising her First Amendment rights to associate with like-minded individuals about Title IX issues on the GCCC campus by (1) orchestrating the issuance of the Notice from April 25 to July 27, 2018, to ban her from involvement with anyone on campus (including Title IX victims) or at campus events, (2) limiting her freedom to travel

and access otherwise publicly dedicated accommodations, public events, and roadways through the campus, (3) endorsing comments by Trustees Wasinger and Douglass at Board meetings on June 9 and June 25, 2020, that blamed lawsuits like plaintiffs' for harming GCCC having the effect of intimidating and deterring witnesses by threats of ostracizing supportive individuals and those who supported Plaintiffs, and (4) shutting down the public comment section of board of trustee meetings beginning in February 2019 and for a number of months thereafter linked to comments made the previous month that inferred reference to her Notice and exercise of her civil rights.  The Notice and comments caused a chilling prior restraint on her speech and the association of others she advocated for, unlawfully restrained her association and travel rights, harmed her reputation and hurt her emotionally, physically and economically.

ii.   **Plaintiff Elizabeth Everett's Claims and Theories:**

A.    **Title IX Retaliation (Count I)** by GCCC in violation of 20 U.S.C. § 1681 et seq. Complaints were raised by and on behalf of Plaintiff on February 23, 2018, on February 27, 2018, in early March 2018, on March 23, 2018, on March 26, 2018, on March 29, 2018, on April 10, 2018, through the Faculty Senate Report issued on May 10, 2018, during the summer of 2018, by objections to the Goheen Report in January 2019, and continuing until May 22, 2019 that she had been discriminated against because of her sex in violation of her rights under Title IX, and following those complaints, GCCC retaliated by subjecting her to a hostile educational environment, failing to properly investigate, pitting her peers against her by having them sit in, violating her privacy rights, taking verbal jabs at her, and recording at the cheer coach's directions and for the cheer coach's protection, his unauthorized Title IX interview, bringing in an outside Title IX investigator to do an inadequate investigation and interrogation of cheer students, and causing her to be subjected to claims against her by her peers blaming her for the coach's alleged wrongful separation from the college and his failure to attend the national competition because she complained, exposing her to public ridicule and derision by her peers before and after the May 2018 Board of Trustees' meeting, by allowing the head of HR to discourage cheer student Sabrina Gunnip from telling the Board of Trustees about the recording she made of the unauthorized Title IX interview conducted by the coach, encouraging a criminal investigation and potential charges for criminal threat, which caused her to be held up to ridicule, derision and distain among her peers, to fail classes, take more semesters to

graduate, subjected her to college and community distain and long term damage to her economic prospects that have forever been tarnished by the notoriety of the Title IX inadequacies that were condoned, not condemned, by the Board of Trustees, who publicly claimed through their legal counsel to have retained an "independent investigator", but in reality did <u>not</u> do an investigation or prepare any report to the college. Trustee Crist even contacted the purported independent investigator, inferring he knew she declined to act on GCCC's behalf, and was referred back to president Swender for further information. GCCC and its trustees failed to protect her and instead, ignored the administration's failures, condoned, ratified, augmented by inadequate investigation, and encouraged the conduct and the ensuing retaliation as documented through the evidence and testimony of witnesses in this case. Plaintiff's complaints also caused the GCCC Defendants to harass and embarrass her through its conduct in adopting the Goheen report and during the June 2020 Board meetings. Trustees failed to exercise their oversight authority to ameliorate the harms brought forth to them and exhibited deliberate indifference to her Title IX rights.

B.   **Title IX Hostile Educational Environment (Counts III and IV**) by GCCC in violation of 20 U.S.C. § 1681 et seq.  First, Plaintiff claims GCCC was deliberately indifferent to sexual harassment and discrimination of female students like Plaintiff by the cheer coach for several years prior to her situation stemming from its official policies of deliberate indifference to sexual harassment and discrimination, indifference to training, and inadequate responses to credible reports of sexual misconduct dating back to the topless complaint in 2015, to the bare-butts photo complaint in 2017, Trustee Wasinger's inadequate warning in 2017 about coach Knapp to Eleanor Everett, her mother, Toni Douglass' complaints to Trustee Merilyn Douglass, the complaint by Shaney Tiumalu, the complaints submitted by Laura Aberle, Yulissa Hernandez, Sydney Rodriquez, Breanna Boley, Jade Denton and Sophia Hernandez, Knapp's intimidation and threat  of the college taking away her scholarship as evidenced by the audio tape from his February 23, 2018 meeting with her, as well as her own complaints, as documented through the evidence and testimony of witnesses in this case, which created a heightened risk of sexual harassment that was known or obvious in a context subject to the school's control and as a result, Everett suffered pervasive harassment that deprived her of access to the educational opportunities or benefits

provided by the school. (*Simpson v. Univ. of Colo. Boulder,* 500 F.3d 1170 (10th Cir. 2007)).

