IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| ANTONIA DOUGLASS and | ) | |
| ELIZABETH EVERETT, | ) | |
| Plaintiffs, | ) | CIVIL ACTION |
| v. | ) | |
| | ) | No. 20-2076-KHV |
| GARDEN CITY COMMUNITY | ) | |
| COLLEGE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

Elizabeth Everett filed suit against Garden City Community College ("GCCC"), Herbert J. Swender, Rodney Dozier, Merilyn Douglass, Blake Wasinger, Jeff Crist, Steve Martinez, Teri Worf, in their official capacities, and Brice Knapp, in his individual and official capacities ("GCCC defendants").  Plaintiff alleges retaliation under Title IX, 20 U.S.C. § 1681 et seq., and violations of federal civil rights under the First, Fourth and Fourteenth Amendments, U.S. Const. amends. I, IV, V, XIV, and 42 U.S.C. § 1983.  Pretrial Order (Doc. #224) filed September 22, 2022.  This matter is before the Court on Garden City Community College Defendants' Motion For Summary Judgment Against Plaintiff Elizabeth Everett (Doc. #214) filed September 16, 2022.  For reasons stated below, the Court sustains defendants' motion in part.

## Legal Standard

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735, 740 (10th Cir. 2007).  A factual dispute is "material" only if it "might affect the outcome of the

suit under the governing law." <u>Liberty Lobby</u>, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position.  <u>Id.</u> at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Nahno-Lopez v. Houser</u>, 625 F.3d 1279, 1283 (10th Cir. 2010).  Once the moving party meets the initial burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which she carries the burden of proof.  <u>Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.</u>, 912 F.2d 1238, 1241 (10th Cir. 1990); <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586–87 (1986).  To carry her burden, the nonmoving party may not rest on her pleadings but must instead set forth specific facts supported by competent evidence.  <u>Nahno-Lopez</u>, 625 F.3d at 1283.

The Court views the record in the light most favorable to the nonmoving party.  <u>Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.</u>, 938 F.2d 1105, 1110 (10th Cir. 1991).  It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative.  <u>Liberty Lobby</u>, 477 U.S. at 250–51.  In response to a motion for summary judgment, a party cannot rely on ignorance of facts, speculation or suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.  <u>Conaway v. Smith</u>, 853 F.2d 789, 794 (10th Cir. 1988).  The heart of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  <u>Liberty Lobby</u>, 477 U.S. at 251–52.

## **<u>Factual Background</u>**

-2-

The following facts are uncontroverted or viewed in a light most favorable to plaintiff, the nonmoving party.

GCCC is a community college in Garden City, Kansas, which receives federal financial assistance.  Since January of 2019, Dr. Ryan Ruda has been President of GCCC.  Dr. Herb Swender was President from January of 2011 until he resigned in August of 2018.  In 2018, Dee Wigner was Executive Vice President, CFO and Vice President for Administrative Services.  Brice Knapp was GCCC cheerleading coach from April of 2014 through March 29, 2018.  Blake Wasinger, Jeff Crist, Steven Martinez, Teri Worf and Dr. Merilyn Douglass were GCCC Trustees during 2017 and 2018.

GCCC Board And Policies

GCCC Trustees follow the "Carver Model" of policy governance: they supervise the President and leave administrative matters to the President's discretion.  GCCC's Trustees do not focus on the day-to-day operations.  In accordance with this model, the President sends weekly updates to GCCC Trustees.

For Title IX complaints, GCCC delineated responsibility based on the nature of the complaint.  The HR Director oversaw complaints about employees, faculty and personnel.  The Vice President of Student Services oversaw complaints about students.  From 2016 to 2018, Melanie Hands and Colin Lamb were Title IX investigators.  During this time, before he became President, Ruda was a Title IX coordinator, investigator, Vice President of Student Services and Dean of Student Services.  As the Vice President of Student Services and Dean of Student Services, Ruda disciplined students for violating school codes of conduct and school rules.

The President was the ultimate decision maker at GCCC.  Although the Board of Trustees could challenge the President's Title IX decisions, it delegated all authority to the President.  The GCCC Student Handbook stated as follows: "Any person believing that he or she has been subject to unlawful harassment, as set forth in this policy, should utilize the Discrimination or Harassment Complaint Procedure, as found in the Student Handbook."  Ex. E, Student Handbook (Doc. #215-5) at 10.  That procedure did not actually appear, however, in the 2017-2018 Student Handbook.  The Student Handbook referred to Section 106.8 of Title IX for investigation procedures.  Until Congress amended Section 106.8 in May of 2020, the regulation directed recipients to adopt and publish Title IX procedures to resolve student and employee complaints.

Coach Knapp testified repeatedly that he did not remember receiving training for sexual harassment, discrimination or Title IX generally.  He was not aware that GCCC had a Title IX coordinator or investigator.  Emily Clouse, Director of Human Resources, did not recall receiving Title IX training.  John Green, Athletic Director, never read Title IX policies and procedures and never investigated a Title IX complaint.

Arenas Blackmails Plaintiff

Plaintiff is a former GCCC student and cheerleader.  She attended GCCC from the summer of 2017 through May of 2020, and was a member of the cheer squad from the summer of 2017 through May of 2018.  GCCC offered plaintiff a cheerleading scholarship, and she signed a contract to be a member of the cheer team.

Henry Arenas was another cheer student at GCCC.  At a party in February of 2018, Arenas blackmailed plaintiff for sex.  On February 23, 2018, a fellow cheer student reported the blackmail

to Knapp.  After receiving the report, Knapp called Arenas and spoke to plaintiff.  Knapp asked Sabrina Gunnip, the cheer captain, to join and record his meeting with plaintiff.  Ex. 237, Recording February 23, 2018 (Doc. #210-11).    During his conversation with plaintiff, Knapp stated that he did not believe GCCC would remove Arenas from the dorms "for just blackmail" and "for just trying to get [plaintiff] to sleep with him" because "guys try to sleep with [plaintiff] every day."  Id.  Knapp continued that GCCC would "not . . . send Arenas home over him trying to have sex with [plaintiff]."  Id.  Knapp told plaintiff that she needed to ignore the blackmail and focus on nationals.  Id.  Knapp repeatedly said that he did not know how to proceed and that he planned to take the situation to Athletic Director Green, who supervised Knapp and reported directly to the President.

