## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| ANTONIA DOUGLASS and ELIZABETH EVERETT, | ) ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| GARDEN CITY COMMUNITY COLLEGE, et al., | ) ) |
| | ) |
| Defendants. | ) |
| | ) |

CIVIL ACTION

No. 20-2076-KHV

## MEMORANDUM AND ORDER

Antonia Douglass filed suit against Garden City Community College ("GCCC") and Herbert J. Swender, Rodney Dozier, Merilyn Douglass, Blake Wasinger, Jeff Crist, Steve Martinez, Teri Worf and Brice Knapp in their individual capacities ("GCCC defendants"). Plaintiff alleges retaliation under Title IX, 20 U.S.C. § 1681 et seq., and violations of federal civil rights under the First and Fourteenth Amendments, U.S. Const. amends. I and XIV, and 42 U.S.C. § 1983. Pretrial Order (Doc. #224) filed September 22, 2022. This matter is before the Court on Garden City Community College Defendants' Motion For Summary Judgment Against Plaintiff Antonia Douglass (Doc. #268) filed November 16, 2022. For reasons stated below, the Court sustains defendants' motion in part.

## Legal Standard

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735, 740 (10th Cir. 2007). A factual dispute is "material" only if it "might affect the outcome of the

suit under the governing law." <u>Liberty Lobby</u>, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position. <u>Id.</u> at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Nahno-Lopez v. Houser</u>, 625 F.3d 1279, 1283 (10th Cir. 2010). Once the moving party meets the initial burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which she carries the burden of proof. <u>Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.</u>, 912 F.2d 1238, 1241 (10th Cir. 1990); <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586–87 (1986). To carry her burden, the nonmoving party may not rest on her pleadings but must instead set forth specific facts supported by competent evidence. <u>Nahno-Lopez</u>, 625 F.3d at 1283.

The Court views the record in the light most favorable to the nonmoving party. <u>Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.</u>, 938 F.2d 1105, 1110 (10th Cir. 1991). It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative. <u>Liberty Lobby</u>, 477 U.S. at 250–51. In response to a motion for summary judgment, a party cannot rely on ignorance of facts, speculation or suspicion and may not escape summary judgment in the mere hope that something will turn up at trial. <u>Conaway v. Smith</u>, 853 F.2d 789, 794 (10th Cir. 1988). The heart of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Liberty Lobby</u>, 477 U.S. at 251–52.

## **Factual Background**

-2-

The following facts are uncontroverted or viewed in a light most favorable to plaintiff, the nonmoving party.

GCCC is a community college in Garden City, Kansas, which receives federal financial assistance.  Herb Swender was President from January of 2011 until he resigned in August of 2018. From April of 2014 through March 29, 2018, Brice Knapp was GCCC cheerleading coach. Rodney Dozier is Chief of Police for the GCCC Police Department.  Blake Wasinger, Jeff Crist, Steven Martinez, Teri Worf and Merilyn Douglass were GCCC Trustees during 2017 and 2018.

GCCC Board And Policies

GCCC Trustees follow the "Carver Model" of policy governance: they supervise the President and leave administrative matters to the discretion of the President, the ultimate decision maker.  GCCC's Trustees do not focus on day-to-day operations.  In accordance with this model, the President sends weekly updates to GCCC Trustees.  Although the Board of Trustees could challenge the President's Title IX decisions, it delegated all authority to the President.

The GCCC Student Handbook stated as follows: "Any person believing that he or she has been subject to unlawful harassment, as set forth in this policy, should utilize the Discrimination or Harassment Complaint Procedure, as found in the Student Handbook."  Ex. E, Student Handbook (Doc. #215-5) at 10.  That procedure did not actually appear, however, in the 2017-2018 Student Handbook.  The Student Handbook referred to Section 106.8 of Title IX for investigation procedures.  Until Congress amended Section 106.8 in May of 2020, the regulation directed recipients to adopt and publish Title IX procedures to resolve student and employee complaints.

-3-

From 2016 to 2018, Melanie Hands and Colin Lamb were Title IX investigators.  During this time, before he became President in January of 2019, Ryan Ruda was a Title IX coordinator, investigator, Vice President of Student Services and Dean of Student Services.  Coach Knapp testified repeatedly that he did not remember receiving training for sexual harassment, discrimination or Title IX generally.  He was not aware that GCCC had a Title IX coordinator or investigator.  Emily Clouse, Director of Human Resources, did not recall receiving Title IX training.  John Green, Athletic Director, never read Title IX policies and procedures and never investigated a Title IX complaint.

<u>Title IX Complaints</u>

Between 2015 and April of 2018, GCCC received more than a dozen complaints about Knapp and other Title IX concerns at GCCC.  For more than 25 years, plaintiff has been an active participant in GCCC programs and events, a host mom for GCCC student athletes, a volunteer for the GCCC Endowment Association and a booster for the Broncbusters Athletic Association, an athletic fundraising organization.  Starting in 2017, individuals began to share concerns with plaintiff about past and ongoing treatment of female students at GCCC—in particular, Knapp's inappropriate behavior toward female cheer squad members.  Plaintiff privately reached out to GCCC administrators and encouraged students, parents and others to report their Title IX concerns to GCCC through appropriate channels.  She also offered to deliver their messages to the GCCC Board of Trustees ("the Board") to substantiate the depth and breadth of the problems.  When GCCC administrators and the Trustees failed to act, plaintiff came to believe that that GCCC was intentionally scuttling any complaints.

Plaintiff was an ally for Title IX reporters on campus.  On February 23, 2018, cheer student Elizabeth Everett texted plaintiff that she needed help because she felt uncomfortable and intimidated in a meeting with Athletic Director Green, Knapp and a male cheer student whom Everett had reported to Green and Knapp.  Specifically, Everett had reported that the male cheer student had blackmailed her for sex.  Plaintiff drove to campus and pulled Everett from the meeting.  Plaintiff did not feel comfortable after seeing Everett "curled up in a chair" with "four men in [the] room staring at her."  Exhibit 18 (Doc. 274-16) at 35:21–36:1.  After the meeting, plaintiff began contacting other cheerleaders and parents to collect statements about their Title IX concerns.

On March 26, 2018, President Swender emailed the Trustees, Randy Grisell (GCCC counsel) and HR Director Clouse, stating that he had retained Bev Temaat, the Title IX Coordinator for Dodge City Community College, to investigate the cheer student complaints. Temaat was not trained as an investigator.  Swender asked Temaat to assist with the investigation because he had determined that Ruda and Lamb, who served as Title IX coordinators and investigators, might have personal conflicts of interest.

At the beginning of her investigation, Temaat did not believe that Knapp or the cheerleader complaints were the focus of her fact-finding mission.  Temaat believed that Swender had asked her to determine whether GCCC needed Title IX investigations.  Temaat made three visits to GCCC.  The first was to meet with Swender and Grisell.  The second was to meet with HR Director Clouse.  After the second meeting, Temaat told Swender that GCCC had complex and greatly expanding Title IX issues.

In April of 2018, Temaat informed Swender and Grisell that she had completed her work and identified at least four or five Title IX situations that warranted immediate investigation by a team of investigators.  Temaat did not conduct a Title IX investigation or complete any reports and felt misled regarding her role at GCCC.  Clouse testified that Temaat completed a Title IX report, but Temaat insisted that she never conducted a Title IX investigation and that she clearly informed Swender, Grisell and Clouse that she was not a Title IX investigator and was not conducting a Title IX investigation.

On April 10, 2018, plaintiff spoke at a Board meeting regarding her concerns with the cheer program, Knapp and GCCC's response to Tile IX reports.  Plaintiff also gave the Board several letters from concerned students and parents.  Plaintiff continued to attend Board meetings to follow the GCCC response to these complaints.

No Trespass Notice

On April 18, 2018, plaintiff attempted to speak about Title IX issues with Leslie Wenzel, Director of Student Success.  Plaintiff told Wenzel that they needed to discuss Title IX issues in the cheer program.  Wenzel responded that she would not talk to plaintiff and walked out of the room.  Roger Ratliff, a booster for the Broncbusters Athletic Association, and plaintiff's husband were present for this interaction

On April 19, 2018, Wenzel reported to GCCC Campus Police Chief Dozier that plaintiff had harassed her.  Wenzel reported that she felt intimidated and that she wanted to do her job without fear of future harassment.  Dozier documented the interview.  Wenzel identified other people for Dozier to contact regarding plaintiff's behavior.  On April 19, 2018, Wenzel submitted

a written report to Clouse.