Second, Plaintiff claims GCCC had actual knowledge of and was deliberately indifferent to prior reports of sexual harassment and misconduct in the cheer program and in the athletic department that was severe, pervasive and objectively offensive to such a degree that it deprived Everett of access to the educational benefits or opportunities provided by the school. (*Murrell v. Sch. Dist. No. 1, Denver, Colo.,* 186 F.3d 1238, 1246 (10th Cir. 1999)).

Third, Plaintiff claims GCCC's deliberate indifference to Plaintiff's reports of sexual harassment and retaliation caused her to undergo intimidation and harassment on campus, or made her vulnerable to it, that deprived her of educational opportunities and benefits. Such an on-campus hostile environment is and was under GCCC's substantial control. (*Farmer v. Kansas State University,* 918 F. 3d 1094 (10th Cir. 2019))

C. **Equal Protection (Count VII)** violation under 42 U.S.C. § 1983 by Coach Knapp in his individual and official capacities. Plaintiff brings an equal protection claim under 42 U.S.C. § 1983 against Coach Knapp in his individual and official capacities. Plaintiff alleges that Coach Knapp did not treat similarly situated male students in the same fashion as he treated her and other female cheer students and that his conduct toward her was based on sex and was sufficiently severe or pervasive as to interfere unreasonably with her education and create a hostile and/or abusive educational environment, as itemized above in Sections A and B, which establishes an equal protection violation based on sexual harassment.

D. **False Arrest and Malicious Prosecution (Counts VIII and IX)** under the Fourth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983 against Strawder in his individual capacity and Garden City, Kansas through the GCPD under *Monell*. Everett claims that Strawder's misconduct began with his intent, his mens rea, of identifying her as the target of his unlawful actions prompted by his own animus against Everett because she refused to press charges against her blackmailer, Henry Arenas, as well as prompted by behaviors of GCCC-connected individuals, including Emily Clouse believed to be acting on behalf of Herb Swender, Sabrina Gunnip, Holly Springer and/or Melissa Bours. Everett claims Strawder's intentions were to unlawfully contrive a reason to arrest her, when he

participated in a criminal solicitation in violation of K.S.A. § 21-5303,[4] [5] when he admits in context with Ms. Gunnip that he had no probable cause to arrest Plaintiff for any behavior because he did not know what Plaintiff's singular text of May 9, 2018 meant, even though he was certain it was not sufficient to be a criminal threat under K.S.A. § 21-5415(a)(1), prior to his involvement on May 10, 2018. Strawder misused his state authority to engage in unlawful conduct himself, to attempt to create a "crime" involving speech, not assault or battery, by Everett. He encouraged or requested Gunnip, as a cut through, to assist and aid him in his own wrongful behavior of encouraging, aiding or abetting of Everett over text messages that he typed himself on Gunnip's iPhone. Strawder began on May 10, 2018 representing himself as a female cheer student named Sabrina Gunnip, using her smartphone, as a method to fabricate probable cause and thus at that moment and in that context Strawder knowingly instituted an illegal process, which eventually resulted in Plaintiff's arrest and detention. Strawder invented an unlawful operation against Everett, totally lacking initial probable cause. He became the bad actor as the improper aider and abettor by misusing his state actor authority at the moment he chose to insert himself into the situation for his own

---

[4]  Defendants City of Garden City, Kansas and Strawder object to the inclusion of the phrase "he participated in a criminal solicitation in violation of K.S.A. § 21-5303" as they contend it has never been pled or mentioned in any pleading or deposition. Plaintiff contends that these Defendants had notice of this allegation as pled in paragraphs 32, 34, 285-287, 290, 294, 301, 303-304, 309, 313, and 315-316 of the Second Amended Complaint, and that these Defendants also had notice of this through Deposition Exhibit 100 and the 30(b)(6) Powers Deposition, page 53 line 11 to 64, line 20 which raised this issue with respect to the City's training and supervision.  Defendants contend that Plaintiff asked a series of general questions about the statute, but never alleged Strawder violated the statute.