Also on February 23, 2018, plaintiff, Arenas, Knapp, Green and Green's assistant met about the blackmail allegation.  Before plaintiff arrived, she did not know that Arenas and Knapp would be at the meeting.  Plaintiff was the only female in the meeting.  During the meeting, Knapp stated that plaintiff was causing problems with the cheer team and that the team needed to focus on nationals.  Every time that plaintiff tried to speak, someone would interrupt her and she generally felt intimidated.  Eventually, plaintiff texted Toni Douglass, a community member, for help. Douglass pulled plaintiff from the meeting.

Green referred the blackmail allegation to Ruda.  Ruda, along with other GCCC officials, investigated plaintiff's allegations and documented their results.   GCCC had suspended plaintiff and Arenas from the cheer squad during the investigation, but Ruda quickly lifted plaintiff's suspension.  GCCC eventually dismissed Arenas from the cheer team, placed him on disciplinary

probation, told him to have no contact with plaintiff and advised him not to engage in any acts of retaliation or intimidation toward any GCCC student.

GCCC reported the blackmail incident to the Garden City Police Department (the "GCPD"). The GCPD captain assigned the matter to investigator Freddie Strawder. Strawder interviewed plaintiff on March 26, 2018, but closed the case because she declined to pursue criminal charges against Arenas.

<u>Title IX Complaints</u>

In 2015, GCCC received a complaint that Knapp had walked in on female cheerleaders changing clothes. GCCC found that the complaint was unfounded and did not conduct a Title IX investigation. In 2017, when Wigner was HR director, Sophia Hernandez, the dance coach, complained to him that Knapp had taken a photograph of five female cheerleaders' bare butts through a hotel window. Wigner documented the complaint and met with Knapp. Ruda became aware of the photo around June 12, 2017. On July 31, 2017, Wigner met with Green and Knapp to discuss the photo, but she did not conduct a Title IX investigation. Wigner did not keep notes. In 2017, she issued a written warning letter to Knapp. She testified that she likely received approval from Swender, Green or Ruda before issuing the warning letter.

On January 23, 2018, HR director Clouse received another sexual harassment complaint about Knapp from Hernandez. On February 26, 2018, GCCC received correspondence from a community member, Laura Aberle, accusing Knapp of inappropriate conduct with the female cheerleaders. On or about February 26, 2018, Clouse met with Knapp about the letter. Knapp denied the allegations. Clouse also met with Knapp on March 9 and March 13, 2018.

On March 19, 2018, Aaron Kucharik, a community member and member of the GCCC Endowment Society, received a "dead drop envelope."  Shortly thereafter, Kucharik gave the envelope and its contents to GCCC.  Kucharik first went to Hands, a Title IX investigator, who took a copy to Ruda.  Ruda told Kucharik that it was a personnel matter and that Kucharik should take it to HR.  When he took the packet to Clouse, Kucharik told her that GCCC needed to investigate.  Clouse took the package, said she would look into it and walked off to the office of President Swender.

On March 20, 2018, Ruda notified Clouse that during an interview, a cheerleader stated that she was not comfortable reporting a situation to Knapp because Knapp was always making comments about the cheerleaders' appearances, which made her uncomfortable.  The cheerleader did not want her report documented.  Clouse responded that she would follow up with Swender about this issue, but she did not investigate.

On March 23, 2018, plaintiff met with Tammy Hutcheson, a GCCC faculty member, to discuss Knapp and Arenas.  During the meeting, Hutcheson and plaintiff reduced plaintiff's concerns to a letter addressed to the GCCC HR department and the GCPD.  The letter detailed plaintiff's concerns about Knapp's inappropriate comments and retaliation against her for reporting Arenas.  Plaintiff and Hutcheson took the letter to GCCC's HR office and gave a copy to two GCCC Trustees, Wasinger and Leonard Hitz.

In the letter, plaintiff accused Knapp of regularly making inappropriate comments during cheerleading practices.  These comments included references to how many sexual partners the cheerleaders had, calling a cheerleading pyramid "bitches on bitches" and telling the female

cheerleaders to stand like they had straws in their vaginas.  Knapp also made comments about cheerleaders being more flexible after spending time with their boyfriends.  Plaintiff testified that these comments began in August of 2017 and continued until at least March of 2018.  Knapp also commented on plaintiff's bra size, touched her butt, placed his hands too close to her vagina while practicing stunts and tickled her.

On March 26, 2018, Renee Harbin, a GCCC faculty member, wrote a complaint about Knapp on behalf of a student.  In this letter, Harbin reported inappropriate comments by Knapp to cheerleaders about their bodies and sexual relationships.  Harbin also reported that Knapp would slap the cheerleaders' butts.  Clouse confirmed that HR received this letter and that she immediately contacted Randy Grisell, GCCC counsel.

On March 26, 2018, President Swender retained Bev Temaat, the Title IX Coordinator for Dodge City Community College, to do a fact-finding investigation into various student complaints.  Temaat was not trained as an investigator.  Swender asked Temaat to assist with the investigation because he determined that Ruda and Lamb, who served as Title IX coordinators and investigators, might have personal conflicts of interest.

At the beginning of her investigation, Temaat did not believe that Knapp or the cheerleader complaints were the focus of her fact-finding mission.  Temaat believed that Swender has asked her to determine whether GCCC needed Title IX investigations.  Temaat made three visits to GCCC.  The first was to meet with Swender and Grisell.  The second visit was with HR Director Clouse.  After the second meeting, Temaat told Swender that GCCC had complex and greatly expanding Title IX issues.

-8-

On March 28, 2018, GCCC's administration suspended Knapp with pay.  The next day, he resigned.  After he resigned, students bullied plaintiff and blamed her for his resignation.  Ruda and Lamb told plaintiff to report the bullying.  When plaintiff reported bullying by fellow students, GCCC contacted them and told them to stop their retaliatory behavior.  Plaintiff eventually stopped reporting, however, because students called her a snitch.  The bullying continued through the spring semester of 2018.  Plaintiff's mother took her to and from school during that semester because she was scared for plaintiff's safety.  During the public comment section at Board meetings, plaintiff's mother and other community members reported ongoing bullying.  For example, on May 8, 2018, plaintiff's mother told Dozier, head of GCCC security, that a large group of cheer students were harassing three students that attended the Board meeting to report Title IX concerns.  It is not clear how, or whether, GCCC responded to these reports of ongoing student bullying.