On April 24, 2018, Dozier interviewed Kristi Tempel, GCCC Director of Public Relations, regarding the encounter between Wenzel and plaintiff.  Tempel described plaintiff's tone as "disruptive . . . aggressive and inappropriate."  Exhibit Y (Doc. #270-24).  Tempel was not in the room during the encounter, however, but in the room next to it.  The same day, Dozier contacted athletic association booster Ratliff about the incident.  Ratliff reported that plaintiff's behavior was "uncalled for" but not harassing.  Exhibit 86 (Doc. #274-60) at 4.  Dozier did not interview plaintiff or her husband, both of whom testified that plaintiff did not harass Wenzel during the conversation on April 18, 2018.

On April 25, 2018, Dozier issued a no trespass notice (the "Notice") against plaintiff.  Before issuing the Notice, Dozier consulted Clouse and Grisell.  Dozier directed plaintiff to contact Grisell with any questions about the Notice.  Swender received a copy of the Notice and that same day, PR Director Tempel emailed to Swender plaintiff's arrest record from an unrelated incident in February of 2017.

This was the first time GCCC had issued a no trespass notice to a community member.  The Notice did not include an expiration date or information regarding an appeal process.   The Notice prevented plaintiff from entering the GCCC campus or attending GCCC-sponsored events but did not otherwise impose restrictions on plaintiff.

After receiving the Notice, plaintiff told Trustee Merilyn Douglass, her sister-in-law, that she believed the Notice was retaliation for her Title IX report on April 10, 2018.  Plaintiff told Douglass that she wanted GCCC to investigate the Notice and rescind it immediately.

On April 26, 2018, plaintiff's counsel contacted Grisell to challenge the Notice.  Plaintiff's counsel asked Swender to rescind the Notice, but he refused to do so and the Trustees acquiesced in his decision.  Plaintiff continued to challenge the Notice through her counsel through at least May 18, 2018, but Swender did not rescind the Notice.  On April 25, 2018, plaintiff asked the Trustees to rescind the Notice and investigate her complaint of retaliation, but they refused and told plaintiff that it was up to Swender to enforce or revoke the Notice because they had delegated the decision to Swender under the Carver Model of governance.  Other than redirecting plaintiff to Swender with any complaints, the Trustees did not have any involvement with the Notice

While the Notice remained in effect, GCCC permitted plaintiff to attend all Board meetings, which she did.  For example, on May 8, 2018, plaintiff attended a Board meeting where other Title IX reporters, such as cheer student mother Eleanor Everett, brought their concerns to the Board.  Plaintiff also asked to attend graduation on campus and GCCC approved this request. The Notice made it difficult for plaintiff to help students, however, and she could not attend various GCCC social events with friends.  For example, on May 3, 2018, a student called plaintiff and asked for help because detectives were questioning her.  Plaintiff could not help because the student was in on-campus housing.  While the Notice was in effect, however, plaintiff spoke with Title IX investigators Ruda and Lamb "on a regular basis."  She did so until August of 2018. Exhibit 81 (Doc. #274-55) at 7.   Plaintiff could also text, call or email any GCCC student or employee.

On May 4, 2018, over the objection of several GCCC employees, Dozier advised the GCCC police that he had lifted the Notice.  Exhibit DD (Doc. #270-29).  Grisell continued to

contact plaintiff's counsel about the Notice, however, until at least May 18, 2018, and during these conversations, Grisell represented that the Notice remained in effect.  On July 27, 2018, Grisell emailed plaintiff's counsel and stated as follows: "Please be apprised that the [Notice] issued against [plaintiff] is rescinded as of July 27, 2018."  Exhibit EE (Doc. #270-30) at 2.

The Goheen Report

On May 8, 2018, the GCCC Faculty Senate drafted a document titled "A Call for Immediate and Effective Action by the Board of Trustees of Garden City Community College" ("Call for Action").  Knapp had resigned on March 29, 2018, but the Call for Action raised Title IX concerns about him.  On or around May 16, 2018, the Board issued a statement acknowledging Title IX complaints and stating that it was retaining an independent investigator.  The next month, on June 12, 2018, the Board retained Greg Goheen, an attorney, to conduct an independent investigation.

Goheen investigated the allegations in the "Call for Action" and issued a report on his findings (the "Goheen Report").  Plaintiff generally alleges that the Goheen Report was deficient and that Goheen had minimized her Title IX report in an effort to discredit her.  For example, the Goheen Report does not detail the Title IX report which plaintiff made on April 10, 2018.  The Goheen Report also repeated a rumor that plaintiff had had sexual relationships with student athletes at GCCC.

Plaintiff first heard about this rumor from faculty member Holly Chandler.  According to Chandler, Trustee Martinez told her about the rumor at a Board meeting on April 10, 2018—the same meeting in which plaintiff had expressed her concerns with the cheer program, Knapp and

GCCC's response to Title IX reports.  Martinez told plaintiff that Swender had started the rumor.  The Goheen Report also included a statement by Ruda that he had heard Swender spread this rumor about plaintiff.  The Goheen Report addressed the rumor and stated as follows: "Dr. Swender is alleged to have told Steve Martinez that [plaintiff] was sleeping with student athletes.  [Plaintiff] denies that she slept with any college student athletes.  Mr. Martinez stated that Dr. Swender never talked about [plaintiff] in a negative way to him."  Exhibit 8 (Doc. #274-8) at 29.  At a Board meeting in January of 2019, when the Trustees considered the findings in the Goheen Report, Martinez admitted spreading the rumor but denied saying that Swender had started it.

During the public comment session, at the same meeting in January of 2019, Chief Dozier spoke about his personal complaints regarding plaintiff.  Specifically, Dozier was upset because he had learned that plaintiff had filed a complaint against him, alleging that he had not adequately investigated Wenzel's complaint of harassment before issuing the Notice.  During this time, Dozier was visibly upset, spoke aggressively and turned around to point at plaintiff.

At the end of that meeting and over several objections, the Board voted to adopt the Goheen Report.  Eight Board members voted to adopt the report and two Board members voted against it.

The Board had increased security to manage the public at Board meetings, but Wasinger and other Trustees were concerned that the public comment sessions were too unruly.  In February of 2019, the Board therefore voted to close the public comment sessions of its meetings.  According to Wasinger, they always intended to reopen the sessions but wanted time to reset and refocus.  Exhibit 63 (Doc. #274-43) at 248.  The Trustees remained available to the public "24/7."  Id.  The Board reopened the public comment sessions in September of 2019.

Board Meetings In June of 2020

Before a Board meeting on June 8, 2020, Ruda sent GCCC employees a memorandum explaining that because of the number of claims filed against GCCC, it was now in the "high risk category" for liability insurance.  As result, GCCC was subject to an additional $494,000 for liability insurance.  Ruda's memo named the plaintiffs with pending suits against GCCC. Specifically, he stated as follows: "With the claims of Hoke, Bradforth, Douglass, Kucharik, Tiamalu and Sophia Hernandez, our anticipated losses are exceeding our premium."  Exhibit 35 (Doc. #274-25) at 2 (emphasis added).  Because of the additional expense, Ruda recommended that GCCC leave 11 positions vacant to pay the insurance premium.[1]

Ruda had informed Wasinger about the insurance budget issue before the Board meeting on June 9, 2020, and Wasinger planned comments for the Board meeting.  At the meeting on June 9, 2020, Wasinger stated as follows:

> I know you kind of sent some preliminary data on that, and I'm actually glad you brought it up. You know, Ryan, I—I kind of held my tongue a year ago or two years ago when we were a different board sitting there . . . . But these claims or these lawsuits or whatever might entail from it, weren't going after the college money, weren't going after the owner's money.  You know, it was the carrier's money.  And I held my tongue, because obviously we don't know what's what would entail by it, but we all know how insurance works.  And I mean, the truth of it is, is increased claims the insurance carrier is going to, they're going to recoup their losses by deductibles and premiums.  So, you know, with more, obviously more, information, you know, personally, that statement of not taking owners' money is completely false.  They are taking owners' money.  They're affecting everyone in this room.  Everyone in administration, faculty, staff.  They're affecting every student and every community member, whether . . . indirectly or . . . directly.