[5] Following the September 6, 2022 Pretrial Conference, the undersigned Magistrate Judge entered an order setting a deadline of September 15, 2022 for the parties to provide a revised, proposed Pretrial Order to address issues discussed during the conference. The revised, proposed order had been approved by all parties but contained additional language to which Defendants City of Garden City, Kansas and Strawder objected (See Footnote 4). A second Pretrial Conference was scheduled for September 21, 2022 to address the issue. The undersigned Magistrate Judge reviewed the proposed language, the parties positions, relevant caselaw, and  heard the argument of counsel. While the additional language does not create a new claim, rather it provides an additional fact in support of Plaintiff Everett's claims of false arrest and malicious prosecution, objection to the Pretrial Order prompts "an inquiry into whether the objecting party received adequate notice." *Burke v. Regalado*, 935 F.3d 960, 1005-06 (10th Cir. 2019) (citing *Wilson v. Muckala,* 303 F.3d 1207, 1215-16 (10th Cir. 2002)). The undersigned Magistrate Judge found Defendants City of Garden City, Kansas and Strawder had adequate notice Everett claimed violation of K.S.A. § 21-5303 in support of her false arrest and malicious prosecution claims and did not require the language at issue be stricken from the Pretrial Order.

motives, his mens rea, using Gunnip as a pawn for his own contrived operation of unlawful mischief. The moment he began his "operation" against Everett without probable cause to arrest her for any criminal threat, he facilitated Mark Johnson's improper involvement to make an arrest based on Strawder's actions. On May 3, 2018 Strawder was recorded stating to GCCC college faculty that he was fed up with college goings on and he specifically mentioned Plaintiff Everett, expressing distain for her decision not to press charges against Arenas. On May 10, 2018, he exceeded his authority under the GCPD's policies regarding treatment of the public, investigation policies, and he violated the department's ethics policies, as well, while acting at the behest and with the participation of Gunnip and her mother, Holly Springer, to fabricate probable cause because they also held a grudge against Everett.

Everett also clams the GCPD failed to properly train, supervise, or discipline its police officers, including Strawder, letting him set up his own investigations without having proper oversight controls and policies in effect to curb the obvious and open risk of a detective exercising an unlawful agenda motivated by personal animus against Everett based on her refusal to bring charges against the blackmailer, Henry Arenas, and concerning the correct and best practices in evaluating probable cause to detain a person under an arrest warrant. The GCPD failed to have policies, procedures and effective training in place to prevent Strawder and others like him from using their state actor authority to carry out their own personal agenda, fabricate probable cause and thereby effect an unlawfully issued warrant with an affidavit that contained material misrepresentations. No one in authority over Strawder reviewed his conduct to assure he did not falsely start an operation without sufficient oversight, target an individual for criminal investigation lacking initial probable cause and proceed to violate Kansas' criminal solicitation law using a cut through like Gunnip and causing other officers including Mark Johnson to act at his behest and make a false arrest and proceed with a malicious prosecution. [67]

Strawder (1) participated in Everett's warrantless arrest that lacked probable cause, which was followed by an unlawful detention and overnight stay in the jail depriving her of her liberty interests; (2) falsifying his role in a criminal solicitation and omitting evidence in

---

[6] See Footnote 4.
[7] See Footnote 5.

his post-arrest affidavit to support the arrest and thus contained inaccurate, misleading and fabricated evidence and excluded exculpatory evidence; and (3) the GCPD failed to adequately train, supervise or discipline its police officers, including Strawder and officer Mark Johnson, concerning the correct and best practices in evaluating probable cause to detain a person under an arrest warrant. Detective Strawder's actions were based on the GCPD custom or policy of failing to adequately train or supervise employees on probable cause minimum requirements. The GCPD failed to properly train, supervise, or discipline its police officers, including Strawder and officer Johnson, especially where there is no policy against being involved in a criminal solicitation operation without proper authorization, where a right to free speech is involved, which has First Amendment rights implications, not just typical criminal constitutional rights implications, where no probable cause existed before the GCPD became involved and where a criminal threat charge that is based on speech is involved, thereby permitting Strawder to violate Everett's Fourth and Fourteenth Amendment constitutional rights. Garden City, being aware that its lack of training, supervision, and discipline leads to improper conduct by its employee police officers, Strawder and through him, officer Mark Johnson, Garden City through its Police Department acted with deliberate indifference in failing to establish a program of effective training, supervision and discipline in an area where it is obvious that limitations should have been in place prior to 2018.