In April of 2018, Temaat informed Swender and Grisell that she had completed her work.  Temaat identified at least four to five Title IX situations that warranted immediate investigation by a team of investigators, including the blackmail situation and student bullying.  Temaat did not conduct a Title IX investigation or complete any reports and felt misled regarding her role at GCCC.  Specifically, HR Director Clouse testified that Temaat completed a Title IX report, but Temaat insisted that she never conducted a Title IX investigation and that she clearly informed Swender, Grisell and Clouse that she was not a Title IX investigator and was not conducting a Title IX investigation.

On May 8, 2018, the GCCC Faculty Senate drafted a document titled "A Call for

Immediate and Effective Action by the Board of Trustees of Garden City Community College" ("Call for Action").  Knapp had resigned on March 29, 2018, but the Call for Action raised Title IX concerns about him.  On or around May 16, 2018, the Board issued a statement acknowledging Title IX complaints and stated that it was retaining an independent investigator.  The next month, on June 12, 2018, the Board retained Greg Goheen, an attorney, to conduct an independent investigation.

Goheen conducted an independent investigation into the allegations in the "Call for Action" and issued a report on his findings (the "Goheen Report").  Plaintiff generally alleges that the "Goheen Report" was deficient, but the Board adopted it.  Goheen did not interview Hernandez, even though she had offered to be interviewed.  Trustee Martinez agreed that Hernandez had material information that the Trustees should have reviewed before adopting the report.

<u>GCPD Arrests Plaintiff</u>

On May 9, 2018, cheer captain Gunnip called police investigator Strawder and reported that she had recently received a phone call and follow-up text message from plaintiff.  The text message stated as follows: "let my name come out of your mouth one more time [and] see what happens."  <u>Exhibit 22</u> (Doc. #234-19) at 2.  Strawder arranged to interview Gunnip the next day. During this interview, Strawder told Gunnip that based on the text message of May 9, he did not have probable cause to arrest plaintiff for criminal threat.  Strawder asked Gunnip if she would like to send messages to plaintiff's phone to gather more evidence.  Gunnip agreed.

Gunnip and Strawder began texting plaintiff's phone number.  They initiated the text conversation by asking: "Who is this anyway?" They then sent a follow-up message: "Don't care

to talk?"  Exhibit 22 (Doc. #234-19) at 3.  During the resulting text conversation, plaintiff used vulgar language and insulted Gunnip.  Plaintiff also texted Gunnip the following statements: "pull up I'll be at the college behind the library," "where are you . . . let's settle this," "shut up . . . fight me," "post up," "let's go" and "won't be able to see once I'm done with you."  Id. at 4, 6, 11, 12, 13, 15 & 17.  When Gunnip (or Strawder on her behalf) asked plaintiff what she would do if Gunnip did not want to fight, plaintiff responded that she would "fight [her] anyways [sic]."  Id. at 15.

During the text conversation on May 10, 2018, plaintiff told Gunnip to meet her at the GCCC library at 3:30 p.m. to fight and eventually texted Gunnip that she was on her way and then that she was "here."  Id. at 18.  At some point during the text conversation, Strawder called Detective Mark Johnson and asked him to wait for plaintiff at the GCCC campus.  Strawder told Johnson that if plaintiff arrived on campus, he had probable cause to arrest her for criminal threat.  Johnson arrested plaintiff in her car outside the GCCC fine arts building at 3:30 p.m. on May 10, 2018.  Exhibit 21 (Doc. #234-18) at 28.  Strawder prepared an affidavit for the county attorney and court.  In this affidavit, Strawder did not indicate that he had texted plaintiff from Gunnip's phone.  Garden City dropped the charges against plaintiff, and Strawder did not communicate with any GCCC employee about her arrest.

GCCC Board Meetings

On June 8, 2020, Ruda sent GCCC employees a memorandum explaining that because of the number of claims filed against GCCC, it was now in the "high risk category" for liability insurance.  As a result, GCCC was subject to an additional $494,000 for liability insurance, and

Ruda recommended that GCCC leave 11 positions vacant to pay for the insurance. The memo listed the civil suits by name, but the list did not include plaintiff.

Before a Board meeting on June 9, 2020, Ruda had informed GCCC trustee Wasinger about the insurance budget issue, and Wasinger made plans to comment at the meeting. At the meeting, he stated as follows:

> I know you kind of sent some preliminary data on that, and I'm actually glad you brought it up. You know, Ryan, I—I kind of held my tongue a year ago or two years ago when we were a different board sitting there . . . . But these claims or these lawsuits or whatever might entail from it, weren't going after the college money, weren't going after the owner's money. You know, it was the carrier's money. And I held my tongue, because obviously we don't know what's what would entail by it, but we all know how insurance works. And I mean, the truth of it is, is increased claims the insurance carrier is going to, they're going to recoup their losses by deductibles and premiums. So, you know, with more, obviously more, information, you know, personally, that statement of not taking owners money is completely false. They are taking owners money. They're affecting everyone in this room. Everyone in administration, faculty, staff. They're affecting every student and every community member, whether . . . indirectly or . . . directly. And I know there's a lot of factors and I'm again, I'm not playing victim, but . . . [w]e're not an institution that just has bottomless pockets. And, of course, I'm frustrated. You know, I'd like to see resolve on these things. The sooner the better, if that's the case.

Exhibit ZZ (Doc. #217-14). Wasinger made similar comments at a Board meeting two weeks later, on June 25, 2020. Trustee Douglass made similar comments at both meetings. Holly Chandler, a GCCC faculty member, stated that as a civil litigant with pending claims against GCCC, these comments intimidated her.

Procedural History

On February 2, 2022, plaintiff filed this action. Plaintiff alleged that (1) in violation of Title IX, GCCC subjected her to a hostile educational environment and retaliated against her for

engaging in protected activities; (2) in violation of 42 U.S.C § 1983, Knapp (in his individual and official capacities) violated her equal protection rights and GCCC, Dozier, Swender, Knapp and the Trustees (in their official capacities) conspired to violate her First, Fourth and Fourteenth Amendment rights; and (3) in violation of 42 U.S.C. § 1985(2), Wasinger and Douglass conspired to intimidate her.  Defendants argue that they are entitled to summary judgment on each of plaintiff's claims.