---

[1]     It is not clear when or how the Board approved Ruda's recommendation, but after review of the Board meetings in June of 2020, the Board either approved Ruda's recommendation or ratified his decision at some point during that time.  GCCC ultimately chose to leave those 11 positions vacant to pay the insurance premium.

-11-

And I know there's a lot of factors and I'm again, I'm not playing victim, but . . . [w]e're not an institution that just has bottomless pockets.  And, of course, I'm frustrated.  You know, I'd like to see resolve on these things.  The sooner the better, if that's the case.

Exhibit ZZ (Doc. #217-14).  Wasinger made similar comments at the Board meeting on June 25, 2020 and Douglass made similar comments at both meetings.  The comments did not expressly name plaintiff, but did address people with pending suits against GCCC, which included plaintiff.[2] Faculty member Chandler testified that as a civil litigant with claims against GCCC, these comments intimidated her.  Plaintiff believes the Trustees intended to intimidate her with their comments.

Procedural History

On February 2, 2020, plaintiff filed this action.  Under 42 U.S.C § 1983, plaintiff claimed that the GCCC defendants (1) retaliated against her for reporting Title IX concerns and supporting Title IX victims, in violation of the First Amendment[3] and (2) conspired to do so.  Plaintiff further alleged that (1) the GCCC defendants (except Knapp) issued the Notice without providing an

---

[2]     Although not clear from the record, Wasinger and Douglass were likely referring to this suit, which plaintiff had filed four months before the meetings in June of 2020.

[3]     In her brief, plaintiff argues that the alleged retaliatory actions violated her rights to petition, associate and speak.  Plaintiff's Memorandum In Opposition To The Garden City Community College Defendants' Motion For Summary Judgment Against Plaintiff Antonia Douglass (Doc. #273) filed November 18, 2022 at 112–15.  Plaintiff then includes arguments regarding general violations of her First Amendment rights to petition, associate and speak.  The Pretrial Order clearly states that plaintiff alleged that defendants violated her First Amendment rights in retaliation for her protected speech.  Pretrial Order (Doc. #224) filed September 22, 2022 at 26.  Moreover, plaintiff must establish a constitutional injury to show retaliation under the First Amendment.  See Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000) (First Amendment retaliation test).  Accordingly, the Court finds that plaintiff has alleged retaliation in violation of the First Amendment and will address her alleged injuries under the Worrell retaliation framework.

appeal procedure in violation of her Fourteenth Amendment right to procedural due process; (2) GCCC retaliated against her for engaging in protected activities in violation of Title IX; and (3) GCCC and Trustees Wasinger and Douglass conspired to intimidate her in violation of 42 U.S.C. § 1985(2).  Defendants argue that they are entitled to summary judgment on each of plaintiff's claims.

## Analysis

The GCCC defendants (including Knapp) assert that they are entitled to summary judgment on plaintiff's claims of retaliation in violation of the First Amendment because (1) the individual defendants are entitled to qualified immunity, (2) plaintiff cannot establish that GCCC is liable under Monell v. Department of Social Services, 436 U.S. 658 (1978), (3) plaintiff cannot establish a prima facie case of retaliation in violation of the First Amendment and (4) plaintiff cannot establish a conspiracy to retaliate.  GCCC, Swender, Dozier and the Trustees further argue that they are entitled to summary judgment on plaintiff's procedural due process claim because she cannot show that the Notice infringed upon a protected property or liberty interest, and GCCC argues that plaintiff cannot establish a prima facie case of retaliation in violation of Title IX. Finally, Wasinger and Douglass argue that they are absolutely immune from liability under Section 1985.

## I.     Section 1983 Retaliation Claim

Plaintiff alleges that the GCCC defendants (including Knapp) retaliated against her for publicly reporting Title IX concerns at a Board meeting on April 10, 2018, in violation of the First Amendment.   Defendants argue that (1) the individual defendants are entitled to qualified

immunity; (2) plaintiff cannot prove that GCCC is liable under Monell; and (3) plaintiff cannot establish a prima facie case of retaliation.

In Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000), the Tenth Circuit Court of Appeals explained the law that applies to retaliation claims when defendant is not plaintiff's employer and they have no contractual relationship.  See Leverington v. City of Colo. Springs, 643 F.3d 719, 728 (10th Cir. 2011).  To establish retaliation in violation of the First Amendment, plaintiff must prove that (1) she was engaged in constitutionally protected activity; (2) defendant's actions caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that protected activity; and (3) her protected conduct substantially motivated defendant's actions.  Worrell, 219 F.3d at 1212.

Plaintiff alleges that because she reported Title IX concerns to the Board on April 10, 2018, defendants retaliated against her in the following ways: (1) without probable cause, Dozier issued (and the Trustees and Swender enforced) the Notice that banned her from campus and GCCC events between April 25 and July 27, 2018;[4] (2) Trustees Wasinger and Douglass disparaged civil rights litigants at two Board meetings in June of 2020, after plaintiff had filed this lawsuit; (3) the Trustees removed the public comment sessions at Board meetings from February until September of 2019; (4) the Trustees adopted the Goheen Report, which included rumors about plaintiff, and publicly disparaged her; and (5) GCCC's retaliation was pursuant to GCCC custom or policy to

---

[4]     Although an internal GCCC document states that Dozier lifted the Notice on May 4, 2018, Grisell informed plaintiff's counsel about the recission on July 27, 2018 and expressly stated that GCCC was lifting the Notice that day.  Further, both parties address the Notice as if it were lifted on July 27, 2018.  The Court therefore presumes for purposes of this analysis that GCCC lifted the Notice on July 27, 2018.

intimate critics and silence Title IX reporters.

### A.    Qualified Immunity

Defendants argue that all individual defendants are entitled to qualified immunity on plaintiff's retaliation claims because clearly established law did not put them on notice that their conduct was unconstitutional.  To overcome an official's qualified immunity claim, plaintiff must demonstrate that (1) the official violated a statutory or constitutional right and (2) at the time, the law clearly established that right.  See N.E.L. v. Douglas Cty., Colo., 740 F. App'x 920, 928 (10th Cir. 2018).  A right is clearly established when every reasonable official would understand that what he or she is doing violates that right.  Id. at 928–29.  Once plaintiff establishes an inference that defendants' conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 876–77 (10th Cir. 1993).

Defendants cite Hirt v. Unified School District No. 287, No. 2:17-CV-02279-HLT, 2019 WL 1866321 (D. Kan. Apr. 24, 2019), aff'd sub nom. Clark v. Unified Sch. Dist. No. 287, 822 F. App'x 706 (10th Cir. 2020), in which a school district banned a community member from campus because he insulted various school board members at school board meetings.  On April 24, 2019, this Court held that Kansas law had not clearly established that indefinitely banning a member of the public from a school campus would violate the First Amendment.  Id. at *18–19.  Defendants argue that when they issued the Notice on April 25, 2018, they could not have been on notice that they were violating plaintiff's clearly established rights.

Defendants' focus, however, is too narrow.  In the Tenth Circuit, the law has been clearly established since at least 2000 that Section 1983 prohibits retaliation for exercising constitutionally protected rights under the First Amendment.  See Worrell, 219 F.3d at 1212; see also Nave v. Indep. Sch. Dist. No. 20 of LeFlore Cty., No. CIV-17-096-KEW, 2018 WL 6419296, at *9 (E.D. Okla. Dec. 6, 2018).  A reasonably competent public official would necessarily know that such retaliatory behavior violated plaintiff's First Amendment rights.  See, e.g., Worrell, 219 F.3d at 1212.  The individual defendants are not entitled to qualified immunity and the Court overrules defendants' motion on this ground.

### B.   Monell Liability

Plaintiff alleges that under Monell, GCCC is liable for constitutional violations by its employees pursuant to GCCC custom or policy.  Pretrial Order (Doc. #224) filed September 22, 2022 at 27.  Specifically, plaintiff alleges that when they issued and enforced the Notice, Swender, Dozier and the Trustees acted pursuant to GCCC informal policy or custom to intentionally scuttle any Title IX complaints, intimidate critics and inadequately enforce Title IX.  Id.  Applying Monell, GCCC argues that it is entitled to summary judgment because it did not have a policy of silencing Title IX critics.  Garden City Community College Defendants' Memorandum In Support Of Their Motion For Summary Judgment Against Plaintiff Antonio Douglass (Doc. #269) filed November 16, 2022 at 50.