E.  **Conspiracy (Count XII)** to interfere with civil rights under 42 U.S.C. § 1983 by Swender, Knapp, Trustees Crist, M. Douglass, Martinez, Wasinger, Worf, and Strawder in their individual capacities, only, official and individual capacities[8] and GCCC and GCPD under *Monell* and the following non-parties who also participated in the conspiracy, Henry Arenas, Debra Atkinson, Melisa Bours, Karina Comacho, Emily Clouse, Greg Goheen, John Green, Randy Grisell, Sabrina Gunnip, Leonard Hitz, Mark Johnson, Colin Lamb, Ryan Ruda, and Holly Springer, as documented through the evidence and testimony of witnesses in this case. Defendants conspired to deter Everett from speaking and exercising her First Amendment rights to free speech and association, including with Plaintiff Douglass and faculty member Tammy Hutcheson who helped her prepare her Title IX retaliation complaint of March 23, 2018, and about Title IX issues

---

[8]  The Court dismissed plaintiff's official capacity claims against Swender, Dozier, Knapp, Douglass, Wasinger, Crist, Martinez and Worf. Doc. 88 a 14.

on the GCCC campus by aiding and abetting the orchestration by Strawder of her false arrest and malicious prosecution and her false arrest by Mark Johnson on May 10, 2018, by and endorsing comments by Trustees Wasinger and Douglass at Board meetings on June 9 and June 25, 2020, that blamed lawsuits like plaintiffs' for harming GCCC. Defendants' conduct caused a chilling prior restraint on her speech, violated her association rights under the First Amendment, her Fourth and Fourteenth Amendment rights to not be falsely arrested and maliciously prosecuted, and harmed her reputation, her liberty interests, and hurt her emotionally, physically and economically.

### iii.   Plaintiffs' Common claims and theories:

**A.**   **Section 1985(2) Conspiracy (Count XI)**. Defendants Wasinger and Douglass publicly and intentionally blamed and castigated civil rights advocates within the last two years, which included Plaintiffs, as the reason for a reported $500,000 plus jump in insurance premium/deductible costs for the College's errors and omissions liability coverages. Their conduct at the June 9, 2020 and June 25, 2020 Board Meetings shaming and blaming civil rights Plaintiffs in the presence of a wide audience was done intentionally to threaten friendly witnesses against testifying and to harm Plaintiffs and deterred and intimidated witnesses, and potential jurors, thus injuring Plaintiffs. Their behaviors obstructed justice by threatening similar treatment of anyone who supported Plaintiffs' causes of action in federal court. Their comments directly and implicitly conveyed the message from state authorities that people who dared criticize and then dared be involved in lawsuits like Plaintiffs were to be ostracized, and were bad people in the Garden City community, created an us-against-them civil rights-based divisiveness in the community, and were intended to harm Plaintiffs' professional career opportunities, access to the justice system, economic standing and reputations in the community. Wasinger and Douglass had a meeting of the minds as demonstrated by their prepared notes and admitted knowledge of the insurance increases during the week prior to the June 9, 2020 Board meeting but feigning surprise during the meeting and then continuing to blame the victims for the insurance premium increases. Their conduct was intended to and did threaten and deter civil rights advocates and witnesses, including Plaintiffs, from testifying about the civil rights violations, and made with the intent to stigmatize and discredit Plaintiffs. Plaintiffs also allege that defendants' actions intimidated them from testifying in court about the Title IX allegations. Their statements were repeated by president Ryan Ruda in public relations and news media interviews and public statements, intending to widen the audience of their message of intimidation. The Plaintiffs have been harmed in their prosecution of this matter by reluctant witnesses and harmed in their reputations by these specious claims blaming them for the college's own

bad acts, deterring and obstructing justice and damaging them in their personal and economic relationships with others in the community into the future.

**b.    Defendants' Defenses.**

Defendants generally deny plaintiffs' claims and damages and assert the following defenses:

**i.**     Plaintiffs have failed to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6).

**ii.**    Plaintiffs did not engage in speech or conduct protected by the First Amendment of the United States Constitution.