## Analysis

Defendants assert that they are entitled to summary judgment on all of plaintiff's claims because (1) plaintiff cannot establish that GCCC deprived her of access to educational benefits and opportunities in violation of Title IX, (2) plaintiff cannot establish a prima facie case of Title IX retaliation, (3) the statute of limitations bars plaintiff's equal protection claim against Knapp, (4) plaintiff cannot establish that she suffered a First, Fourth or Fourteenth Amendment deprivation and (5) Wasinger and Douglass are absolutely immune from liability under Section 1985.

The Court addresses each of plaintiff's claims in turn.

## I.      Title IX Discrimination By Virtue Of Hostile Educational Environment

Plaintiff claims that (1) before she reported Knapp, GCCC had actual knowledge and was deliberately indifferent to reports of sexual harassment by Knapp that was severe, pervasive and objectively offensive and deprived her of access to the educational benefits and opportunities provided by GCCC; and (2) after she reported Knapp, GCCC was deliberately indifferent to her

reports of harassment by Knapp supporters on campus. [1]   These two claims arguably overlap, but the first claim focuses on GCCC's failure to adopt policies or practices that could have prevented sexual harassment by Knapp, while the second claim is based on GCCC's indifference to the hostile educational environment which plaintiff endured while trying to attend school after reporting Knapp's harassment.[2]   GCCC argues that (1) plaintiff cannot establish overt and pervasive harassment and (2) it was not deliberately indifferent to reports of sexual harassment by Knapp of which it had actual knowledge.

Title IX of the Education Amendments Act of 1972 provides that "[n]o person in the United

---

[1]      In filing Garden City Community College Defendants' Motion For Summary Judgment Against Plaintiff Elizabeth Everett (Doc. #214) on September 16, 2022, GCCC did not address plaintiff's claim that it was deliberately indifferent to reports of harassment by Knapp supporters.  In their reply brief, GCCC first argued that plaintiff cannot show that it was deliberately indifferent to her claims of intimidation and harassment by Knapp supporters on campus.  The Court will not consider arguments first raised in reply briefs.  See Mondaine v. Am. Drug Stores, Inc., 408 F. Supp. 2d 1169, 1202–03 (D. Kan. 2006); Black & Veatch Corp. v. Aspen Ins. (UK) Ltd., No. CV 12-2350-KHV, 2019 WL 4958211, at *1 (D. Kan. Oct. 7, 2019) ("Court will not consider arguments and authorities which defendants first raise in their reply brief."); Mike v. Dymon, Inc., No. 95-2405-EEO, 1996 WL 427761, at *2 (D. Kan. July 25, 1996) (in fairness and to ensure proper notice, court generally summarily denies or excludes all arguments and issues first raised in reply briefs).  GCCC is therefore not entitled to summary judgment on this claim.

[2]      Plaintiff argues that she alleged two "before" claims and one "after" claim.  The "before" claims encompass GCCC's deliberate indifference to sexual harassment before plaintiff reported harassment.  First, plaintiff alleges that GCCC failed to train its members on Title IX and failed to establish Title IX procedures.  Second, plaintiff alleges that GCCC was deliberately indifferent to known reports of Knapp's harassment and that this indifference proximately caused plaintiff's injury i.e. harassment.  Both "before" claims target the pre-harassment circumstances at GCCC and are therefore redundant.  Because the Court does not see a significant distinction between plaintiff's "before" claims, it finds that plaintiff alleged two hostile environment claims: one pre-harassment and one post-harassment.

States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  Title IX plaintiffs cannot impose liability on a school district or other governmental entity, however, based on vicarious liability or agency theories.  Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 640 (1999) ("[A] recipient of federal funds may be liable in damages under Title IX only for its own misconduct."); Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 285 (1998) ("[I]t would 'frustrate the purposes' of Title IX to permit a damages recovery against a school district for a teacher's sexual harassment of a student based on principles of respondeat superior[.]") (citation omitted).  Instead, Title IX imposes liability when "the institution itself, rather than its employees (or students), [is] the wrongdoer." Simpson v. Univ. of Colo. Boulder, 500 F.3d 1170, 1177 (10th Cir. 2007).

To establish a Title IX teacher-on-student (or coach-on-student) sexual harassment claim, plaintiff must show that the funding recipient "(1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it (4) deprived the victim of access to the educational benefits of opportunities provided by the school." Murrell v. Sch. Dist. No. 1, 186 F.3d 1238, 1246 (10th Cir. 1999); see also Gebser, 524 U.S. at 287.  A school is liable when it remains "deliberately indifferent to acts of . . . harassment of which it had actual knowledge." Davis, 526 U.S. at 642.  This form of liability is limited "to circumstances where[ ] the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs." Id. at 645.

GCCC argues that (1) it lacked actual knowledge of inappropriate sexual conduct by

-15-

Knapp, (2) it was not deliberately indifferent to any reports of sexual misconduct and (3) the reported incidents did not rise to the degree of overt and pervasive harassment that constituted a hostile environment.

### A.   Actual Knowledge

To show actual knowledge, plaintiff must establish that an appropriate person knew of discrimination in the GCCC programs.  Escue v. N. Okla. Coll., 450 F.3d 1146, 1153 (10th Cir. 2006) (quoting Gebser, 524 U.S. at 290).  "[H]arassment of persons other than the plaintiff may provide the school with the requisite notice to impose liability under Title IX."  Id.  Events that are "too dissimilar, too infrequent, and/or too distant in time to provide the school with actual knowledge of sexual harassment in its programs" do not meet the actual knowledge standard to survive summary judgment.  Id.  (quotation marks omitted).

Defendant argues that the prior reports about Knapp were too dissimilar, too infrequent and too distant in time from plaintiff's reports in March of 2018 and that it therefore did not have actual knowledge of Knapp's alleged harassment.  Plaintiff has presented evidence that GCCC received complaints that (1) Knapp had walked in on cheerleaders changing clothes in 2015; (2) Knapp had taken photos of five cheerleaders' bare butts in 2017; (3) Knapp had sexually harassed the female dance coach in January of 2018; and (4) Knapp had inappropriately touched and spoken to the female cheerleaders in February of 2018.

These reports were similar, relatively frequent and close in time to plaintiff's report in March of 2018.  In fact, the reports span virtually all of Knapp's tenure at GCCC, so defendants were arguably on notice that they were not dealing with isolated incidents of aberrant behavior.