Local governments or municipalities, including GCCC, can be held liable for employees' actions taken pursuant to "official policy."  Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986); Monell, 436 U.S. at 694.  To prove liability under Monell and its progeny, plaintiff must

show (1) a constitutional violation by a governmental employee, (2) the existence of a governmental custom or policy and (3) a direct causal link between the custom or policy and the violation.  See Monell, 436 U.S. at 694.

The Supreme Court has held that "an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988).  To discern "when a decision on a single occasion may be enough to establish an unconstitutional municipal policy," the Court must consider whether the municipality—through an official with "final policymaking authority"—sanctioned or ordered the act.  Id. (internal citations omitted). Whether an official has final policy making authority is a question of state law.  Id. (citing Pembaur, 475 U.S. at 483.

Under Kansas law, the board of trustees is responsible "for the operation, management and control of the college." K.S.A. § 71–201(a).  Accordingly, like a school board, the board of trustees has final policymaking authority.  See Ware v. Unified Sch. Dist. No. 492, 881 F.2d 906, 912–13 (10th Cir. 1989) (under Kansas law, school board has final policymaking authority).  Further, to establish a causal link between the actions of the Board and the alleged unconstitutional deprivation, plaintiff may show either that the Board delegated its decision-making authority to an official whose conduct caused the constitutional violation, or that the Board exercised its decision-making authority with deliberate indifference to the constitutional rights of plaintiff.  Gates v. Unified Sch. Dist. No. 449 of Leavenworth Cnty., Kan., 996 F.2d 1035, 1042 (10th Cir. 1993).

-17-

As shown below, plaintiff has established a genuine issue of material fact whether Swender, Dozier and the Trustees violated her First Amendment rights when Dozier issued and Swender and the Trustees enforced the Notice.  Plaintiff has not established a genuine issue of material fact whether defendants violated her First Amendment rights when (1) Trustees Wasinger and Douglass disparaged civil rights litigants at two Board meetings in June of 2020, after plaintiff had filed this lawsuit; (2) the Trustees removed the public comment sessions at Board meetings from February until September of 2019; and (3) the Trustees adopted the Goheen Report, which included rumors about plaintiff, and publicly disparaged her.  Accordingly, GCCC is not liable under Monell regarding the Trustees' comments, public comment sessions or Goheen Report/public disparagement.  The Court therefore sustains GCCC's motion on these claims.

Plaintiff has presented evidence, however, that (1) Swender refused to rescind the Notice until July 27, 2018 and therefore ratified Dozier's decision to issue the Notice, (2) the Trustees refused to investigate plaintiff's complaint to Trustee Douglass that the Notice was retaliation for her Title IX report and (3) the Trustees deferred to Swender regarding the Notice pursuant to the Carver Model of governance—again, notwithstanding plaintiff's report of retaliation.  Plaintiff has established a genuine issue of material fact whether the Board delegated its decision-making authority to Swender and whether Swender caused a constitutional violation by ratifying Dozier's decision to issue the Notice and enforcing it until July 27, 2018.

Because plaintiff has established a genuine issue of material fact whether an unconstitutional policy could be inferred from Swender's ratification of the Notice, see Praprotnik,

485 U.S. at 123, the Court overrules defendants' motion that plaintiff may not hold GCCC liable for issuing and enforcing the Notice under Monell.

### C.      Retaliatory Issuance And Enforcement Of The Notice

Plaintiff alleges that in retaliation for reporting Title IX concerns to the Board on April 10, 2018, defendants issued and enforced the Notice against her.  Defendants argue that plaintiff cannot establish the third element under Worrell—causation.  Specifically, defendants assert that (1) plaintiff cannot establish that her protected conduct substantially motivated their actions and (2) Swender, Knapp and the Trustees did not participate in issuing the Notice and therefore, plaintiff cannot establish their intent to retaliate.

At the summary judgment stage, to demonstrate that plaintiff's conduct substantially motivated defendants' conduct, plaintiff must show facts which demonstrate that defendants "acted on the basis of a culpable subjective state of mind."  See McCook v. Spriner Sch. Dist., 44 F. App'x. 896, 905 (10th Cir. 2002) (internal quotation marks omitted).  If the adverse action against plaintiff was not retaliatory or if defendants did not cause the adverse action, defendants may successfully defend the retaliation claim.  Worrell, 219 F.3d at 1213.  Without more, temporal proximity between the protected speech and the alleged retaliation does not allow an inference of a retaliatory motive, unless plaintiff establishes sufficiently close proximity.  Trant v. Oklahoma, 754 F.3d 1158, 1170 (10th Cir. 2014); see also Marx v. Schnuck Markets, Inc., 76 F.3d 324, 329 (10th Cir. 1996) (must be "close temporal proximity").  A six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient.  Meiners v. Univ. of Kan., 359 F.3d 1222, 1231 (10th Cir.

-19-

2004).

### i.      Dozier

As to Dozier, plaintiff has presented evidence that (1) she expressed Title IX concerns to the Board on April 10, 2018; (2) Dozier attended that Board meeting; and (3) Dozier issued the Notice two weeks later, on April 25, 2018.  Plaintiff has also presented evidence that (1) her husband and Ratcliff—each of whom observed the exchange between plaintiff and Wenzel—do not recall plaintiff harassing Wenzel during the short conversation on April 18; (2) Ratcliff reported to Dozier that he did not believe plaintiff had harassed Wenzel; and (3) Dozier did not interview plaintiff.  Viewed in the light most favorable to plaintiff, Dozier's investigation was cursory and inadequate.  Moreover, the Notice—which banned her from entering the campus and attending GCCC events—was arguably disproportionate to any need to protect Wenzel from harassment by plaintiff.  On this record, a jury could easily conclude that plaintiff's protected activity substantially motivated Dozier to under-investigate and over-react by issuing the Notice.

Viewing the evidence in the light most favorable to plaintiff, she has established a genuine issue of material fact whether Dozier's decision to issue the Notice was substantially motivated by her protected conduct on April 10, 2018.  The Court overrules defendants' motion for summary judgment on this ground.

### ii.      The Trustees, Swender and Knapp

As to plaintiff's allegation that Swender and the Trustees enforced the Notice in retaliation for her protected speech, defendants argue that the Trustees, Swender and Knapp are entitled to summary judgment because they did not participate in issuing the Notice.  Plaintiff responds that

Swender and the Trustees enforced the Notice and are therefore responsible for the retaliation.  To survive summary judgment, plaintiff must present evidence that each individual defendant had an intent to retaliate.  See A.M. v. Holmes, 830 F.3d 1123, 1163 (10th Cir. 2016).

Plaintiff has presented evidence that (1) she reported her Title IX concerns to the Board on April 10, 2018; (2) on April 25, 2018, plaintiff reported to Trustee Douglass that she believed the Notice was in retaliation for her Title IX report; (3) on April 26, 2018, plaintiff's attorney contacted GCCC counsel Grisell to demand that GCCC rescind the Notice; (4) even after several requests from plaintiff, Swender refused to rescind the Notice; (5) Swender informed the Trustees about the Notice; (6) when plaintiff complained to the Trustees about the Notice, they deferred to Swender and told plaintiff that because they had delegated such authority to Swender under the Carver Model of governance, it was up to him to enforce or revoke the Notice; and (7) Dozier rescinded the Notice on May 4, 2018, but Grisell did not inform plaintiff that GCCC had lifted the Notice until July 27, 2018 and did not inform plaintiff that Dozier previously lifted it.  Plaintiff has established a genuine issue of material fact whether Swender and the Trustees intended to retaliate against her by refusing to rescind the Notice.

The Court overrules defendants' motion on the issue whether Dozier, Swender and the Trustees intended to retaliate.  Because plaintiff has not presented evidence that Knapp intended to retaliate or even argued that he participated in issuing the Notice after the termination of his employment at GCCC, the Court sustains defendant's motion as to Knapp.

### D.    Comments At Board Meetings In June Of 2020

Plaintiff alleges that because she reported Title IX concerns to the Board on April 10, 2018,

Trustees Wasinger and Douglass blamed her and other civil rights plaintiffs for GCCC financial woes at two Board meetings in June of 2020.  Defendants argue that plaintiff cannot show that the Trustees' actions caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in protected activity.