**iii.**   Defendant Swender alleges that the actions or the acts alleged to be committed by him by Plaintiff Douglass in § 4.A.i.B, § 4.i.A.i.C, and § 4.A.i.D. and by Plaintiff Everett in § 4.A.ii.E were discretionary in nature and taken in good faith. Defendant Swender is protected from liability by the doctrines of qualified immunity, official immunity, absolute immunity, and/or judicial immunity. Plaintiffs do not and cannot provide a basis for liability against Defendant Swender in his official capacity.[9]

**iv.**    Defendant Douglass alleges that the actions or the acts alleged to be committed by her by Plaintiff Douglass in § 4.A.i.B, § 4.i.A.i.C, and § 4.A.i.D. and by Plaintiff Everett in § 4.A.ii.E and by both Plaintiffs in the common claims section were discretionary in nature and taken in good faith. Defendant Douglass is protected from liability by the doctrines of qualified immunity, official immunity, absolute immunity, and/or judicial immunity.

---

[9] Defendants raised the qualified immunity defense in their Motions to Dismiss. (Docs. 35, 44, and 48). Defendants' Motions were largely denied by the Court. (Docs. 88-90). At the motion to dismiss stage under Fed. R. Civ. P. 12, a qualified immunity defense is viewed with a more stringent standard of review. Whereas at the summary judgment stage under Fed. R. Civ. P. 56, the standard of review requires plaintiff to bear the burden of overcoming the qualified immunity defense. "The procedural posture of the qualified-immunity inquiry may be critical. Because they turn on a fact-bound inquiry, "qualified immunity defenses are typically resolved at the summary judgment stage" rather than on a motion to dismiss." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). "Asserting a qualified immunity defense via a Rule 12(b)(6) motion . . . subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Id.* (internal quotation marks omitted). On a motion to dismiss, "it is the defendant's conduct as alleged in the complaint that is scrutinized for [constitutionality]." *Behrens v. Pelletier*, 516 U.S. 299, 309, 116 S. Ct. 834, 133 L. Ed. 2d 773 (1996); see also *Thompson v. Ragland*, 23 F.4th 1252, 1256 (10th Cir. 2022).

Plaintiffs do not and cannot provide a basis for liability against Defendant Douglass in her official capacity.[10]

    **v.**    Defendant Worf alleges that the actions or the acts alleged to be committed by her by Plaintiff Douglass in § 4.A.i.B, § 4.i.A.i.C, and § 4.A.i.D. and by Plaintiff Everett in § 4.A.ii.E were discretionary in nature and taken in good faith. Defendant Worf is protected from liability by the doctrines of qualified immunity, official immunity, absolute immunity, and/or judicial immunity. Plaintiffs do not and cannot provide a basis for liability against Defendant Worf in his official capacity.[11]

    **vi.**    Defendant Wasinger alleges that the actions or the acts alleged to be committed by him by Plaintiff Douglass in § 4.A.i.B, § 4.i.A.i.C, and § 4.A.i.D and by Plaintiff Everett in § 4.A.ii.E and by both Plaintiffs in the common claims section were discretionary in nature and taken in good faith. Defendant Wasinger is protected from liability by the doctrines of qualified immunity, official immunity, absolute immunity, and/or judicial immunity. Plaintiffs do not and cannot provide a basis for liability against Defendant Wasinger in his official capacity.[12]

    **vii.**    Defendant Crist alleges that the actions or the acts alleged to be committed by him by Plaintiff Douglass in § 4.A.i.B, § 4.i.A.i.C, and § 4.A.i.D. and by Plaintiff Everett in § 4.A.ii.E were discretionary in nature and taken in good faith. Defendant Crist is protected from liability by the doctrines of qualified immunity, official immunity, absolute immunity, and/or judicial immunity.

---

[10] Id.

[11] Id.

[12] Defendants raised the qualified immunity defense in their Motions to Dismiss. (Docs. 35, 44, and 48). Defendants' Motions were denied by the Court. (Docs. 88-90). At the motion to dismiss stage under Fed. R. Civ. P. 12, a qualified immunity defense is viewed with a more stringent standard of review. Whereas at the summary judgment stage under Fed. R. Civ. P. 56, the standard of review requires plaintiff to bear the burden of overcoming the qualified immunity defense. "The procedural posture of the qualified-immunity inquiry may be critical. Because they turn on a fact-bound inquiry, "qualified immunity defenses are typically resolved at the summary judgment stage" rather than on a motion to dismiss." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). "Asserting a qualified immunity defense via a Rule 12(b)(6) motion . . . subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Id.* (internal quotation marks omitted). On a motion to dismiss, "it is the defendant's conduct as alleged in the complaint that is scrutinized for [constitutionality]." *Behrens v. Pelletier*, 516 U.S. 299, 309, 116 S. Ct. 834, 133 L. Ed. 2d 773 (1996); see also *Thompson v. Ragland*, 23 F.4th 1252, 1256 (10th Cir. 2022).