-16-

Plaintiff added to the catalogue of misconduct when she reported that Knapp inappropriately touched cheerleaders, made inappropriate comments about their sex lives and appearances and generally used inappropriate, sex-based language—such as calling a cheerleading pyramid "bitches-on-bitches" and telling female cheerleaders to stand like they had straws in their vaginas. A reasonable jury could readily conclude that GCCC had actual knowledge of Knapp's alleged harassment, and GCCC is not entitled to summary judgment on this ground.

### B. Deliberate Indifference

Defendant argues that it was not deliberately indifferent to reports about Knapp. Plaintiff presented evidence, however, that GCCC never conducted a Title IX investigation into Knapp's actions. It did not conduct a Title IX investigation into the photos in 2017. Instead, it issued Knapp a written warning letter—even though GCCC policy is that the HR Director investigate and submit a report to the President.

"[A] 'minimalist response is not within the contemplation of a reasonable response'" to reports of harassment  Escue, 450 F.3d at 1155 (quoting Vance v. Spencer Cnty. Pub. Sch. Dist., 231 F.3d 253, 260 (6th Cir. 2000) (where student raped, school district could not satisfy its obligation by investigating and doing nothing more.)). Plaintiff has presented evidence that GCCC did not investigate reports about Knapp. "If conducting a hollow investigation is a minimalist response, then doing less than that [cannot] suffice." Swearingen, 2022 WL 16961236, at *18. Again, a reasonable jury could easily conclude that GCCC was deliberately indifferent to complaints about Knapp before plaintiff reported him.

### C. Severe And Pervasive

-17-

GCCC argues that as a matter of law, Knapp's conduct was not severe and pervasive. The severe and pervasive standard used in hostile environment cases under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., is employed in cases under Title IX. Franklin v. Gwinnett County Public Sch., 503 U.S. 60, 75 (1992) (citing Meritor Sav. Bank. FSB v. Vinson, 477 U.S. 57 (1986)). To be liable, defendant's conduct must be so extreme that it interfered with or altered the conditions of plaintiff's school environment, so that she was denied access to an educational opportunity or benefit. Ebert v. Lamar Truck Plaza, 878 F.2d 338, 339 (10th Cir. 1989) (citing Meritor, 477 U.S. at 67). This determination is made considering all circumstances surrounding the alleged harassment, the number of incidents, their duration, the severity and whether they were physically humiliating or threatening. Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998).

Plaintiff has presented evidence that Knapp regularly made physically humiliating (and potentially threatening) comments about the appearances and sex lives of female cheerleaders and that Knapp touched her and the other female cheerleaders in inappropriate and physically humiliating and threatening ways. Plaintiff has established a genuine issue of material fact whether Knapp's behavior was so severe, pervasive and objectively offensive that it deprived her of access to the education benefits provided by GCCC. Again, a reasonable jury could easily find for plaintiff on this issue.

The Court overrules defendant's motion for summary judgment on plaintiff's claim that GCCC deprived her of educational benefits and opportunities protected under Title IX.

## II.    Title IX Retaliation

Plaintiff asserts that because of her protected activity, GCCC subjected her to the following

materially adverse actions: (1) retaliatory harassment; (2) retaliatory failure to properly investigate her complaints; (3) violation of her privacy rights by allowing another student to join and record her meeting with Knapp on February 23, 2018; and (4) encouraging of Strawder to investigate her for criminal threat.  GCCC argues that plaintiff cannot establish a prima facie case of Title IX retaliation because (1) she cannot show that it took materially adverse action against her, (2) even if she can, it did not have sufficient notice of the allegedly adverse actions and (3) it reasonably responded to known reports of retaliation.

Title IX "prohibits retaliation against individuals because they have complained of sex discrimination."  Hiatt v. Colorado Seminary, 858 F.3d 1307, 1315 (10th Cir. 2017) (citing Jackson v. Birmingham Bd. Of Educ., 544 U.S. 167, 183 (2005)).  Plaintiff can establish retaliation either with direct evidence of retaliation or indirectly by relying on the three-part McDonnell-Douglas framework.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 792 (1973); Hiatt, 858 F.3d at 1315 (applying McDonnell-Douglas framework to Title IX retaliation).

Under this framework, plaintiff must first establish a prima facie case of retaliation.  To do so under Title IX, plaintiff must show that: (1) she engaged in protected activity; (2) defendant had knowledge of the protected activity; (3) defendant took materially adverse school-related action against plaintiff; and (4) a causal connection existed between the protected activity and the adverse action.  Tackett v. Univ. of Kan., 234 F. Supp. 3d 1100, 1109 (D. Kan. 2017).  A challenged action is materially adverse if it might have dissuaded a reasonable person from making or supporting a charge of discrimination.  See Burlington N. Santa Fe Ry Co. v. White, 548 U.S. 53, 68 (2006). Deciding whether a recipient's actions are "materially adverse" is a case-specific exercise that

requires an objective inquiry that does not turn on plaintiff's personal feelings.  Semsroth v. City of Wichita, 555 F.3d 1182, 1184–85 (10th Cir. 2009).

To trigger Title IX liability, a recipient must have actual notice through an appropriate person.  Escue v. N. Okla. Coll., 450 F.3d 1146, 1152 (10th Cir. 2006).  An appropriate person "is, at a minimum, an official of the recipient with authority to take corrective action to end the discrimination" or retaliation.  Gebser, 524 U.S. at 290.

GCCC concedes that based on plaintiff's report of Arenas' misconduct on February 23, 2018 and her reports of Knapp's misconduct on March 23, 2018, she engaged in protected activity. GCCC argues that as a matter of law, however, plaintiff cannot establish that she suffered materially adverse action and that even if she can, plaintiff cannot show that GCCC had sufficient notice of such action and responded with deliberate indifference.

### A.      Retaliatory Harassment

Plaintiff alleges that GCCC subjected her to retaliatory harassment by responding with deliberate indifference to known reports that other students were bullying her on campus.  GCCC argues that plaintiff cannot show that a person with corrective authority had actual notice of such harassment and responded with deliberate indifference.