Plaintiff has presented evidence that Wasinger and Douglass blamed civil rights suits for harming GCCC, GCCC students and Garden City community members.  Wasinger commented that he was frustrated and would "like to see resolve" on the claims—emphasizing "[t]he sooner, the better."  Plaintiff argues that these comments injured her but only has presented evidence that Chandler, a GCCC faculty member with a pending civil rights case against GCCC, felt threatened by them and that plaintiff believes the Trustees intended to also intimidate her.  Plaintiff did not submit evidence that she actually felt threatened.

As a matter of law, the statements at the Board meetings in question—which did not mention plaintiff by name—would not chill a person of ordinary firmness from continuing to engage in protected speech.  Cf. Pierce v. Chene, No. 1:15-cv-758, 2017 WL 3600458, at *10 (D.N.M. Feb. 1, 2017) (involuntary disenrollment of children could chill parents' speech by forcing them to choose between First Amendment rights and education for their children); Esparza v. Bowman, 523 F. App'x. 530, 536 (10th Cir. 2013) (police officer pursuit of arrest without probable cause would chill person of ordinary firmness); Allen v. Avance, 491 F. App'x. 1, 6 (10th Cir. 2012) (prospect of punishment severe enough to violate Eighth Amendment sufficient to chill person of ordinary firmness); Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 687 (4th Cir. 2000) (official's statements to plaintiffs that it would "become his mission to cause as much pain,

damage, and injury as possible to [them]" and that he would "inflict the maximum degree of penalty" if the plaintiffs refused to agree to temporary injunction sufficient to chill person of ordinary firmness); <u>Van Deelen v. Johnson</u>, 497 F.3d 1151, 1157 (10th Cir. 2007) (deputy sheriff's threat to shoot taxpayer if he brought more tax appeals would chill person of ordinary firmness).

Plaintiff has not established a genuine issue of material fact whether the Trustees' comments would chill a person of ordinary firmness from continuing to engage in protected activity. The Court therefore sustains defendants' motion for summary judgment on this claim.

### E.    Public Comments Section

Plaintiff alleges that that because she reported Title IX concerns at the Board meeting on April 10, 2018, the Trustees retaliated by closing the public comment session of Board meetings from February until September of 2019. Defendants argue that plaintiff cannot show that the Trustees' actions caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that protected activity.

Even when defendant's actions make it "more difficult" to engage in protected speech, courts properly dismiss First Amendment retaliation claims when "alternative avenues" remain open to engage in such speech. <u>Smith v. Plati</u>, 258 F.3d 1167, 1177 (10th Cir. 2001). The Tenth Circuit has reasoned that in such circumstances, plaintiff retains "the ability to speak freely about any political, social or other concern." <u>Id.</u>

Defendants have presented evidence that by contacting Swender, the Trustees or other GCCC employees with sufficient authority, such as Title IX investigators Ruda and Lamb, plaintiff could report Title IX concerns to defendants at any time. Trustee Wasinger also testified that the

Trustees remained available to the public "24/7" during the closure of the public comment session. Because alternative avenues remained open for plaintiff to report Title IX issues at GCCC from February to September of 2019, she has not established that the Trustees' decision to close the public comment session would chill a person of ordinary firmness from engaging in protected speech. The Court sustains defendants' motion for summary judgment on this claim.

### F.     Goheen Report And Public Disparagement

Plaintiff alleges that in retaliation to her Title IX report on April 10, 2018, the GCCC defendants harmed her reputation. Specifically, plaintiff claims that (1) Swender and Trustee Martinez spread a rumor about her having sexual relationships with student athletes and (2) the Trustees adopted the Goheen Report which detailed this rumor and minimized her Title IX concerns. Defendants argue that plaintiff cannot show that any damage to her reputation caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that protected activity.

To establish injury, plaintiff must show that defendants' actions would chill a person of ordinary firmness. Eaton v. Meneley, 379 F.3d 949, 953 (10th Cir. 2004). This "standard for evaluating that chilling effect is objective" and "vigorous." Id. at 953, 955. Applying that standard, courts in this Circuit have found that statements concerning the illegality or impropriety of a plaintiff's conduct are insufficient, standing alone, to support a First Amendment retaliation claim. See, e.g., How v. City of Baxter Springs, Kan., 217 F. App'x 787, 798 (10th Cir. 2007) (threat of criminal charges not injury that would chill person of ordinary firmness from continuing to exercise constitutional rights); Valdez v. New Mexico, 109 F. App'x 257, 263 (10th Cir. 2004)

(statements made to press regarding plaintiff's possible involvement in criminal activity not sufficient for First Amendment retaliation claim); Taylor v. City of Claremore, No. 18-cv-269-GKF-FHM, 2019 WL 3482965, at *9 (N.D. Okla. July 31, 2019) (statement that plaintiff had committed perjury would not chill person of ordinary firmness from continuing to engage in First Amendment activity).

Accordingly, "[e]ven in the context of [a] First Amendment retaliation case, . . . injury to one's reputation is not enough" to establish a chilling effect. Eaton, 379 F.3d at 956. In Phelan v. Laramie Cnty Comm. College Bd. of Trustees, 235 F.3d 1243, 1248 (10th Cir. 2000), the Tenth Circuit reasoned that defendant's disparaging statement "carried no penalties" and did not "restrict [plaintiff's] opportunities to speak." Phelan, 235 F.3d at 1248; see also Blume v. Meneley, 283 F. Supp. 2d 1178, 1188 (D. Kan. 2003) (defamation not sufficient to state retaliation claim under Section 1983). It emphasized that the government may interject its voice into public discourse and concluded that because plaintiff remained free to express her views publicly and to criticize defendants, their conduct would not chill a person of ordinary firmness. Phelan, 235 F.3d at 1247.

Here, plaintiff has not established a genuine issue of material fact whether defendants' alleged retaliation would chill a person of ordinary firmness from continuing to engage in protected speech. Even if the rumor and the Goheen Report harmed plaintiff's reputation, plaintiff remained free to express her views publicly and to criticize defendants' conduct. The Court therefore sustains defendants' motion for summary judgment on this claim.

## II.    Section 1983 Conspiracy Claims

Plaintiff asserts that GCCC and the individual defendants (including Knapp) conspired to

retaliate against her for her Title IX report on April 10, 2018 by (1) orchestrating the issuance and enforcement of the Notice; (2) endorsing comments by Wasinger and Douglass at the Board meetings in June of 2020; and (3) eliminating the public comment sessions at Board meetings for several months.[5]  Defendants argue that (1) plaintiff cannot show that she suffered a deprivation of her constitutional rights; (2) plaintiff cannot establish a conspiracy; (3) Swender, Dozier and Knapp are entitled to qualified immunity for the Notice; and (4) plaintiff cannot establish that GCCC is liable under Monell.

To succeed on a conspiracy claim under Section 1983, plaintiff must show (1) an actual deprivation of a constitutional right, (2) a combination of two or more persons acting in concert and (3) a meeting of the minds, an agreement among defendants or a general conspiratorial objective.  Brooks v. Gaenzle, 614 F.3d 1213, 1227–28 (10th Cir. 2010).  Again, to establish an actual deprivation of a constitutional right under a First Amendment retaliation theory, plaintiff must prove that (1) she was engaged in constitutionally protected activity, (2) defendants' actions caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that protected activity and (3) her protected conduct substantially motivated defendants' actions.  Worrell, 219 F.3d at 1212.

The Court has determined as a matter of law that defendants' conduct in endorsing comments by Wasinger and Douglass at Board meetings in June of 2020 and eliminating public comment sessions at Board meetings would not chill a person of ordinary firmness from continuing

---

[5]     Plaintiff does not allege a conspiracy regarding the Goheen Report or public disparagement.  Pretrial Order (Doc. #224) filed September 22, 2022 at 28–29.

to engage in protected activity under the First Amendment.  Accordingly, plaintiff cannot show a constitutional violation on either theory, and defendants are entitled to summary judgment on the conspiracy claims which are premised on those actions.