Plaintiffs do not and cannot provide a basis for liability against Defendant Crist in his official capacity.[13]

**viii.**    Defendant Martinez alleges that the actions or the acts alleged to be committed by him by Plaintiff Douglass in § 4.A.i.B, § 4.i.A.i.C, and § 4.A.i.D. and by Plaintiff Everett in § 4.A.ii.E were discretionary in nature and taken in good faith. Defendant Martinez is protected from liability by the doctrines of qualified immunity, official immunity, absolute immunity, and/or judicial immunity. Plaintiffs do not and cannot provide a basis for liability against Defendant Martinez in his official capacity.[14]

**ix.**    Defendant Knapp alleges that the actions or the acts alleged to be committed by him Plaintiff Everett in her equal protection claim were discretionary in nature and taken in good faith. Defendant Knapp is protected from liability by the doctrines of qualified immunity, official immunity, absolute immunity, and/or judicial immunity. Plaintiffs do not and cannot provide a basis for liability against Defendant Knapp in his official capacity.[15]

**x.**    Defendant Dozier alleges that the actions or the acts alleged to be committed by him by Plaintiff Douglass in § 4.A.i.B, § 4.i.A.i.C, and § 4.A.i.D. and by Plaintiff Everett in § 4.A.ii.E were discretionary in nature and taken in good faith. Defendant Dozier is protected from liability by the doctrines of qualified immunity, official immunity, absolute immunity, and/or judicial immunity. Plaintiffs do not and cannot provide a basis for liability against Defendant Dozier in his official capacity.[16]

---

[13] Id.

[14] Id.

[15] Id.

[16] Defendants raised the qualified immunity defense in their Motions to Dismiss. (Docs. 35, 44, and 48). Defendants' Motions were denied by the Court. (Docs. 88-90). At the motion to dismiss stage under Fed. R. Civ. P. 12, a qualified immunity defense is viewed with a more stringent standard of review. Whereas at the summary judgment stage under Fed. R. Civ. P. 56, the standard of review requires plaintiff to bear the burden of overcoming the qualified immunity defense. "The procedural posture of the qualified-immunity inquiry may be critical. Because they turn on a fact-bound inquiry, "qualified immunity defenses are typically resolved at the summary judgment stage" rather than on a motion to dismiss." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). "Asserting a qualified immunity defense via a Rule 12(b)(6) motion . . . subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Id.* (internal quotation marks omitted). On a motion to dismiss, "it is the defendant's conduct as alleged in the complaint that is scrutinized for [constitutionality]." *Behrens v. Pelletier*, 516 U.S. 299, 309, 116 S. Ct. 834, 133 L. Ed. 2d 773 (1996); see also *Thompson v. Ragland*, 23 F.4th 1252, 1256 (10th Cir. 2022).

xi.  Plaintiffs fail to state a federal civil rights claim against Defendant GCCC under the doctrine announced in *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

xii.  Everett's arrest was based on probable cause. Strawder did not violate Everett's constitutional rights.  Even if probable cause was lacking, Everett's arrest was based on arguable probable cause that Everett's conduct constituted a criminal threat. Freddie Strawder has qualified immunity from Everett's claims.[17]

xiii.  Douglass withdrew any claims against the City or Strawder.

xiv.  Everett does not assert any official capacity claims against Strawder. To the extent she does, they are redundant of the claims against the City of Garden City and should be dismissed.

xv.  Plaintiffs fail to state a civil rights claim against Defendant City of Garden City under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The City of Garden City adequately trained, supervised, and disciplined GCPD officers. The City of Garden City maintained adequate policies, procedures, and training related to GCPD officers' investigations and arrests. The City of Garden City adequately supervised GCPD officers and Strawder. The City of Garden City did not maintain an unconstitutional custom, practice or policy of failing to adequately train, supervise, or discipline GCPD officers regarding probable cause requirements or any other requirements.  No unconstitutional custom, practice, or policy of the City or of GCPD (or lack thereof) caused a violation of Everett's constitutional rights.  The City was not deliberately indifferent in any manner that caused a violation of Everett's constitutional rights.