Retaliatory harassment, if sufficiently severe, may constitute adverse action for purposes of a retaliation claim.  Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1264 (10th Cir. 1998). To impute liability to GCCC, plaintiff must show that someone with corrective authority at GCCC had actual notice of the alleged retaliation.  Escue, 450 F.3d at 1152; see also Davis, 526 U.S. at 640-43 (recipient may be liable under Title IX only for its own misconduct; plaintiff cannot use

agency principles to impute liability for misconduct of teachers to recipient of federal funds).

Where recipients of federal funding are deliberately indifferent to known acts of student-on-student harassment and the harasser is under the school's disciplinary authority, the recipient may be liable for "subjecting" students to student-on-student retaliatory harassment. Davis, 526 U.S. at 646–47; see Feminist Majority Found. v. Hurley, 911 F.3d 674, 695 (4th Cir. 2018) (educational institution can be liable for acting with deliberate indifference toward known instances of student-on-student retaliatory harassment). A school is deliberately indifferent if its "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648. This "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." Id. Indeed, "courts should refrain from second-guessing the disciplinary decisions made by school administrators." Id.; see Stiles v. Grainger Cty., Tenn., 819 F.3d 834, 849 (6th Cir. 2016) (although continuing harassment by fellow students required plaintiff student to transfer schools, school not liable because prompt, tailored and repeated responses to the harassment—including interviewing victim, other students and teachers, and disciplining students with verbal warnings and suspensions—not deliberate indifference); see also Porto v. Town of Tewksbury, 488 F.3d 67, 75 (1st Cir. 2007) (no deliberate indifference where school reasonably believed it had been successful in stopping inappropriate behavior).

GCCC argues that as a matter of law, it did not respond to plaintiff's reports of bullying by students with deliberate indifference. Specifically, GCCC contacted the students whom plaintiff identified and told them to stop their retaliatory behavior. Plaintiff responds that GCCC

had actual notice of ongoing harassment because her mother and other community members reported continued bullying at board meetings.  In fact, plaintiff presented evidence that (1) during a Board meeting in May of 2018, GCCC security had to escort students reporting Title IX concerns out of the meeting to protect them from a group of angry students; (2) in April of 2018, Temaat informed President Swender and GCCC counsel Grisell that GCCC had ongoing issues with students bullying Title IX reporters; and (3) students continued to bully plaintiff through the spring of 2019.

Viewing the evidence in the light most favorable to plaintiff, she has established a genuine issue of material fact whether GCCC reasonably responded to known reports of ongoing bullying toward her and other Title IX reporters and whether GCCC reasonably believed that it had been successful in stopping the retaliatory harassment.  The Court therefore overrules GCCC's motion for summary judgment on this claim.

### B.      Retaliatory Failure To Investigate

Plaintiff alleges that in retaliation of her protected activity, GCCC failed to properly investigate her Title IX complaints.  GCCC argues that a failure to investigate does not constitute materially adverse action.  The Tenth Circuit generally assesses Title IX claims under the same legal analysis as claims under Title VII.  Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ., 245 F.3d 1172, 1176 (10th Cir. 2001).   Ordinarily, unless an employer's failure to investigate an internal complaint leads to demonstrable harm, it is not considered retaliatory because it leaves an employee no worse off than before the complaint was filed.  Daniels v. United Parcel Serv., Inc., 701 F.3d 620, 640 (10th Cir. 2012) (citing Fincher v. Depository Tr. & Clearing

Corp., 604 F.3d 712, 721–22 (2d Cir. 2010)).  A contrary rule would open employers to retaliation claims even where they failed to investigate because of a good faith belief that the complaint was without merit.  Fincher, 604 F.3d at 721–22.

Plaintiff asserts that GCCC's failure to adequately investigate her complaints led to the adoption of the Goheen Report, which was defective because Goheen did not interview key witnesses, such as the dance coach, Hernandez, who began reporting Knapp in 2015.  Plaintiff has raised a genuine issue of material fact whether GCCC's failure to properly investigate was in good faith and if such a failure might dissuade a reasonable student from raising a discrimination claim.  Accordingly, the Court overrules GCCC's motion for summary judgment on this claim.

### C.  Retaliatory Privacy Violation

Plaintiff alleges that Knapp retaliated against her for reporting Arenas' blackmail by instructing Gunnip (the cheer captain) to join and record their meeting on February 23, 2018.  GCCC argues that even though Knapp asked Gunnip to record his meeting with plaintiff, this does not constitute materially adverse action and that even if it does, Knapp did not have the requisite corrective authority to impute liability on GCCC for his actions.

Inviting a peer to join a Title IX interview—without the consent of the person reporting— might dissuade a reasonable person from making or supporting a charge of discrimination.  Plaintiff has not established, however, that GCCC had notice of Knapp's decision to have Gunnip join the meeting.  Once again, GCCC could obtain notice only through an appropriate person.  Gebser, 524 U.S. at 290.  An appropriate person "is, at a minimum, an official of [GCCC] with authority to take corrective action [on behalf of GCCC] to end the discrimination."  Id.  Plaintiff

-23-

has not established that Knapp had corrective authority or that GCCC had actual notice that Knapp asked Gunnip to join the meeting on February 23, 2018.  GCCC therefore cannot be held liable under Title IX for Knapp's actions.  Accordingly, the Court sustains GCCC's motion for summary judgment on this claim.

      **D.**      **Retaliatory Arrest**

Plaintiff claims that because of her Title IX reports, GCCC orchestrated her arrest for criminal threat in May of 2018.  GCCC argues that it is entitled to summary judgment on plaintiff's claim that it encouraged GCPD to investigate her for criminal threat.  The Court agrees.  Plaintiff has not presented any evidence to support her allegation.  In fact, the record does not reflect that GCPD officers communicated with any GCCC members regarding plaintiff's arrest.  The Court therefore sustains GCCC's motion for summary judgment on this claim.

**III.**      **Equal Protection Claim Under Section 1983**

Plaintiff alleges that Knapp's sex-based conduct was sufficiently severe or pervasive to unreasonably interfere with her education and create a hostile educational environment, which establishes an equal protection violation under the Fourteenth Amendment.  Knapp argues that the statute of limitations bars plaintiff's claim because she filed suit more than two years after these incidents of harassment.

The statute of limitations for Section 1983 actions arising in Kansas is two years.  Johnson v. Johnson Cnty. Com'n Bd., 925 F.2d 1299, 1301 (10th Cir. 1991) (citing K.S.A. § 60–513(a)(4)). As a general principle of federal common law, however, the continuing violation doctrine is available to a Section 1983 litigant.  Herrera v. City of Espanola, 32 F.4th 980, 994 (10th Cir.