As to plaintiff's theory that defendants conspired to issue and enforce the Notice, because direct evidence of an agreement rarely is available, plaintiff can rely solely on circumstantial evidence to establish a conspiracy.  Snell v. Tunnell, 920 F.2d 673, 702 (10th Cir. 1990).  Proof of an agreement among defendants need not be express.  Frasier v. Evans, 992 F.3d 1003, 1025 (10th Cir. 2021).  Parallel action may or may not indicate an agreement to act in concert.  Id.  To demonstrate a conspiratorial agreement, plaintiff must show "a single plan, the essential nature and general scope of which was know[n] to each person who is to be held responsible for its consequences."  Snell, 920 F.2d at 702.

## A.    General Conspiratorial Objective

As explained above, plaintiff established a genuine issue of material fact whether she suffered a constitutional deprivation when Dozier issued and Swender and the Trustees enforced the Notice in retaliation for her protected speech.  As to the alleged conspiracy, plaintiff has presented evidence that (1) Dozier issued the Notice 15 days after plaintiff reported Title IX concerns to the Board—including her concern that Swender and Green were ignoring Title IX reports; (2) Dozier performed a cursory and inadequate investigation before issuing the Notice; (3) Trustee Douglass did not respond to plaintiff's concern that Dozier issued the Notice in retaliation for her protected speech; (4) Swender refused to rescind the Notice after multiple requests from plaintiff's counsel; (5) Swender informed the Trustees about the Notice and the circumstances that

led to its issuance; (6) the Trustees ignored plaintiff's request to rescind the Notice and instead told her that it was solely up to Swender to rescind or enforce the Notice—even though under the Carver Model of governance the Trustees had the power to rescind the Notice; (7) the same day that Dozier issued the Notice, Tempel pulled plaintiff's arrest records from an unrelated incident in 2017 and sent it to Swender; (8) GCCC had a pattern of ignoring Title IX reports; and (9) the Notice was the first time GCCC had issued a no trespass notice against a community member.

Plaintiff has established a genuine issue of material fact whether Swender, Dozier and the Trustees conspired to silence her by issuing the Notice.

Knapp argues that plaintiff cannot establish that he was involved in the conspiracy regarding the issuance and enforcement of the Notice.  Plaintiff does not respond to this argument and has not presented evidence that Knapp was involved.  Accordingly, Knapp is entitled to summary judgment on this claim.

### B.    Qualified Immunity And Liability Under <u>Monell</u>

Defendants argue that Swender, Dozier and the Trustees are entitled to qualified immunity on plaintiff's conspiracy claims because clearly established law did not put them on notice that their conduct was unconstitutional.  Again, defendants' argument is too narrow.  Swender, Dozier and the Trustees are not entitled to qualified immunity; a reasonably competent public official would necessarily know that such retaliatory behavior violated plaintiff's First Amendment rights. <u>See, e.g.</u>, <u>Worrell</u>, 219 F.3d at 1212.

Similarly, GCCC argues again that plaintiff cannot establish that when Dozier issued and Swender and the Trustees enforced the Notice, they acted pursuant to GCCC policy or to retaliate

against Title IX reporters.  As explained above, because plaintiff has established a genuine issue of material fact whether an unconstitutional policy could be inferred from Swender's ratification and enforcement of the Notice, see Praprotnik, 485 U.S. at 123, the Court denies defendants' motion for summary judgment on the theory that plaintiff may not hold GCCC liable for the Notice under Monell.

The Court overrules defendants' motion as to Swender, Dozier and the Trustees on plaintiff's Section 1983 conspiracy claim because she established a genuine issue of material fact whether they agreed to issue and enforce the retaliatory Notice.  The Court also overrules defendants' motion as to GCCC's liability under Monell.  As to Knapp, however, the Court sustains defendants' motion for summary judgment because plaintiff has not established a genuine issue of material fact whether he participated in a conspiracy to retaliate against plaintiff by issuing or enforcing the Notice.

## III.    Section 1983 Procedural Due Process

Plaintiff brings a procedural due process claim under Section 1983 against Swender, Dozier and the Trustees in their individual capacities, and GCCC under Monell.  Plaintiff alleges that Swender, Dozier and the Trustees violated the due process clause by (1) issuing and enforcing the Notice and (2) failing to give her an identifiable procedure or mechanism to challenge its nature, adequacy, justification, procedural and/or constitutional deficiencies.  Plaintiff argues that GCCC is liable because Dozier, Swender and the Trustees issued and enforced the Notice pursuant to a policy or custom of intimidating critics and silencing Title IX reporters.  Defendants argue that plaintiff cannot show a protected property or liberty interest that implicates due process

protections.

Procedural due process claims are evaluated under a two-step process: (1) whether a protected property or liberty interest implicates due process protections and (2) whether the procedures used to deprive plaintiff of that interest were constitutionally sufficient. Moore v. Bd. of Cty. Comm'rs, 507 F.3d 1257, 1259 (10th Cir. 2007).

Defendants argue that plaintiff cannot show a protected property or liberty interest in entering GCCC property or attending GCCC-sponsored events. The Court has previously held that plaintiff does not have a property interest in entering the GCCC campus. Order On Motion To Dismiss (Doc. #90) filed June 9, 2021 at 17. Plaintiff does, however, have a liberty interest in her freedom to association and speech. See e.g., NAACP v. State of Ala. ex rel. Patterson, 357 U.S. 449, 460 (1958) ("It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech.").

Here, plaintiff argues that the Notice infringed upon a narrower liberty interest—her right to associate and speak in relation to her Title IX activity. Plaintiff's Memorandum In Opposition To The Garden City Community College Defendants' Motion For Summary Judgment Against Plaintiff Antonia Douglass (Doc. #273) filed November 18, 2022 at 118. According to plaintiff, defendants deprived her of this right by issuing the Notice without providing a clear avenue to challenge it. Id.

Here, the record shows that even after the Notice, plaintiff continued to associate and speak in relation to her Title IX activity. GCCC issued the Notice on April 25, 2018, but permitted

plaintiff to attend Board meetings—where she initially reported her Title IX concerns—and graduation.  Until August of 2018, plaintiff spoke with Title IX investigators/coordinators Ruda and Lamb "on a regular basis."  Plaintiff attended all Board meetings to track defendants' response to her Title IX report, and she continued to associate with other Title IX reporters—such as cheer student mother Eleanor Everett at the Board meeting on May 8, 2018.

Plaintiff has presented no evidence that the Notice affected her ability to associate and speak in relation to Title IX activity.  Plaintiff only presented evidence that because of the Notice, (1) she could not respond to a student's request for help in May of 2018 and (2) she could not attend various social events with friends.  Specifically, a student texted plaintiff for help because investigators were questioning her in her door room.  Plaintiff did not present evidence, however, about whether this incident related to Title IX activity.  Similarly, plaintiff has not presented evidence that the missed social events related to Title IX activity.  Because plaintiff has failed to establish that the Notice infringed upon her right of association and speech in relation to Title IX activity, the Notice did not implicate due process protections.  The Court therefore sustains defendants' motion for summary judgment on plaintiff's procedural due process claim.

## IV.    Title IX Retaliation

Plaintiff asserts that because she reported Title IX concerns to the Board on April 10, 2018, she suffered the following materially adverse actions: (1) GCCC issued and enforced the Notice; (2) GCCC subjected her to retaliatory harassment; (3) Trustees Wasinger and Douglass blamed her and other civil rights plaintiffs for GCCC's increased insurance premiums during Board meetings in June of 2020; and (4) the Trustees closed public comment sessions from February to

September of 2019.   GCCC argues that (1) plaintiff cannot establish a prima facie case of retaliation; (2) it had non-retaliatory reasons for its actions; and (3) plaintiff cannot establish pretext.

Title IX "prohibits retaliation against individuals because they have complained of sex discrimination." Hiatt v. Colo. Seminary, 858 F.3d 1307, 1315 (10th Cir. 2017) (citing Jackson v. Birmingham Bd. Of Educ., 544 U.S. 167, 183 (2005)).  Plaintiff can establish retaliation either with direct evidence of retaliation or indirectly by relying on the three-part McDonnell-Douglas framework.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 792 (1973); Hiatt, 858 F.3d at 1315 (applying McDonnell-Douglas framework to Title IX retaliation).