xvi.  Because Strawder did not violate Everett's constitutional rights, Everett has no claim against the City.

xvii.  Liability on 42 U.S.C. § 1983 may not be based on respondeat superior.

xviii.  Plaintiffs have failed to mitigate damages.

xix.  Plaintiffs' claims are barred, in whole or in part, because Defendants made good-faith efforts to comply with all applicable laws and did, in fact, comply with all such laws by promptly conducting Title IX investigations, following up on complaints of inappropriate behavior by Toni Douglass, responding to

---

[17] Id.

community complaints regarding its cheer program and operations, ensuring community members were given adequate venues to address concerns, and by promptly investigating all complaints of sexual harassment .

xx.     Plaintiffs did not suffer any damages attributable to Defendants' actions.

xxi.    Plaintiffs lack standing to assert a First Amendment retaliation claim against GCCC because Plaintiffs have not suffered an injury-in-fact. See *Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003) (quoting *Phelps v. Hamilton*, 122 F.3d 1309, 1326 (10th Cir. 1997) ("To meet this standing requirement, a plaintiff must demonstrate 'that (1) he or she has suffered an injury in fact; (2) there is a causal connection between the injury and the conduct complained of; and (3) it is likely that the injury will be redressed by a favorable decision.'")); see also *Loving v. Boren*, 133 F.3d 771, (plaintiff must show injury-in-fact to have standing in the First Amendment context).

xxii.   Plaintiffs' First Amendment claim fails because they have no protected right to speak at a Board of Trustees' meeting.

xxiii.  Plaintiffs' Title IX claim fails because GCCC responded to the alleged improper conduct and did not act with deliberate indifference.  GCCC at all times responded to the complaints identified by Plaintiffs in § 4.A.i.A, 4.A.ii.A., 4.A.ii.B, and 4.A.ii.C.

xxiv.   Plaintiffs did not suffer severe, pervasive, or objectively offensive discrimination or harassment.

xxv.    Plaintiffs' claim for punitive damages are barred. See *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247(1981).

xxvi.   Plaintiffs' Section 1985 claims are barred because the alleged improper comments were neither abusive nor threatening as a matter of law.

xxvii.  Plaintiff Everett unreasonably failed to utilize GCCC's internal corrective mechanisms available to her by failing to file any Title IX Complaint with GCCC after March 2018.

xxviii. Plaintiff Douglass unreasonably failed to utilize GCCC's internal corrective mechanisms available to her by failing to seek remediation from the Board of Trustees regarding her concerns about the no trespass notice.

xxix.   Plaintiff Douglass has no protected property interests sufficient to support any due process claim.

**xxx.**   Plaintiffs' claims – to the extent the claims seek damages for actions occurring before February 22, 2018 - are time barred by the applicable statute of limitations.

**xxxi.**   Everett's claims against Strawder and the City are sufficiently without basis that these defendants are entitled to recover their attorney's fees and costs of defense pursuant to 42 U.S.C. § 1988. For example, the conspiracy claim against Strawder and the City lacks any basis whatsoever and is the sole reason Everett's claims against these defendants were properly brought in this lawsuit predominated with issues related to other defendants.  This lawsuit was later consolidated with other lawsuits against other defendants for discovery, and consequently, Strawder and the City incurred substantially more defense costs than were necessary based on the unsubstantiated and unsupported conspiracy allegations.

**xxxii.**   Everett's allegations of wrongdoing against Strawder and the City have no evidentiary support.

**5.**      **DAMAGES AND NON-MONETARY RELIEF REQUESTED.**

**a.   Damages requested by Plaintiff Antonia Douglass:**

Title IX retaliation against GCCC - Compensatory damages in the amount of $600,000.

First Amendment Retaliation, Violation of Due Process Rights, Section 1983 Conspiracy to interfere with civil rights against Defendants GCCC, Swender, Dozier, Knapp, Crist, M. Douglass, Martinez, Wasinger, and Worf – compensatory damages in the amount of $600,000.

Section 1985 Conspiracy to interfere with civil rights against M. Douglass, and Wasinger – compensatory damages in the amount of $500,000.