2022).  Under the continuing violation doctrine, plaintiff can assert a claim based on incidents which occurred outside of the limitations period when she "seeks redress for injuries resulting from a series of separate acts that collectively constitute one unlawful act."  Hamer v. City of Trinidad, 924 F.3d 1093, 1098 (10th Cir. 2019) (citations omitted).  In other words, one violation continues when "the conduct as a whole can be considered a single course of conduct."  Id.

In the context of the continuing violation doctrine, both the Supreme Court and the Tenth Circuit have expressly addressed the difference between discrete acts and a hostile environment. In contrast to discrete acts, which are "easily identifiable and individually actionable," Croy v. Cobe Labs., Inc., 345 F.3d 1199, 1203 (10th Cir. 2003), a hostile environment by its "very nature involves repeated conduct," and "cannot be said to occur on any particular day."  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002).  A hostile environment instead "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own."  Id.

Plaintiff has presented evidence that on February 23, 2018, Knapp justified Arenas' actions by telling plaintiff that "guys try to sleep with [her] every day."  Plaintiff also presented evidence that Knapp made comments about the female cheerleaders' appearances and sex lives in March of 2018.  These comments in February and March of 2018 involve conduct that allegedly began in August of 2017.  Specifically, beginning in August of 2017, Knapp repeatedly (1) made comments about the female cheerleaders' sex lives and appearances, (2) told female cheerleaders to stand straight like there were straws in their vaginas, (3) touched them inappropriately and (4) called the cheer pyramid "bitches on bitches."

Plaintiff established a genuine issue of material fact whether Knapp's comments on February 23, 2018 and in March of 2018 were a part of a series of actions that created an alleged hostile environment.  Because Knapp's motion for summary judgment does not otherwise address plaintiff's equal protection claim, the Court overrules his motion on this claim.

## IV.    Section 1983 Conspiracy Claims

Plaintiff asserts that defendants conspired to violate her Fourth, Fourteenth and First Amendment rights by (1) orchestrating her false arrest and malicious prosecution, in violation of Fourth and Fourteenth Amendments and (2) endorsing comments by Douglass and Wasinger at the Board meetings in June of 2020, in violation of First Amendment.  Defendants argue that as a matter of law plaintiff cannot show that her arrest and prosecution constituted a deprivation of her constitutional rights or that she suffered a First Amendment injury.

To succeed on a conspiracy claim under Section 1983, plaintiff must show (1) an actual deprivation of a constitutional right, (2) a combination of two or more persons acting in concert and (3) a meeting of the minds, an agreement among defendants or a general conspiratorial objective.  Brooks v. Gaenzle, 614 F.3d 1213, 1227–28 (10th Cir. 2010).

### A.    Fourth And Fourteenth Amendments

Plaintiff alleges that GCCC, Dozier, Knapp and the Trustees conspired to violate her Fourth and Fourteenth Amendment rights by encouraging her false arrest for criminal threat on May 10, 2018 and subsequent malicious protection.  Defendants argue that plaintiff cannot establish the actual deprivation of a constitutional right because Johnson had probable cause to arrest her.  The Court agrees.  For reasons stated in the Court's order on defendant Strawder and Garden City's

-26-

motion for summary judgment, plaintiff has not shown a genuine issue of material fact whether she suffered an actual deprivation of a constitutional right when Johnson arrested her. Memorandum And Order (Doc. #281) filed December 9, 2022 at 6–9.  The Court therefore sustains defendants' motion for summary judgment on this claim.

> **B.      First Amendment**

Plaintiff claims that GCCC conspired with Wasinger and Douglass to violate her speech and association rights under the First Amendment by endorsing comments by Wasinger and Douglass at board meetings on June 9 and June 25, 2020.  Pretrial Order (Doc. #224) filed September 22, 2022 at 35.

Liberally construing the Pretrial Order, plaintiff alleges that defendants' comments at the board meetings were in retaliation for her protected speech.  See Trujillo v. Uniroyal Corp., 608 F.2d 815, 818 (10th Cir. 1979) (courts are to "liberally construe" pretrial orders "to cover any of the legal or factual theories that might be embraced by their language" (internal quotation marks and citation omitted)).  Defendants argue that plaintiff never articulates a First Amendment injury and cannot establish a constitutional deprivation under the First Amendment.  Plaintiff does not provide a clear response to this argument.[3]

To establish retaliation under the First Amendment, plaintiff must prove that (1) she was

---

[3]      In her response, plaintiff responds with a vague First Amendment injury, i.e. that defendants' comments at the board meetings in June of 2020 "had a chilling affect [sic] on her as well as others."  See Plaintiff's Memorandum In Opposition To The Garden City Community College Defendants' Motion For Summary Judgment Against Plaintiff Elizabeth Everett (Doc. #235) filed October 13, 2022 at 112.  In the Pretrial Order (Doc. #224) filed September 22, 2022 at 35, plaintiff alleges that the defendants' comments at the board meetings "caused a chilling prior restraint on her speech, violated her association rights . . . and harmed her reputation."

engaged in constitutionally protected activity, (2) defendants' actions caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that protected activity, and (3) the defendant's actions were substantially motivated as a response to her protected conduct. McBeth v. Himes, 598 F.3d 708, 717 (10th Cir. 2010) (internal quotation marks omitted, alterations in original).  Plaintiff's reports about Arenas and Knapp are constitutionally protected speech.  See Tiumalu v. Garden City Cmty. Coll., No. 20-2193, 2021 WL 1817844, at *7 (D. Kan. May 6, 2021) (Title IX complaint constitutionally protected speech).

Defendant argues that plaintiff cannot show a First Amendment injury resulting from the comments at the Board meetings.  The Court agrees.  Plaintiff has presented evidence that Wasinger and Douglass blamed civil rights suits for harming GCCC, GCCC students and Garden City community members.  Wasinger commented that he was frustrated and would "like to see resolve" on the claims—emphasizing "[t]he sooner, the better."  Exhibit ZZ, June 8, 2020 Recording (Doc. #217-14).  Plaintiff argues that these comments injured her but only has presented evidence that Chandler, a GCCC faculty member with a pending civil rights case against GCCC, felt threatened by them.