Under this framework, plaintiff must first establish a prima facie case of retaliation.  To do so under Title IX, plaintiff must show that (1) she engaged in protected activity; (2) defendant had knowledge of the protected activity; (3) materially adverse school-related action was taken against plaintiff; and (4) the protected activity caused the adverse action.  Tackett v. Univ. of Kan., 234 F. Supp. 3d 1100, 1109 (D. Kan. 2017).  A challenged action is materially adverse if it might dissuade a reasonable person from making or supporting a charge of discrimination.  See Burlington N. Santa Fe Ry Co. v. White, 548 U.S. 53, 68 (2006).  If plaintiff makes a prima facie case of retaliation, the burden shifts to defendant to articulate a legitimate nonretaliatory reason for the materially adverse action.  Hiatt, 858 F.3d at 1316.  If defendant satisfies this burden, plaintiff must show a genuine issue of material fact whether the proffered reason is pretextual.  Id.  To do this, plaintiff can show weakness, implausibility, inconsistency, incoherency or contradiction in defendant's proffered reasons.  Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997).

To trigger Title IX liability, a recipient must have actual notice through an appropriate person.  Escue v. N. Okla. Coll., 450 F.3d 1146, 1152 (10th Cir. 2006).  An appropriate person "is, at a minimum, an official of the recipient with authority to take corrective action to end the discrimination" or retaliation.  Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998).  GCCC does not argue that it lacked notice of the allegedly adverse actions.  For purposes of this analysis, the Court therefore presumes that GCCC had actual notice of its employees' actions.

GCCC concedes that plaintiff engaged in protected activity in reporting Title IX concerns on April 10, 2018.  GCCC argues that as a matter of law, however, plaintiff cannot establish a prima facie case of retaliation or that its legitimate nonretaliatory reasons were pretextual.

### A.    No Trespass Notice

Plaintiff alleges that GCCC retaliated against her for reporting Title IX concerns by issuing and enforcing the Notice.  GCCC does not contest that plaintiff engaged in protected activity when she reported Title IX concerns at a Board meeting on April 10, 2018 or that the Notice constitutes materially adverse action.   Instead, GCCC argues that plaintiff cannot establish (1) a causal connection between her protected activity and the Notice and (2) that its nonretaliatory reasons for issuing the Notice were pretextual.

### i.    Causation

GCCC argues that plaintiff cannot establish a causal connection between her protected activity and the Notice.  Under Title IX, plaintiff may demonstrate a causal connection "by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."  Meiners, 359 F.3d at 1231.  However, "unless the [adverse

action] is very closely connected in time to the protected activity, the plaintiff must rely on additional evidence beyond mere temporal proximity." Id.  A six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient.  Id.

Here, Dozier issued the Notice 15 days after plaintiff reported Title IX concerns to the Board.  For purposes of establishing a prima facie case through temporal proximity, plaintiff has presented sufficient evidence of a causal connection between her protected activity and the Notice. The Court therefore overrules defendants' motion on this ground.

### ii.    Nonretaliatory Reasons And Pretext

Because plaintiff has established a prima facie case, the burden shifts to GCCC to provide legitimate, nondiscriminatory reasons for the Notice.  See Berry v. Stevison Chevrolet, 74 F.3d 980, 986 (10th Cir. 1996).  GCCC argues that Dozier issued the Notice because he received a complaint that plaintiff had harassed Wenzel on campus and believed it was necessary and that Swender "had no involvement with" the Notice.  Garden City Community College Defendants' Motion For Summary Judgment Against Plaintiff Antonia Douglass (Doc. #269) filed November 16, 2022 at 35.  Because GCCC has offered legitimate, nondiscriminatory reasons for the Notice, plaintiff must show that the stated reasons are pretextual.

Plaintiff has presented evidence that (1) GCCC had never issued a no trespass notice to a community member before issuing hers on April 25, 2018; (2) Dozier performed a cursory and inadequate investigation into Wenzel's complaint about plaintiff; (3) Ratliff, plaintiff and her husband (three out of four of the people in the conversation with Wenzel) did not believe that

plaintiff had harassed Wenzel during the conversation; (4) Swender informed the Trustees about the Notice; (5) the day Dozier issued the Notice, plaintiff complained to Trustee Douglass that she believed the Notice was retaliatory and that she wanted GCCC to rescind it and the Trustees to investigate Dozier's decision to issue it; (6) the Trustees did not investigate the Notice; and (7) the Trustees and Swender did not rescind the Notice until July 27, 2018.  Viewing the evidence in the light most favorable to plaintiff, she has established a genuine issue of material fact whether GCCC's stated reasons for the Notice were pretextual.  The Court therefore overrules defendants' motion for summary judgment on this claim.

### B.      Retaliatory Harassment

Plaintiff alleges that GCCC retaliatorily harassed by ostracizing and intimidating her and adopting the Goheen report because of her Title IX report.  Pretrial Order (Doc. #224) filed September 22, 2022 at 26.  GCCC argues that plaintiff cannot establish (1) materially adverse action; (2) a causal connection between plaintiff's protected activity and the Trustee's decision to adopt the Goheen Report; and (3) that its nonretaliatory reasons for adopting the report were pretextual.

### i.      Materially Adverse Action

Retaliatory harassment, if sufficiently severe, may constitute adverse action for purposes of a retaliation claim.  Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1264 (10th Cir. 1998).  Acts that carry "a significant risk of humiliation [and] damage to reputation" may be considered adverse actions.  Id. (citing Annett v. Univ. of Kan., 371 F.3d 1233, 1239 (10th Cir. 2004)).  A materially adverse action is one that might dissuade a reasonable person from making or

supporting a charge of discrimination.  See Burlington, 548 U.S. at 68; Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d 1126, 1133 (10th Cir. 2010).  The Court must separate actions that are likely to deter victims of discrimination from engaging in protected activity, from "petty slights, minor annoyances, and simple lack of good manners" which do not create such deterrence. See Burlington, 548 U.S. at 68; Johnson v. Weld Cty., 594 F.3d 1202, 1216 (10th Cir. 2010). Deciding whether a recipient's actions are "materially adverse" is a case-specific exercise that requires an objective inquiry that does not turn on plaintiff's personal feelings.  Semsroth v. City of Wichita, 555 F.3d 1182, 1184–85 (10th Cir. 2009).

Plaintiff has presented evidence that (1) at a Board meeting in January of 2019, Trustee Martinez admitted spreading a rumor that plaintiff had slept with student athletes; (2) Martinez told her that President Swender had started this rumor; (3) Chandler told plaintiff that the rumor began circulating on April 10, 2018—the day plaintiff reported Title IX concerns; (4) plaintiff felt humiliated by this rumor and believes that it significantly damaged her reputation; (5) during the public comment session of a Board meeting in January of 2019, Dozier told the Board that he had personal complaints about plaintiff because she reported him for issuing the retaliatory Notice, pointed at her and was visibly angry; (6) in January of 2019, the Board adopted the Goheen Report, which republished the rumor; (7) the Goheen Report minimized plaintiff's Title IX report in an attempt to discredit her; and (8) in June of 2020, Ruda released a memo detailing GCCC's increased insurance premium and blamed civil rights plaintiffs with pending cases against GCCC—expressly naming plaintiff because she had filed suit against GCCC in February of 2020. Again, because GCCC has not put forth a contrary argument, the Court presumes that it had notice

of these actions.

A reasonable jury could conclude that GCCC's alleged retaliatory harassment was sufficiently severe to deter a reasonable person from making or supporting a charge of discrimination. The Court therefore overrules GCCC's motion for summary judgment on this ground.

### ii.    Causal Connection

Under Title IX, a plaintiff may demonstrate a causal connection through temporal proximity to a protected activity. Meiners, 359 F.3d at 1231. The Tenth Circuit has recognized that "a pattern of adverse . . . actions over a period of weeks or months may demonstrate" a retaliatory animus. Steele v. Kroenke Sports Enters., L.L.C., 264 F. App'x 735, 746 (10th Cir. 2008) (citing Marx v. Schnuck Mkts., Inc., 76 F.3d 324, 329 (10th Cir. 1996)); see also Hinds v. Sprint/United Mgmt. Co., 523 F.3d 1187, 1204–05 (10th Cir. 2008) (pattern of retaliatory conduct may provide temporal proximity sufficient to preclude summary judgment).

Here, the harassment by Swender and Martinez began the day plaintiff reported Title IX concerns to the Board, and Swender, Dozier and the Trustees continued to harass plaintiff though June of 2020—when Ruda sent his memo about liability insurance. Plaintiff has established a genuine issue of material fact whether the actions of Swender, Dozier and the Trustees demonstrate a pattern of adverse actions over the months after she reported Title IX concerns in April of 2018. For purposes of her prima facie case, plaintiff has presented sufficient evidence of a causal connection between her protected activity and the alleged harassment.