Punitive damages against Swender, Dozier, Knapp, Crist, M. Douglass, Martinez, Wasinger, and Worf in the amount of $1,000,000 or an amount as determined by the jury.

Attorney fees and costs pursuant to Title IX and 42 U.S.C. § 1988, Court-awarded, to be determined after prevailing at trial.

**b.  Damages requested by Plaintiff Elizabeth Everett:**

Title IX retaliation and Hostile Education Environment against GCCC - compensatory damages in the amount of $1,700,000.

Equal Protection against Defendant Knapp - compensatory damages in the amount of $1,700,000.

False Arrest and Malicious Prosecution against Strawder and City of Garden City, Kansas - compensatory damages in the amount of $100,000

Section 1983 Conspiracy to interfere with civil rights against Defendants GCCC, Swender, Dozier, Knapp, Crist, M. Douglass, Martinez, Wasinger, Worf, Strawder and City of Garden City, Kansas – compensatory damages in the amount of $1,700,000.

Section 1985 Conspiracy to interfere with civil rights against M. Douglass, and Wasinger – compensatory damages in the amount of $500,000.

Attorney fees and costs pursuant to Title IX and 42 U.S.C. § 1988, Court-awarded, to be determined after prevailing at trial.

**C.     Damages requested by Defendants:**

Defendants will seek reimbursement of their/its attorneys' fees pursuant to Civil Rights Attorney's Fees Awards Act of 1976 and 42 U.S.C. § 1988(b).

## 6.    AMENDMENTS TO PLEADINGS.

**None.**

## 7.    DISCOVERY.

Under the scheduling order and any amendments, all discovery was to have been completed by September 13, 2022. Discovery is now complete.

Other than this discovery issue, all other unopposed discovery may continue after the deadline to complete discovery so long as it does not delay briefing or ruling on dispositive motions or other pretrial preparations. Although discovery may be conducted

beyond the deadline to complete discovery if all parties agree to do so, under these circumstances the court will not be available to resolve any disputes except those noted herein that arise during the course of such extended discovery.

8.     **MOTIONS.**

     **a.**     **Pending Motions.**

       None.

     **b.**     **Additional Pretrial Motions.**

After the pretrial conference, the parties intend to file the following motions:

Plaintiffs intend to file a motion for discovery abuses in violation of three litigation hold letters and Rule 26 disclosure requirements, motions in limine, and other motions as appropriate in response to Defendants' motions.

Defendants intend to file motions for summary judgment; motions in limine; motions for attorney fees and costs pursuant to 42 U.S.C. § 1988; motions regarding trial and jury instructions; motions for accommodations for defense counsel during trial and other motions as appropriate in response to Plaintiffs' motions. The dispositive-motion deadline, as established in the scheduling order and any amendments, is **September 16, 2022**.  The parties should follow the summary-judgment guidelines on the court's website:

*http://ksd.uscourts.gov/wp-content/uploads/2015/10/Summary-Judgment-Guidelines.pdf*

Consistent with the scheduling order filed earlier in this case, the arguments and authorities section of briefs or memoranda must not exceed 30 pages, absent an order of the court.

   **c.**  **Motions Regarding Expert Testimony.** Not applicable, i.e., the parties have stipulated that no retained expert testimony will be used in this case.

**9.**  **TRIAL.**

   The trial docket setting, as established in the scheduling order and any amendments, is **February 27, 2023, at 9:00 a.m., in Wichita, Kansas**. This case will be tried by jury. Trial is expected to take approximately **15 court days**. The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial. If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

**10.**  **ALTERNATIVE DISPUTE RESOLUTION (ADR).**

   The status of settlement negotiations is as follows: currently stalled, but ongoing. The parties currently believe the prospects for settlement of this case are fair and they do not believe that further court-ordered ADR would be helpful. The parties believe that it would be helpful to continue settlement negotiations and that the most productive time for this would be during the summary judgment process. The parties previously attended mediation in January and February, 2022. The parties are reminded that, under D. Kan. Rule 40.3, they must immediately notify the court if they reach an agreement that resolves the litigation as to any or all parties. Jury costs may be assessed under this rule if the parties

do not provide notice of settlement to the court's jury coordinator at least one full business day before the scheduled trial date.

IT IS SO ORDERED.

Dated September 21, 2022, at Wichita, Kansas.

<u>s/ Gwynne E. Birzer</u>
Gwynne E. Birzer
U. S. Magistrate Judge