The Court concludes that the statements at the Board meetings in question would not chill a person of ordinary firmness from continuing to engage in protected speech.  See e.g., Pierce v. Chene, No. 1:15-cv-758, 2017 WL 3600458, at *10 (D.N.M. Feb. 1, 2017) (involuntary disenrollment could chill parents' speech because disenrollment of children forced them to choose between education they thought best for children and their First Amendment rights); Esparza v. Bowman, 523 Fed. App'x. 530, 536 (10th Cir. 2013) (police officer's pursuit of arrest without

-28-

probable cause would chill person of ordinary firmness); <u>Allen v. Avance</u>, 491 Fed. App'x. 1, 6 (10th Cir. 2012) (prospect of punishment severe enough to satisfy Eighth Amendment sufficient to chill person of ordinary firmness); <u>Evans v. Fogarty</u>, 241 Fed. App'x. 542, 559 (10th Cir. 2007) (citing <u>Suarez Corp. Indus. v. McGraw</u>, 202 F.3d 676, 687 (4th Cir. 2000) (official's statements to plaintiffs that it would "become his mission to cause as much pain, damage, and injury as possible to [them]" and that he would "inflict the maximum degree of penalty" if the plaintiffs refused to agree to temporary injunction sufficient to chill person of ordinary firmness)); <u>Van Deelen v. Johnson</u>, 497 F.3d 1151, 1157 (10th Cir. 2007) (threat by a deputy sheriff to shoot taxpayer if he brought more tax appeals would chill person of ordinary firmness).

Because plaintiff has not established a constitutional deprivation under the First Amendment, the Court sustains defendants' motion for summary judgment on this claim.

## V.    Section 1985(2) Conspiracy Claim

Plaintiff alleges that Wasinger and Douglass conspired to intimidate her in violation of 42 U.S.C. § 1985(2) when they blamed civil rights plaintiffs for the insurance premium increase at the Board meetings in June of 2020. Wasinger and Douglass argue that legislative immunity bars plaintiff's claim and that even if legislative immunity does not apply, plaintiff has not presented sufficient evidence to establish a conspiracy.

Section 1985(2) contains a deterrence provision, which "concerns intimidating parties, witnesses, or jurors in court so that they will not attend court or testify." <u>King v. Knoll</u>, 399 F. Supp. 2d 1169, 1179 n.57 (D. Kan. 2005). The "deterrence" provision of Section 1985(2) provides that "[i]f two or more persons in any State or Territory conspire to deter, by force, intimidation, or

-29-

threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." 42 U.S.C. § 1985(2). To establish a deterrence claim under Section 1985(2), plaintiff must show (1) a conspiracy, (2) that defendants intended to deter testimony by force or intimidation and (3) that plaintiff suffered injury. Brever v. Rockwell Int'l Corp., 40 F.3d 1119, 1126 (10th Cir. 1994).

Under the Supreme Court's functional test of absolute legislative immunity, whether immunity attaches turns not on the official's identity, or even on the official's motive or intent, but on the nature of the act in question. See Bogan v. Scott–Harris, 523 U.S. 44, 54 (1998); Forrester v. White, 484 U.S. 219, 224 (1988). More specifically, legislative immunity shields an official from liability if the act in question was undertaken "in the sphere of legitimate legislative activity." Bogan, 523 U.S. at 54. Local legislators, like their counterparts on the state and regional levels, are entitled to absolute immunity for their legislative activities. Id. at 49.

As a matter of law, Wasinger and Douglass argue that they are entitled to absolute immunity for their comments at the board meetings on June 9 and June 25, 2020 because the Board was making decisions that impacted GCCC's budget. Specifically, Wasinger and Douglass stated that GCCC students and faculty and the Garden City community would feel the financial effects of civil rights claims against GCCC. These comments directly responded to a proposed $494,000 increase to GCCC's annual insurance premium and deductible, and because of this increase, the Board decided to eliminate 11 positions at GCCC. Kansas law authorizes the board to establish

-30-

the GCCC budget and to affix employment decisions based on the President's recommendation. <u>See</u> K.S.A. § 71-201(5); K.S.A. § 71-612.

Courts regularly hold that funding choices are "discretionary, policymaking decision[s] implicating the budgetary priorities of the [state] and the services the [state] provides." <u>Bogan</u>, 523 U.S. at 55–56; <u>see also</u> <u>Sable v. Myers</u>, 563 F.3d 1120, 1124–25 (10th Cir. 2009) (holding a mayor's introduction of a budget was a legislative function because it was an integral step in the legislative process); <u>Burnett v. Fallin</u>, 785 F. App'x 546, 553 (10th Cir. 2019) (legislative immunity applies to "discretionary policy-making decisions that implicated budgetary priorities for the State"); <u>Almonte v. City of Long Beach</u>, 478 F.3d 100, 107 (2d Cir. 2007) ("[W]e conclude that legislative immunity cloaks not only the vote on the budgetary resolutions, but also any discussions the Council members may have held, and any agreements they may have made, regarding the new budget in the months preceding the actual vote."); <u>Rateree v. Rockett</u>, 852 F.2d 946, 950 (7th Cir. 1988). Because the comments by Wasinger and Douglass implicated the budgetary priorities for the state, the Court finds that as a matter of law, they are absolutely immune from suit for comments at the meetings in June of 2020. The Court therefore sustains Wasinger and Douglass' motion for summary judgment on this claim.

**IT IS THEREFORE ORDERED** that <u>Garden City Community College Defendants' Motion For Summary Judgment Against Plaintiff Elizabeth Everett</u> (Doc. #214) filed September 16, 2022 is **SUSTAINED IN PART and OVERRULED IN PART**. The Court sustains GCCC's motion on plaintiff's Title IX retaliation claims on its alleged involvement in plaintiff's arrest for criminal threat and Gunnip joining and recording plaintiff's meeting with

Knapp on February 23, 2018.  The Court also sustains defendants' motion on plaintiff's Section 1983 conspiracy claims and plaintiff's Section 1985 conspiracy claims against Douglass and Wasinger.   The Court overrules GCCC and Knapp's motion on plaintiff's Title IX hostile environment claims, Title IX retaliatory harassment and retaliatory failure to adequately investigate claims and Section 1983 equal protection claim.

Dated this 4th day of January, 2023 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge

-32-