Because plaintiff has established a prima facie case, the burden shifts to defendant to

provide legitimate, nondiscriminatory reasons for the adverse action.  <u>Berry</u>, 74 F.3d at 986. GCCC argues that the Board adopted the Goheen Report pursuant to a fair vote.  Because it has not offered non-retaliatory reasons for all purported acts of harassment, the Court overrules GCCC's motion for summary judgment on this claim.

### C.      Board Meetings In June Of 2020

Plaintiff alleges that in retaliation for her Title IX reports, GCCC endorsed comments by Trustees Wasinger and Douglass at the Board meetings in June of 2020 that blamed plaintiff and other civil rights plaintiffs for the financial woes of GCCC.  GCCC argues that plaintiff cannot establish (1) materially adverse action and (2) a causal connection between plaintiff's protected activity and Wasinger and Douglass' comments at the Board meetings.

Once again, for an action to be sufficiently adverse, plaintiff must demonstrate that it would deter a reasonable person from making or supporting a charge of discrimination.  <u>See</u> <u>Burlington</u>, 548 U.S. at 68.  As discussed above, the Trustees' comments at the meetings in June of 2020 would not have chilled a person of ordinary firmness from continuing to engage in protected speech.  The Trustees generally discussed pending civil rights suits against GCCC but did not name plaintiff, and as a matter of law, such comments would not deter a reasonable person from engaging in protected activity.  The Court sustains defendants' motion for summary judgment on this claim.

### D.      Public Comment Session

Plaintiff alleges that in retaliation for her Title IX reports, the Trustees closed the public comment sessions of Board meetings from February to September of 2019.  GCCC argues that plaintiff cannot establish materially adverse action.  Again, as explained above, the Trustees'

decision to close the public comment sessions would not chill a person of ordinary firmness from continuing to engage in protected speech.  This decision did not carry a significant risk of humiliation or damage to reputation, or close all avenues to report Title IX concerns.  The Court concludes that as a matter of law, closing the public comment sessions would not deter a reasonable person from engaging in protected activity.  Accordingly, plaintiff has not established a genuine issue of material fact whether she suffered materially adverse action when the Trustees removed the public comment sessions from Board meetings for several months.  The Court sustains defendants' motion on this claim.

## V.      Section 1985(2) Conspiracy Claim

Plaintiff alleges that Wasinger and Douglass conspired to intimidate her in violation of 42 U.S.C. § 1985(2) when they blamed civil rights plaintiffs for the insurance premium increase at Board meetings in June of 2020.  Wasinger and Douglass argue that legislative immunity bars plaintiff's claim and that even if legislative immunity does not apply, plaintiff has not presented sufficient evidence of a conspiracy.

Section 1985(2) contains a deterrence provision, which "concerns intimidating parties, witnesses, or jurors in court so that they will not attend court or testify."  King v. Knoll, 399 F. Supp. 2d 1169, 1179 n.57 (D. Kan. 2005).  The "deterrence" provision of Section 1985(2) provides that "[i]f two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation,

-39-

against any one or more of the conspirators." 42 U.S.C. § 1985(2).  To establish a deterrence claim

under Section 1985(2), plaintiff must show (1) a conspiracy, (2) that defendants intended to deter

testimony by force or intimidation and (3) that plaintiff suffered injury.  Brever v. Rockwell Int'l

Corp., 40 F.3d 1119, 1126 (10th Cir. 1994).

Under the Supreme Court's functional test of absolute legislative immunity, whether

immunity attaches turns not on the official's identity, or even on the official's motive or intent, but

on the nature of the act in question.  See Bogan v. Scott–Harris, 523 U.S. 44, 54 (1998); Forrester

v. White, 484 U.S. 219, 224 (1988).  More specifically, legislative immunity shields an official

from liability if the act in question was undertaken "in the sphere of legitimate legislative activity."

Bogan, 523 U.S. at 54.  Local legislators, like their counterparts on the state and regional levels,

are entitled to absolute immunity for their legislative activities.  Id. at 49.

As a matter of law, Wasinger and Douglass argue that they are entitled to absolute

immunity for their comments at the Board meetings on June 9 and June 25, 2020 because the

Board was making decisions that impacted GCCC's budget.  Specifically, Wasinger and Douglass

stated that GCCC students and faculty and the Garden City community would feel the financial

effects of civil rights claims against GCCC.  These comments directly responded to a proposed

$494,000 increase to GCCC's annual insurance premium and deductible, and because of this

increase, the Board at least ratified Ruda's decision to eliminate 11 positions at GCCC.  Kansas

law authorizes the board to establish the GCCC budget and to affix employment decisions based

on the President's recommendation.  See K.S.A. § 71-201(5); K.S.A. § 71-612.

Funding choices are "discretionary, policymaking decision[s] implicating the budgetary

priorities of the [state] and the services the [state] provides." <u>Bogan</u>, 523 U.S. at 55–56; <u>see also</u> <u>Sable v. Myers</u>, 563 F.3d 1120, 1124–25 (10th Cir. 2009) (mayor's introduction of budget was legislative function because it was integral step in legislative process); <u>Burnett v. Fallin</u>, 785 F. App'x 546, 553 (10th Cir. 2019) (legislative immunity applies to "discretionary policy-making decisions that implicated budgetary priorities for the State"); <u>Almonte v. City of Long Beach</u>, 478 F.3d 100, 107 (2d Cir. 2007) (legislative immunity cloaks not only vote on budgetary resolutions, but discussions and agreements of Council members).  Because the comments by Wasinger and Douglass implicated the budgetary priorities for the state, the Court finds that as a matter of law, they are absolutely immune from suit for comments at the meetings in June of 2020.  The Court therefore sustains the motion for summary judgment of Wasinger and Douglass on this claim.

**IT IS THEREFORE ORDERED** that <u>Garden City Community College Defendants' Motion For Summary Judgment Against Plaintiff Antonia Douglass</u> (Doc. #268) filed November 16, 2022 is **SUSTAINED IN PART and OVERRULED IN PART**.  The Court sustains defendants' motion on plaintiff's (1) Section 1983 <u>Monell</u> claim against GCCC based on the comments by Trustees Wasinger and Douglass comments at the Board meetings in June of 2020, the Trustees' decision to close the public comment sessions of Board meetings, the Goheen Report and public disparagement (2) Section 1983 claims for retaliation based on the comments at Board meetings in June of 2020, the decision to close public comment sessions, Goheen Report and public disparagement (3) Section 1983 claims for conspiracy to retaliate in violation of the First Amendment regarding the comments at Board meetings in June of 2020 and the public comment sessions, (4) Section 1983 procedural due process claim and (5) Section 1985 claim.  As

to Knapp, the Court sustains defendants' motion on plaintiff's Section 1983 claim for First Amendment retaliation and conspiracy to retaliate in violation of the First Amendment.

The Court overrules defendants' motion on plaintiff's Section 1983 claims against Dozier, Swender and the Trustees for (1) First Amendment retaliation regarding the Notice and (2) conspiracy to retaliate in violation of the First Amendment by issuing and enforcing the Notice. As to GCCC, the Court also overrules defendants' motion on plaintiff's (1) Section 1983 Monell claims for the Notice and conspiracy to issue and enforce the Notice and (2) Title IX retaliation claims regarding the Notice and retaliatory harassment.

According, the following claims remain.  Under Section 1983, plaintiff alleges that: (1) Dozier, Swender and the Trustees violated plaintiff's First Amendment rights by issuing and enforcing the Notice in retaliation for plaintiff's protected speech on April 10, 2018; (2) GCCC is liable under Monell for the allegedly retaliatory Notice; (3) Dozier, Swender and the Trustees conspired to violate plaintiff's First Amendment rights by issuing and enforcing the Notice; and (4) GCCC is liable under Monell for the alleged conspiracy to retaliate through the Notice.  Under Title IX, plaintiff alleges that GCCC: (1) retaliated against plaintiff for her protected conduct on April 10, 2018 when it issued and enforced the Notice and (2) harassed plaintiff in retaliation for the same protected conduct.

Dated this 23rd day of January, 2023 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge